DEBORAH M. SMITH
Acting United States Attorney

SUSAN LINDQUIST
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Rm. 253
Anchorage, Alaska  99513-7567
Telephone: (907) 271-5071
Facsimile: (907) 271-2344
susan.lindquist@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CHANDLER D. CARTER<br><br>    Plaintiff,<br><br>  v.<br><br>NORMAN Y. MINETA<br>SECRETARY OF TRANSPORTATION,<br><br>    Defendants. | Case No. 3:04-cv-178-JKS<br><br>**DEFENDANT'S MOTION FOR<br>SUMMARY JUDGMENT** |

Norman Y. Mineta, through counsel,  moves pursuant to Fed. R. Civ. P. 56 for

summary judgment.  The two incidents at issue are whether two Federal Aviation

Administration's ("FAA's") employees discriminated against Chandler Carter ("Mr.

Carter") on the basis of age and sex when they found Verene Miller ("Ms. Miller")

qualified to bid for the position of Supervisory Aviation Safety Inspector (Operations),

Carter v. Mineta
3:04-cv-178-JKS

and whether Johnnie Wallace ("Mr. Wallace") discriminated against Mr. Carter on the

basis of sex and age when he selected Ms. Miller for the promotion.  Complaint ¶¶ 7, 8.

## FACTS

In 1998, John Duncan ("Mr. Duncan") became the manager of the Flight Standards

Division ("FSD"), and Kent Adams ("Mr. Adams") was his Assistant Manager.  AA 846.

As the FSD Assistant Manager, Mr. Adams supervised the three FS District Offices

("FSDOs") managers, including Mr. Wallace, the Acting Assistant Manager at the

Anchorage FSDO.  Ex. H at 735.  When Mr. Duncan arrived, the division was operating

autonomously and one of the established goals was to create a team by selecting new

managers with certain characteristics.  Ex. J at 838.  Mr. Duncan wanted supervisors who

were good leaders, who could bring the team together, who realized that there were

corporate responsibilities and who would hold the employees accountable.  Ex. J at 838.

Mr. Duncan had asked that as supervisor selections were made, that the selections be

discussed with him so that he could be assured that the individual selected as a supervisor

had the characteristics that he was looking for.  Ex. J at 838.  Mr. Duncan also worked to

get the Alaskan Region to establish a selection procedure which included panels of

evaluators.  Ex. Z at 273.

On May 10, 2000, the FAA advertised a vacant position for the Supervisory

Aviation Safety Inspector (Operations) FV-1825-K ("the position") at the Anchorage

FSDO, which is a second level supervisory position.  Ex. C at 351.  Sandy Bergin, a

Personnel Management Specialist for the Human Resources Department, published the vacancy announcement for the position at issue in this case. Ex. C at 339, 350-51. In the qualifications section, she had written that the applicant had to have a year of specialized experience in the next lower grade.

A week later she reviewed the announcement and was uncomfortable because she had overlooked some wording in the qualifications section of the announcement. Ex. C at 351. She felt that the "qualifications statement misrepresented the qualifications for the position . . . because it read one year of specialized experience at the next lower grade." Ex. C at 351. Ms. Bergin knew that in 1996 when the Office of Personnel Management instituted personnel reform, it changed the manner in which an employee could obtain the specialized experience required for a position. Ex. C at 352. Although a year of specialized experience was still required, it did not have to be in the position of the next lowest grade. During this week, another personnel specialist had told her that the union wanted the language changed in vacancy announcement. Ex. C at 354. As a result, Ms. Bergin amended the announcement to read that "the candidates must have one full year of specialized experience equivalent either to the grade 14 or pay band J" and republished it. Ex. C at 354-55; Ex. W. Mr. Carter does not believe that amending the vacancy announcement was discriminatory. Ex. K at 14.

Thereafter, Ms. Bergin reviewed all applications submitted to determine if the applicants met qualifications. Ex. C at 356. Ms. Miller applied for the position, but she

did not have a full year's experience in the next lower grade (FV 14), as a first line supervisor. But she had gained first and second level supervisory experience in private industry. Ex. C at 362; Ex. E at 534-35. Ms. Bergin could not determine if Ms. Miller's private supervisory experience at Lane Aviation was the equivalent of the specialized experience one would acquire in a FAA FV-14 supervisory position. Ex. C at 362. As a result, Ms. Bergin wanted a subject matter expert to determine if the supervisory experience in the private sector would qualify Ms. Miller for the position. Ex. C at 363. She had used a subject matter expert multiple times in her career, but more since 1996 when she started working for FAA. Ex. C at 340, 359-60.

