82

```
 1                    P R O C E E D I N G S
 2         (On record at 9:24 a.m.)
 3         THE COURT:  This is August 6, 2003, we are on the record.
 4   Mr. Martelli, would you state your full name and spell your last
 5   name please?
 6         THE WITNESS:  My full name is Gerald Arthur Martelli,
 7   Junior.  The last name is spelled M-A-R-T-E-L-L-I.
 8         THE COURT:  All right sir.  You have been sworn in.  Mr.
 9   Fleischer will now examine you.
10         THE WITNESS:  Yes ma'am.
11                       GERALD MARTELLI, JR.
12   a witness, called for examination by counsel on behalf of the
13   Complainant, was duly sworn, examined and testified as follows:
14                         DIRECT EXAMINATION
15   BY MR. FLEISCHER:
16   Q     Yes, good morning Mr. Martelli.  This is Hugh Fleischer, I
17         represent Mr. Carter.  And how are you doing this morning
18         sir?
19   A     Not bad.
20   Q     Very well.  Are you employed at this time, Mr. Martelli?
21   A     Yes, I am.
22   Q     And in what capacity and by which Agency?
23   A     I'm employed by the Federal Aviation Administration,
24         Flight Standards, as the office manager for the Phoenix
25         Certificate Management Office in Phoenix, Arizona.
```

1 Q  I see. And prior to your position in Phoenix, Arizona
2    were you employed in Alaska?
3 A  Yes sir, I was.
4 Q  And for what period of time Mr. Martelli?
5 A  I believe I was hired in on the 21st of February 1995 as
6    an Inspector and I last departed Alaska the end of June
7    2002 if I'm not mistaken.
8 Q  All right. So you've been in Phoenix approximately a
9    year, a little bit more.
10 A  Yes sir, that is correct.
11 Q  Very well. Prior to your leaving for Phoenix and while
12    you were in Anchorage what was the last position that you
13    held before leaving the Anchorage, Alaska area?
14 A  The assistant manager for Air Worthiness at the Anchorage
15    Flight Standards District Office.
16 Q  And drawing your attention to the year 2000, or 1999 and
17    2000, you were in place at the FAA in Anchorage, is that
18    correct?
19 A  Yes sir, that's correct.
20 Q  All right. Are you familiar with Johnnie Wallace?
21 A  Yes, I am.
22 Q  And what do you -- what was his position during that time
23    of late '99 up to Spring of 2000 if you know?
24 A  As I recall sir he was the acting office manager for the
25    Anchorage FSDO.

84

| | | |
|---|---|---|
| 1 | Q | All right. Do you recall, Mr. Martelli, if you were ever in the presence of Mr. Wallace and my client, Tom Carter, where there was any discussion or statements by Mr. Wallace regarding Mr. Carter's age? |
| 5 | A | No sir, I do not recall any such conversation. |
| 6 | Q | Do you remember having given an affidavit regarding this case dated March 26th of 2001? |
| 8 | A | To be honest with you I can't really recall, there's been a lot that's transpired between then and now, but I very well may have. |
| 11 | Q | All right. It's not terribly long so let me just read this to you and see if this refreshes your recollection. The question was Complainant alleges his eligibility for retirement has been a subject of discussion with a number of people. He states that he recalls Johnnie Wallace made a comment to the effect that Complainant was too old for this kind of stuff and he needed to retire or similar words to that effect. Complainant states that you were present when Johnnie Wallace made this statement. He stated the comments were made between March and June of 2000. Do you recall this statement? And this is the response that you gave according to this affidavit. Quote..... |
| 24 | A | I recall the conversation with Johnnie Wallace but I do not recall Tom Carter being present. |

1  Q  Okay. Well let me just read this to you if I may.
2     Response is, and I quote, not exactly. I recall that
3     Johnnie Wallace made a statement to Tom that Tom was old
4     enough to retire and or Tom had enough money to do
5     something else. And one needs to understand the context
6     the remark was made in. It was made in the context of two
7     people who have known each other a long time. Johnnie
8     Wallace and Tom Carter go back a long way. They were both
9     hired in the FAA 20 years ago. From my perspective this
10    was the context of Johnnie's remark, two people talking
11    with each other who have known each other a long time. I
12    took Johnnie's statement to mean why does Tom need this
13    grief with the job. It appeared to me that they were
14    joking with each other. I can't recall the exact date
15    Johnnie made this statement but I think it was right
16    before the announcement for the position. And that was
17    what your affidavit of March 26, 2001 stated. Does that
18    in any way refresh your recollection, Mr. Martelli, as to
19    any such conversation?
20 A  It refreshes my recollection of the conversation between
21    Johnnie Wallace and I, however I do not recall Tom Carter
22    being present whenever that conversation took place. I
23    just recall Johnnie Wallace being there and making the
24    comment to me that he had had that conversation with Tom.
25 Q  Well, what do you remember about Mr. Wallace's statement

```
 1            about what he had said to Tom Carter?
 2      A     He told me that he had had a conversation with Tom about
 3            why do you need all this grief, you -- you know, you're
 4            eligible to retire, you've got the money that you need,
 5            you can just go do whatever you wanted to do from now on.
 6            And as I recall at that point Tom had told him he needed
 7            to know right away because he was going to a gunsmith
 8            school I believe in Colorado and that was going to start
 9            in the August timeframe and he needed to know so that he
10            could make plans accordingly.
11      Q     Do you.....
12      A     And that's really all I remember about it to be honest
13            with you.
14      Q     Okay.  And do you remember anything to the effect that Mr.
15            Wallace used the terms or anything approximating age or
16            being too old for the position?
17      A     I never heard that and I'll be honest with you, I would
18            highly doubt that Johnnie Wallace would ever make such a
19            comment.  But I never heard it myself.
20      Q     All right.  Let me ask you this Mr. Martelli.  You know
21            Tom Carter as well, do you not?
22      A     Yes, I do.
23      Q     All right.  The question has come up as to whether Mr.
24            Carter is a team player insofar as his work with the FAA.
25            Do you have any experience in which Mr. Carter may have on
```