A subject matter expert is someone who has experience in the technical aspects of a particular position. Ms. Bergin had a subject matter expert compare the application information about specialized experience with the position description at e next lower grade (FV-14) to determine if the specialized experience was equivalent to the next higher grade FV-K(15). Ex. C at 405-8.

Mr. Carter suggests that Ms. Bergin should have contacted the FAA Aviation Safety Inspector ("ASI") of Ms. Miller's former employer, Lane Aviation, to determine how complex the aviation operation was. Ex. C at 405. Ms. Bergin explained that she was evaluating an individual's job and not the product that the company produces. Ex. C at 406-8. If there is something in the application that needed to be clarified, Ms. Bergin would have called the applicant, and not the company where the applicant gained the

experience.  Ex. C at 411.  The FAA personnel division had never a FAA inspector about the complexity of a company for which an applicant had worked.  Ex. C at 405-8.

Ms. Bergin selected Bob Christensen to assist her.  Ex. C at 363.  She selected him because he had FAA supervisory experience and was now the Manager of the Technical Standard's Branch at the Regional Office, and he had also worked extensively in the private sector.  Ex. C at 363; Ex. E at 528.  Moreover, he had nothing to do with the selection process because he was not working within the Anchorage FSDO where the successful applicant would work.  Ex. C at 363.  Ms. Bergin knew Mr. Christensen from a class they had taken together and Ms. Bergin's predecessor had recommended him as a subject matter expert for Operations positions.  Ex. C at 363.

Ms. Bergin telephoned Mr. Christensen and he agreed to be the subject matter expert. Ex. C at 370.  As he was available immediately, she took Ms. Miller's application and the position description for a FV-14 position to him for evaluation.  Ex. C at 370-71.  She explained to Mr. Christensen that she needed him to determine whether the work Ms. Miller described in her position with Lane Aviation was equivalent to that of a FV-14 (first level) supervisor.  Ex. C at 373.  Ms. Bergin also explained the FV-K(15) (second level supervisor) at issue.  Ex. C at  373.  She stayed with Mr. Christensen while he went over the material and she recalls that he read through it several times.  Ex. C at 374.  Mr. Christensen went through the position description and some of the technical aspects of the ASI work.  Ex. C at 375.  Ms. Bergin perceived that Mr. Christensen felt very

comfortable that Ms. Miller's private experience was comparable. Ex. C at 375. Mr. Christensen had been a FV-4 unit supervisor for nine years and he determined that what Ms. Miller had done in private industry was exactly what he had been doing at a FV-14. Ex. E at 560. Mr. Christensen felt very comfortable that Ms. Miller's past experience was the equivalent of a FV-14 FAA position. Her experience as Chief Pilot was the equivalent of a first level supervisor and her experience as a Director of Operations was the equivalent of a second level supervisor. Ex. E at 534-35, 559-60. He only evaluated Ms. Miller's application.

At the time Mr. Christensen reviewed Ms. Miller's application, Mr. Christensen and Mr. Carter worked amicably together. Ex. A at 66-67. After the selection, Mr. Carter returned in September from two months of sick leave for shoulder surgery and he had already filed an EEO claim based on his non-selection. Ex. A at 67. Mr. Carter believes that Mr. Christensen treated him unfairly after he returned from surgery. Ex. A at 67. Mr. Christensen did not know about any EEO complaint until Mr. Carter told him about it when he was objecting to some decisions Mr. Christensen had made. Ex. E at 547.

Mr. Carter had never heard a comment that Mr. Christensen favored women over men or younger people over older people. Ex. K at 43. Mr. Carter concludes that Mr. Christensen intentionally erred when he concluded that Ms. Miller was qualified because Mr. Christensen was motivated to please Mr. Duncan, and that Mr. Christensen had heard that Mr. Duncan wanted Ms. Miller promoted. Mr. Christensen stated that no one

influenced his decision to qualify Ms. Miller.  Only twenty minutes had passed between the time he was asked to be a subject expert and he did the evaluation, so there was no time to get influenced by others.  Ex. E at 551.  Mr. Christensen said he never heard from Mr. Duncan or anyone else that Mr. Duncan wanted any particular person promoted.  Ex. E at 552.  In particular, he never heard that Mr. Duncan wanted Ms. Miller promoted.  Ex. E at 552-53.