1         his own volition worked with your office in terms of
2         dealing with your employees while you were working there?
3    A    While I was at the Anchorage office prior to Tom Carter
4         taking the temporary detail as the assistant manager for
5         Operations I actually had very little interaction with Tom
6         Carter at the Region. I hope that answers your question.
7    Q    Was there a time when that changed in any way?
8    A    Well, when Tom came down to the office on that detail as
9         the assistant manager for Operations we worked pretty well
10        and pretty close together. I don't think that the
11        timeframe was all that long, but we did work together
12        pretty close.
13   Q    And during that period did you believe that Mr. Carter was
14        a team player?
15   A    I had no reason to believe otherwise.
16   Q    I see. All right, thank you.
17        MR. FLEISCHER: I have no further questions of Mr.
18   Martelli at this time.
19        THE COURT: All right. Thank you. Mr. Martelli, Ms.
20   Jones for the Agency will now be questioning you.
21        THE WITNESS: Yes ma'am.
22                      **CROSS EXAMINATION**
23   BY MS. JONES:
24   Q    Mr. Martelli, this is Cheryl Jones.
25   A    Good morning.

1  Q    Good morning.  We were just discussing, you were with Mr.
2       Fleischer about Tom Carter being a team player.
3       Apparently Mr. Wallace -- you indi -- you also indicated
4       that out at the FSDO Mr. Wallace had said something to Mr.
5       Carter with regard to why would you need all this grief.
6       Do you know what type of grief Mr. Wallace was referring
7       to?
8  A    Well, the office was in a fair amount of turmoil at the
9       time.  And I believe it goes much further back and
10      probably not really related to this, and it had -- really
11      had nothing to do with the manager, just that there were
12      union issues and management issues in the office and the
13      size of the office being such that it was very difficult
14      for management to properly oversee the day to day
15      operations of the office and deal with all the personnel
16      issues.  So someone had made the decision to restructure
17      the office with two assistant managers, one for Air
18      Worthiness and one for Operations.  And I will tell you
19      from my own experience at that point it was a lot of work,
20      it was emotionally taxing to deal with those personnel
21      issues, and not to mention the normal day to day aviation
22      business that we had to deal with.  So there was a lot of
23      stress involved.
24 Q    In your opinion from working with Johnnie Wallace how --
25      can you tell how -- tell us how well he handled the

| | | |
|---|---|---|
| 1 | | situation out there at the Anchorage FSDO? |
| 2 | A | Prior to the restructuring with the two assistant managers |
| 3 | | that they brought in I believe that Johnnie was at a point |
| 4 | | where he was simply overwhelmed by the sheer magnitude of |
| 5 | | the work that was going on there. |
| 6 | Q | And with the addition of the two section supervisors or |
| 7 | | the assistant manager for Air Worthiness and the assistant |
| 8 | | manager for Operations, did that help the situation? |
| 9 | A | Tremendously. You're talking about a huge chunk of work |
| 10 | | and now you're cutting it up into three pieces, dividing |
| 11 | | it out, rather than one person having the whole thing |
| 12 | | trying to deal with it. A huge difference I think. |
| 13 | Q | If someone made the statement that because there was so |
| 14 | | much to do out there that Johnnie Wallace had a difficult |
| 15 | | time making decisions or -- would that be a fair |
| 16 | | statement? |
| 17 | A | I don't think that it's a fair statement to say that a -- |
| 18 | | he had difficulty making decisions because of the amount |
| 19 | | of work. I think it would be a fair statement to say that |
| 20 | | he had a difficult time making decisions because of the |
| 21 | | sheer volume that had to come in there that you have to |
| 22 | | deal with. And it just takes time to get through all |
| 23 | | those issues. |
| 24 | Q | And if that were the case would you have chosen to go |
| 25 | | around Mr. Wallace and just get things done leaving him |

```
 1        out of the loop?
 2   A    You would have to understand my background.  I was in the
 3        Army for nearly 23 years or actually just over 22 years on
 4        active duty.  Served a year in combat, two years with the
 5        middle east peacekeeping forces and -- in Egypt, another
 6        year in Korea and some other assignments.  I would never,
 7        I would never circumvent my superior in any manner.  If I
 8        had to make a decision or take some action that I could
 9        not go directly to my superior they would be -- that
10        person would be the very next one to know as soon as that
11        had taken place and my reasons for having gone around them
12        and not directly to them.  Does that make sense?
13   Q    Yes, I understand you completely.  I don't have any
14        further questions for you Mr. Martelli.
15        THE COURT:  All right.  Is there any redirect Mr.
16   Fleischer?
17        MR. FLEISCHER:  One moment please Your Honor.
18        (Whispered conversation)
19                      REDIRECT EXAMINATION
20   BY MR. FLEISCHER:
21   Q    Given the situation -- this is Hugh Fleischer again, Mr.
22        Martelli.
23   A    Yes sir.
24   Q    Given the situation that you've described in answering
25        questions from Ms. Jones and the ob -- as you say, the
```