Ms. Bergin made the final decision and decided that Ms. Miller was qualified to bid.  Ex. C at 376.  She felt very comfortable that from Ms. Miller's fourteen years of experience at Lane Aviation, that Ms. Miller had at least one year of specialized experience equivalent to a FV-14.  Ex. C at 377.  Mr. Carter opines that Ms. Bergin participated in the discrimination against him because she made errors in evaluating Ms. Miller's application.  He does not know if she did this because she favored women or younger individuals and he cannot say that she specifically discriminated against him. Ex. K at 20, 86-7.

Ms. Bergin found six applicants, including two women, qualified for the position and their names and applications were  forwarded to the chairman of the selection panel. Ex. C at 378-79; Ex. X.  Thereafter, the selection panel considered both the applications and the interviews, which had equal weight, and scored the applicants.  Ex. G at 678  The panel awarded Mr. Carter 4.1 points and Ms. Miller and Mr. Bown 3.9 points.  Ex. A at 37.  Mr. Carter does not claim that the panel discriminated against him.  Ex. K at 46.

The panel chairperson submitted three names, without scores, to Mr. Wallace and told him that Mr. Carter had the highest score, the other two candidates had the same score, and that all the scores were close.  Ex. H at 741, 748.  Mr. Wallace did not know that a subject expert had been used in the hiring process.  Ex. H at 775.  Mr Wallace knew both Mr. Carter and Ms. Miller and that personal knowledge played a role in his decision.  Ex. H at 749.  He wrote, "I am selecting Verene Miller based upon her previous industry experience as a manager, second level, communications, accountability and team player skills."  Ex. H at 755.  Mr. Wallace did not care about Ms. Miller's age or sex, as he was looking for the most qualified person.  Ex. H at 777.  He also did not know how old Ms. Miller was. 777.

Mr. Wallace had known Mr. Carter for many years and occasionally they would talk about retirement.  H at 773.  Mr. Wallace knew that Mr. Carter was interested in gun smithing.  Ex. H at 773.  Mr. Wallace discussed with Mr. Carter that Mr. Carter had many years in with the FAA and that retirement would be good.  Ex. H at 788.  Mr. Carter recalls two occasions, between March and July of 2000, when he believes Mr. Wallace told him something about retirement that Mr. Carter thought was insignificant at the time.  Ex. 28-29.  He had said something about needing to retire, getting too old for this, having enough money to do something else and that he should get away from all the problems.  Ex. K at 49.  According to Mr. Gerald Martelli, another FAA employee, Mr. Wallace told him about his conversation with Mr. Carter.  Mr. Martelli remembers that Mr. Wallace

did not say that Mr. Carter was too old, rather he said that he had a conversation with Mr. Carter about why he did not need all the grief, he was eligible to retire and he had the money he needed.  <u>Compare</u> Ex. T at 86 (Martelli)  <u>with</u> Ex. H at 789 (Wallace).  Mr. Martelli took the statement to mean "why does Tom need this grief with the job." and it appeared to him that this was a conversation between two people who had known one another for a long time and they were joking with one another.  Ex. T at 2.

Mr. Carter was eligible to retire in 1990 and he had discussed this with others on a regular basis.  Ex. K at 50.  Many people were aware that Mr. Carter was thinking of retiring.  Ex. K at 55.  He had had conversations about not wanting to retire while his wife was still working.  Ex. K at 56.  Mr. Wallace remembers conversations about retirement, but denies that he ever said Mr. Carter was "too old."  Ex. H at 788.

Just before the selection process, Mr. Carter had been accepted for a professional gun smithing school in Arizona and he and his wife had spoken to a real estate agent about selling their house.  Ex. A at 16.  They also had an agent looking for a house for them in Arizona.  Ex. A at 16.  But Mr. Carter told Mr. Wallace that if he was selected he would stay another two years.  Ex. K at 53.

The FAA tends to hire older people who are coming to the agency after careers in the military or private industry.  Ex. H at 774-75.  Most of the new people hired are older than 50 and some are close to 60 years old.  Ex. H at 774.  Some FAA employees at the time were 75 and 76 years old.  Ex. H at 775.  At the time of the selection in 2000, Mr.