| | | |
|---|---|---|
| 1 | | sheer magnitude of difficulties in problems and projects |
| 2 | | that Mr. Wallace was facing, did you feel that you and Mr. |
| 3 | | Carter were able to adequately deal with the problems in |
| 4 | | your respective shops notwithstanding the Wallace |
| 5 | | circumstance? |
| 6 | A | I feel like that when Tom Carter and I came on board in |
| 7 | | those two details that there was a huge improvement in the |
| 8 | | flow of work and the decision making because those tasks |
| 9 | | were now cut up into pieces and appropriately assigned to |
| 10 | | either Tom or myself. That's not to say that it was |
| 11 | | absolutely perfect, but it was a huge change. |
| 12 | Q | And did those issues that you were working on with -- in |
| 13 | | conjunction with Mr. Carter include issues that were not |
| 14 | | necessarily within the purview of Johnnie Wallace? |
| 15 | A | I don't believe I understand that question. |
| 16 | Q | Well, were there projects that you and Mr. Carter worked |
| 17 | | on that were not -- did not involve Mr. Wallace? |
| 18 | A | Well, as the office manager they would have to involve |
| 19 | | Johnnie Wallace in some fashion. He was the responsible |
| 20 | | party and so he would have to be made aware at some point |
| 21 | | of everything that was going on there. Because ultimately |
| 22 | | he's responsible -- or was at that time for everything |
| 23 | | that took place in that office. |
| 24 | | (Whispered conversation) |
| 25 | Q | But were there in fact issues that both you and Mr. Carter |

```
 1        were able to deal with on your own authority and that did
 2        not require a review or any other action by Mr. Wallace?
 3   A    Oh, absolutely.  Now I couldn't tell you specifically
 4        which ones they were, but there are countless day to day
 5        activities that Tom Carter and I dealt with in our
 6        respective unit sections, or parts of the office if you
 7        will, that really didn't require any input or oversight
 8        from Johnnie Wallace other than at some point I would
 9        probably make him aware of what I had done.  But not
10        necessarily to seek approval for up front.
11   Q    Do you know of any issues that Mr. Carter dealt with that
12        should have gone to Johnny Wallace but that Mr. Carter did
13        not take to Mr. Wallace?
14   A    I'm not aware of any.
15   Q    Very well.  I have no further questions of Mr. Martelli at
16        this time.  Thank you sir.
17   A    Yes sir.
18        THE COURT:  All right.  Mr. Martelli, thank you very much
19   sir.
20        THE WITNESS:  Yes ma'am.
21        THE COURT:  I am sure based on the comments of the parties
22   here with me that their best hopes and thoughts are with you in
23   regards to the health of your wife.
24        THE WITNESS:  Thank you very much.
25        THE COURT:  And we are off the record now.  Thank you.
```

```
1          THE WITNESS:  Yes ma'am.
2          THE REPORTER:  Off the record.
3          (Off record at 9:42 a.m.)
4          (On record at 10:10 a.m.)
5          THE REPORTER:  We're on the record.
6          THE COURT:  All right, we're on the record.  First of all,
7     the -- Mr. Fleischer, I'll make you -- I'll allow you to make
8     your motion regarding your Exhibit 1 at pages 93 through 95.
9          MR. FLEISCHER:  Well, we would like to begin the Exhibit,
10    Your Honor, with pages 90 and 91, as well as the pages you
11    mentioned.
12         THE COURT:  All right.  Page 90 or 91?
13         MR. FLEISCHER:  Ninety, 91 -- 90 through page 103 -- 104.
14    103, excuse me.  Ninety through page 103.
15         THE COURT:  All right.  And that is Complainant's Exhibit
16    1 at pages.....
17         MR. FLEISCHER:  It's from Complainant's Exhibit 1 and we
18    would reoffer those pages as an Exhibit on the basis of the fact
19    that it goes to the specific question of the deviation and
20    violation by Ms. Verene Miller that was the subject of testimony
21    by Mr. Carter in cross examination of the Agency of Mr. Carter
22    about the particulars of that deviation.  And this deviation
23    report goes directly to that issue and specifically
24    substantiates the statements by Mr. Carter.  And we would ask
25    that that be introduced.
```