Wallace, the selecting official was 58 years old (DOB 1942) and the three candidates

referred to him were Mr. Carter at 65 years old (1935), Ms. Miller at 59 years old (1941),

and Richard Bown at 57 years old (1943). Exs. L, M, N & Ex. A at 4. Mr. Carter

appeared to the judge at the EEO hearing as a youthful and vigorous man whose outward

appearance, demeanor and comportment did not suggest an aging employee. Ex. Q at 26.

Mr. Carter has no evidence that Mr. Wallace did not select him because he prefers women

over men. Ex. K at 50. But Mr. Carter believes that Mr. Wallace discriminated against

him on the basis of sex because Mr. Wallace was doing what Mr. Duncan wanted. Ex. K

at 90. He stated in deposition:

> I'm sorry, you  asked earlier if I thought that Johnnie Wallace had
> discriminated based on sex, and I said no on that
> answer.  But in reconsideration, I think I would
> change my answer and say yes.  He was doing what John
> Duncan wanted.
> Q   And you think John Duncan wanted to promote
> women?
> I can't say that.  I can say that he wanted
> to promote Verene Miller.  I don't know if there was
> any other females he wanted to promote or not.  He
> never mentioned any other females except Verene
> Miller.
> Q   So you believe that Johnnie Wallace, in
> selecting Verene, was doing it to please John Duncan?
> A   Yes, ma'am.

Ex. K at 95. Thus, Mr. Carter alleges that Mr. Wallace was pleasing the boss when he

selected Ms. Miller. Ex. K at 90. But Mr. Wallace had never heard Mr. Duncan indicate

to anyone that he wanted Ms. Miller promoted into a particular position. Ex. H 765, 785-

86.  He knew Mr. Duncan was pleased with some of her work, as he himself was.  Ex. H at 751, 771-72.

Mr. Carter's opinion that Mr. Duncan wanted Ms. Miller promoted stems from a statement he heard Mr. Duncan make when Mr. Carter was the selecting official for an entirely different hiring in May of 2000.  Although Mr. Carter was the selecting official, Mr. Wallace was involved in the process from start to finish because Mr. Carter was only an acting manager at the time and did not want to make the decision single-handedly.  Ex. K at 77-80;  Ex. A at 28.

Ms. Miller and another woman had applied and were ranked by the review panel in the middle of the field.  Ex. Y.  Mr. Carter selected Dave McGlothlen for the position from the list of 15 applicants, even though he was not the number one person on the list.  Ex. J at 856;  Ex. K at 80; Ex O at 2 # 7 & 8.  In making the selection, Mr. Carter considered his personal knowledge about the candidates.  Ex. K at 80.  After the selection was made, as was practice, Mr. Carter, as the selecting official, and Mr. Wallace met with Mr. Duncan and other managers to explain why Mr. McGlothlen. was selected.  Ex. K at 83. Mr. Wallace supported Mr. Carter's justification for Mr. Carter's selection.  Ex. K at 84-85.  Mr. Carter recalls that Mr. Duncan inquired about Ms. Miller and was surprised to find that she was in the middle of the group.  Mr. Carter stated that Mr. Duncan stated in front of Mr. Wallace and Mr. Carter that he wanted Ms. Miller promoted.  Ex. K at 16.

Mr. Duncan recalls that he may have expressed his surprise that Ms. Miller had not

done better in the ranking.  Ex. J at 857.  But Mr. Duncan accepted Mr. Carter's rationale

for his selection.  Ex. J at 856.  Mr. Duncan had discussed career advancement with Ms.

Miller, and other employees.  Ex. J at 852.  He recalls expressing his opinion about

working with her on various projects and receiving positive feedback about her abilities.

J at  840.  Mr. Duncan never told Mr. Wallace, Mr. Christensen, or anyone else that ever

wanted a certain person selected for a particular job.  Ex. J at 850-51, 865-67, 869, 871.

Mr. Jerry Paterson, an FAA supervisor, also stated that he heard Mr. Duncan state

that he would like to see Ms. Miller promoted as soon as possible.  Ex. D at 523.  Mr.

Duncan allegedly made this statement at a meeting with approximately six managers, but

Mr. Paterson could not recall who was there.  Ex. D at 523.  Mr. Paterson believes the

meeting was in late 1999 or early 2000.  Ex. D at 523.  Mr. Duncan does not recall saying

anything like that at a meeting.  Ex. J at 851.  He does recall that the managers discussed

individuals who had supervisory skills and Ms. Miller may have come up as well as other

employees.  Ex. J at 869.

After the selection of Mr. McGlothlen, Ms. Miller spoke to Mr. Carter about not

being selected and discovered that her experience was not clear enough on her application

because Mr. Carter had missed some of it.  Ex. F at 626; Ex. R at 2.  Mr. Carter

recommended that she re-write her application with emphasis on management experience.

Ex. R at 2.  He told her that the position he currently held in an acting capacity was going

to be bid out and that she should bid for it.  He told her that the bid was going to allow for

equivalency.  Ex. R.  Mr. Carter stated that if Ms. Miller were qualified to bid, he wanted to "make sure that she had the opportunity and submitted the best package possible."  Ex. R at 2.  Mr. Wedemeier suggested to Ms. Miller that if the application was not clear, then for the next selection she should make sure that she clearly described her experience.  Ex. F at 627.  Ms. Miller re-wrote her application and bid on the position.  She also performed better in her interview.  Ex. S.

Mr. Carter alleges that Ms. Miller should not have been selected for the supervisory position because on July 8, 1998, Ms. Miller, as an instructor pilot at the Anchorage FSDO, she received a pilot deviation because she was off course.  Ex. P.  The Fairbank's FSDO was assigned to investigate the deviation and issued a Letter of Correction to Ms. Miller.  Ex. P.  On the applications for the position there is no place to list any flying violations and the interviewers did not ask any questions about flying violations.  S. K  at 105.  Moreover, an applicant can have two violations and still qualify to bid for an FAA position.  Ex. U.  Lastly, the position was a supervisory position and the job duties did not include flying.  Ex. V & W.

## PROCEDURAL HISTORY

On August 24, 2000, Mr. Carter timely contacted an Equal Employment Opportunity ("EEO") counselor and on September 25, 2000, he filed a formal EEO Complaint.  The Complaint was investigated and Mr. Carter requested an EEO hearing which commenced on August 5, 2003.  Exs. A-J.  The Administrative Law Judge issued a

bench decision on August 21, 2003 and found that there had been no discrimination.  Ex.
Q.

## STANDARD OF REVIEW

Summary Judgment is appropriate when there "is no genuine issue as to any

material fact" and "the moving party is entitled to a judgment as a matter of law,"  F. R.

Civ. P. 56(C);  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party has

the burden of showing that there is no genuine dispute as to material fact.  Celotex, 477

U.S. at 323-35.  To withstand summary judgment, the non-moving party must establish

that there are genuine factual issues that may be reasonably resolved in favor of either

party.  California Architectural Building Products v. Franciscan Ceramics., Inc., 818 F.2d

1466 (9th Cir. 1987).  There is no genuine issue of material fact when the relevant

evidence in the record, taken as a whole, indicates that a reasonable fact finder could not

return a verdict for the non moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986).

## ANALYSIS

## I.    NO FAA EMPLOYEE DISCRIMINATED AGAINST MR. CARTER

Title VII prohibits discrimination in employment decisions on the basis of "race,

color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).  In disparate treatment

cases brought under Title VII, the complainant must establish a prima facie case of

discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  To

establish a prima facie case, he must show that he (1) belongs to a protected class; (2) was qualified for the position; (3) was subjected to adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.  Peterson v. Hewlett-Packard Co., 358 F.3d 599, 603 (9th Cir. 2004).

Any action that is "reasonably likely to deter employees from engaging in protected activity" is an adverse employment action.  Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir. 2000).  The action must be reasonably likely to deter either the charging party or other employees.  Vasquez v. County of Los Angeles, 349 F.3d 634, 646 (9th Cir. 2003).  The definition focuses on the deterrent effect of conduct on employees, not the severity or ultimate impact of the action.  Ray, 217 F.3d at 1243.  The Supreme Court has cited "hiring, firing, failing to promote, reassignment with significantly different responsibilities [and] a decision causing a significant change in benefits" as examples of adverse employment actions.  Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998).

If the complainant succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the illegal act. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).  The complainant then retains the opportunity to show that the employer's reason is pretext, that a discriminatory reason is more likely, or that the proffered explanation is unworthy

Carter v. Mineta
3:04-cv-178-JKS                              15

of belief.  Id.  The ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff.  Id.

The Age Discrimination in Employment Act ("ADEA") provides that it is

unlawful for an employer to fail or refuse to hire or to discharge any individual or

otherwise discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's age.  29 U.S.C. §

623(a)(1).  In O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996),the

Supreme Court altered slightly the framework for analyzing age discrimination claims by

allowing a prima facie case of age discrimination  to be made out by a plaintiff even

though both employees are over 40 and within the protected class.  In an ADEA case, the

Plaintiff must prove that age was a determinative factor in the employment decision.

Hazen Paper Co. v. Biggins, 507 U.S. 604, 610-11 (1993).

> 1.    Mr. Christensen and Ms. Bergin Did Not Discriminate Against Mr. Carter
>        Because His Application Was Not Before Them And There Is No Evidence
>        Of The Use Of Illegal Criteria In Evaluating Ms. Miller's Experience

Mr. Carter alleges that he was discriminated against on the basis of sex and age

when Ms. Bergin, with the assistance of Mr. Christensen, concluded that Ms. Miller was

qualified to bid for the position.  This allegation does not fit neatly into the McDonnell-

Douglas framework because only Ms. Miller had private experience that needed to be

evaluated to determine if it was the equivalent of a FAA FV-14 position.  There were no

similarly situated employees.  Therefore, Mr. Carter can not make out a prima facie case,

within the <u>McDonell-Douglas</u> framework.  Moreover, Mr. Carter cannot show that he received an adverse employment action because his application was approved on the basis that he had one year in grade.  The fact that he had an additional person to compete against is not an adverse employment action.

Even assuming that finding Ms. Miller qualified to bid was an adverse employment action, there are no other circumstances surrounding the adverse action which give rise to an inference of discrimination.  Ms. Bergin was not comparing applicants when she concluded that she needed a subject matter expert to assist her in evaluating one application.  Certainly Mr. Carter's age or sex had nothing to do with her decision.  She merely applied the personnel regulations and needed to have only Ms. Miller's private industry experience evaluated to determine if it was sufficient to equal the specialized experience an employee would acquire in an FAA FV-14 position.

Mr. Carter stated in his deposition that Ms. Bergin did not follow the correct procedures, but that he could not say that she discriminated against him.  Ex. K at 20.  Thus, there should be no issue at trial that Ms. Bergin did anything to discriminate against Mr. Carter.  Whether Ms. Bergin erred in concluding that Ms. Miller had the equivalent experience is simply immaterial to any issue in this case because any error was not motivated by illegal discrimination on the basis of age or sex.

Like Ms. Bergin, Mr. Christensen also was not comparing applicants.  There is no evidence that he even knew who the other applicants were, let alone their gender and

ages.  Mr. Christensen did not insert himself into the personnel decision, rather, Ms. Bergin independently selected him as the subject matter expert and he performed the task within twenty minutes of being asked.

Mr. Carter alleges that Mr. Christensen discriminated against him on the basis of sex because he knew Mr. Duncan wanted Ms. Miller promoted.  Mr. Christensen does not recall that he ever heard that Mr. Duncan wanted Ms. Miller or anyone else promoted, and there is no reason to disbelieve him.  He was not at the McGlothlen selection meeting when Mr. Carter heard Mr. Duncan speak about promoting Ms. Miller.  Ex. K at 82-3. He was only a member of the QMC meetings since March of 2000 and did not hear any comment from Mr. Duncan about Ms. Miller there.  Ex. E at 552.  There is no other evidence that he improperly favored Ms. Miller based on her age or gender.

Lastly, Mr. Carter, himself, encouraged Ms. Miller to bid for the position and he encouraged her to re-write her application to emphasize management.  She did both and with significant success as she made it past the panel's screening. Ex. S.

There is no colorable claim that these employees discriminated against Mr. Carter. There is no evidence that any alleged errors they made were done to promote Mr. Duncan's desires or because someone harbored negative thoughts about Mr. Carter's age or gender.  Ms. Bergin and Mr. Christensen were not comparing Mr. Carter to Ms. Miller. Mr. Carter fails to make a prima facie case of discrimination on this issue.

2.    Mr. Wallace Did Not Discriminate Against Mr. Carter When He Selected

Ms. Miller For the Position

When Mr. Wallace received three names and three applications to review to select the supervisor, Ms. Miller's qualifications were established.  Mr. Wallace could select any of the three candidates.  The panel chairperson told Mr. Wallace that Mr. Carter got the top score, that Ms. Miller and Mr. Bown had tied, and that all the scores were very close.  Ex. G at 681; Ex. H at 747.  Mr. Wallace did not select the top applicant, just as Mr. Carter had not selected the top candidate when he was the selecting official.

Mr. Carter alleges that Mr. Wallace selected Ms. Miller because he was discriminating against him on the basis of sex.  Mr. Carter presented  no evidence that Mr. Wallace favored women or spoke derogatorily about men.  In fact, Mr. Wallace had collaborated completely in a prior selection when Ms. Miller and another woman were ranked in the middle of 15 candidates, and neither was selected.  Mr. Wallace did nothing to promote her selection in that case.  He, together with Mr. Carter, selected a male applicant who was among the top applicants, but not the top.  Mr. Wallace clearly did not show favoritism towards women in that selection.

The only theory of discrimination on the basis of sex that Mr. Carter has is that Mr. Wallace selected Ms. Miller because he wanted to please Mr. Duncan.  Mr. Carter and Mr. Wallace were present when Mr. Duncan allegedly stated that he wanted Ms. Miller promoted.  Even if Mr. Duncan stated that, Mr. Wallace has no recollection of any statement.  He does recall Mr. Duncan speaking highly of Ms. Miller's skills, but he did

not recall any discussion about promotion.

There is also no evidence that Mr. Duncan was promoting Ms. Miller because of her gender, as opposed to her skills. There were other women vying for promotions because there were two on the May 2000 list of 15 candidates (Graham and Miller) and there were two who applied for the position at issue (Jokela and Miller). There is no pattern of practice of Mr. Duncan inserting himself into the selection process in order to promote women. There is, however, evidence that Mr. Duncan worked to make the selection process more fair by creating panels. He also required the selection officials to explain their choices. His aim was to build a team of supervisors with leadership skills.

There is virtually no evidence that Mr. Wallace treated women more favorably than men. But for arguments sake, even if Mr. Wallace did select Ms. Miller to please his boss, that is not discrimination on the basis of sex. It may be unfair, but it is not intentional discrimination on the basis of sex.

3.    Mr. Wallace Did Not Discriminate Against Mr. Carter on the Basis of Age

Mr. Wallace (DOB 1942) was 58 at the time he selected Ms. Miller (DOB 1941) over Mr. Carter (DOB 1935) and Mr. Bown (DOB 1943). Every player was middle aged and Mr. Wallace did not even select the youngest applicant, who was Mr. Bown.

Mr. Carter relies on conversations with Mr. Wallace about retirement to support his theory that Mr. Wallace selected Ms. Miller because she was younger. Mr. Carter had been eligible to retire for ten years before he applied for the promotion and had spoken

Carter v. Mineta
3:04-cv-178-JKS                              20

frequently with people about retirement.  At the time Mr. Wallace was the oldest manager in the FSDO, and Mr. Carter thought Mr. Wallace did not want any managers older than him, but he based this observation just on his experience in working with Mr. Wallace. Ex. K at 95.  Yet Ms. Miller is a little older than Mr. Wallace.

The crux of Mr. Carter's case for age discrimination, however , is that he recalls Mr. Wallace telling him in the summer of 2000 something like: "You are too old for this kind of stuff.  You have been around too long or a long time, and you need to retire.  Ex. K at 50.  Mr. Wallace remembers speaking with Mr. Carter about retirement, but he does not recall that he said Mr. Carter was too old.  Ex. K at 50.  Mr. Carter was in fact preparing to retire at the time, but he had also informed Mr. Wallace that he would stay two years if selected.  Thus retirement was a legitimate topic between Mr. Wallace and Mr. Carter.  Moreover, Mr. Wallace had no concern that Mr. Carter would not stay in the position.  Mr. Martelli viewed the retirement discussion as joking banter between long time colleagues.  It is a jump to state that prior conversations about retirement prove that Mr. Wallace was motivated by age to select Ms. Miller over Mr. Carter.

Mr. Wallace set forth a non-discriminatory reasons for his selection of Ms. Miller. He looked at the applications, the FAA experience, their skills and primarily at whether they would be a good team player.  He considered his prior knowledge of the candidates too.  Mr. Wallace was impressed with Ms. Miller's work in private industry because he had been in private industry and he knew that she had to have been a good communicator

and team player to make a business profitable. Ex. H at 750.  He recognized her

experience as a Director of Operations at Lane Aviation as supervisory experience at a

high level.  Ex. H at 756.  At Lane Aviation, she had set up a leasing program to make

aircraft available to both clients and her company.  Ex. H at 753.  Mr. Wallace considered

this innovative.  When she was working with Mr. Wallace, he felt that she kept him and

other supervisors well informed at all times.  Ex. H at 750.  She was working on two

programs: co-ordinating the training for all FAA FS employees in the Alaskan region and

the managing the FAA King Air (a type of aircraft) Program. She was a team player,

considered everyone in the office, and treated them fairly.  Ex. H at 759-60.  She had

gotten the King Air program back on track and expanded it to serve the Juneau and

Fairbanks FSDO's as well as the Anchorage FSDO.  Ex. H at 772.

Mr. Wallace had known Mr. Carter since 1978, a little less than twenty-five years.

Ex. H at 756.  He knew Mr. Carter had some higher level supervisory experience.  Mr.

Wallace felt that Ms. Miller had better communication skills than Mr. Carter because she

kept the managers informed.  Ex. H. at 758.  Mr. Wallace had less successful

communication with Mr. Carter and found that he had to follow-up and check the status

of projects that Mr. Carter was managing.

Mr. Wallace presented legitimate non-discriminatory reasons for his selection of

Ms. Miller.  Mr. Carter may argue that Ms. Miller should have been eliminated by virtue

of the fact that she had received a flying violation.  The position at issue was not a flying

position; it was a management position.  Neither the application nor the interviewers asked for information about flying violations.

Mr. Wallace selected Ms. Miller because she had extensive management experience and he had personally worked well with her.  There was no discrimination.

## CONCLUSION

There were three very qualified candidates for the position and Mr. Carter did not get the job.  But that does not make the selection illegal discrimination.

Mr. Carter presented no evidence that the individuals who decided that Ms. Miller's past experience was the equivalent of an FAA FV-14 employee discriminated against him on the basis of age.  Neither employee was comparing Ms. Miller to Mr. Carter.  Neither employee had expressed a dislike for older employees.  There is no evidence that Ms. Miller's gender had anything to do with Ms. Bergin's selection of Mr. Christensen as the subject matter expert.  He had been recommended to Ms. Bergin and he had ample private industry experience as well as experience at the FV-14 supervisory position.  Ms. Bergin asked Mr. Christensen to do a job and he did it right away.  Mr. Christensen did not even know who the other candidates were, let alone whether they were men or women or younger or older.  Mr. Carter's theory that everyone was supporting Ms. Miller to please Mr. Duncan has no evidentiary support.  Neither Ms. Bergin nor Mr. Christensen had heard Mr. Duncan state that he wanted Ms. Miller promoted.

Mr. Wallace did not discriminate against Mr. Carter on the basis of sex.  The only

Carter v. Mineta
3:04-cv-178-JKS                          23

evidence Mr. Carter presented was based on a comment Mr. Duncan made about wanting to promote Ms. Miller.  There is no evidence that Mr. Duncan expressed a desire to promote women in general.  Mr. Wallace does not remember hearing Mr. Duncan's comment, and more importantly, there is no evidence that even if he heard it he acted accordingly.  Actionable discrimination on the basis of gender has to be intentional.

Mr. Wallace did not discriminate against Mr. Carter on the basis of age.  Mr. Wallace, Ms. Miller, Mr. Carter, and Mr. Bown were all older employees, well into their 50's and beyond.  Mr. Wallace selected an individual older than him.   He never said anything derogatory about older employees and the conversations about retirement with Mr. Carter were simply natural given both of their ages and the known fact that Mr. Carter was preparing to retire.  In addition, they had been working with one another for almost 25 years and Mr. Martelli considered the comments about retirement to be jokes between two old friends.

Mr. Wallace presented many legitimate reasons for selecting Ms. Miller.  He reviewed her application and he had observed her work.  He simply felt that she was the best person for the job given the need for a team player.  To prevail, Mr. Carter would need to prove that Mr. Wallace's reasons are pretext, but there is no evidence of that.

For the foregoing reasons, the government asks the Court to grant it summary judgment.

Carter v. Mineta
3:04-cv-178-JKS                    24

Respectfully submitted, on January 30, 2006.

DEBORAH M. SMITH
Acting United States Attorney

s/ Susan J. Lindquist
Assistant U. S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-3378
Fax: (907) 271-2344
E-mail: susan.lindquist@usdoj.gov
AK #9008053

**CERTIFICATE OF SERVICE**

I hereby certify that on January 20, 2006,
a copy of the foregoing **DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT** was served
electronically on Hugh W. Fleischer.

s/ Susan J. Lindquist