1  have any other questions for you.  We're off the record.

2       THE REPORTER:  Off the record.

3       (Off record at 3:15 p.m.)

4       (On record at 3:30 p.m.)

5       THE REPORTER:  We're on the record.

6       THE COURT:  Mr. Wedemeier, I'll have you stand so I can

7  swear you in.  Raise your right hand.

8       (Oath administered)

9       MR. WEDEMEIER:  I do.

10                    **ROBERT WEDEMEIER**

11  a witness, called for examination by counsel on behalf of the

12  Agency, was duly sworn, examined and testified as follows:

13       THE COURT:  All right.  Thank you, please be seated.  Tell

14  us your full name and spell your last name please.

15       THE WITNESS:  Robert G. Wedemeier, W-E-D-E-M-E-I-E-R.

16       THE COURT:  All right.  Sir, the attorneys will be asking

17  questions of you, I may have some questions for you as well.  If

18  you do not understand a question please ask that it be clarified

19  or repeated.

20       THE WITNESS:  Thank you.

21       THE COURT:  Thank you.  You may inquire.

22                    **DIRECT EXAMINATION**

23  BY MS. JONES:

24  Q    Mr. Wedemeier, do you currently work for the Federal

25       Aviation Administration?

Exhibit  F

1  A    I do.

2  Q    And what position do you hold?

3  A    I hold the position of advisory to the Director of Flight

4       Standards service for labor management relations.

5  Q    And what level of position is that?  Is there a particular

6       band or GS level that goes with that?

7  A    J band.

8  Q    And where is this position located?

9  A    It's located at headquarters building in Washington, D.C.

10 Q    And how long have you held that position?

11 A    I have to think for a moment.  Approximately two and a

12      half years.

13 Q    So you went into that job in January of 2001?

14 A    February 15, 2001.  Before that I was on detail to the

15      position for a couple of months while we did national

16      negotiations.

17 Q    And what position did you hold with the FAA prior to that?

18 A    Prior to that I was assigned to the Alaska Region, Flight

19      Standard Service, where I was the senior management

20      consultant to the Division Manager.

21 Q    And how long did you hold that position?

22 A    In -- from 1996 to the time that I went to Washington,

23      D.C. with the other position.

24 Q    During the time that you held this senior management

25      consultant for the Alaska Region Flight Standards what

```
 1        managers did you work for?
 2   A    I worked for -- administratively I was under the control
 3        of the 210 branch manager but I worked directly with the
 4        Division Manager, with the branch managers and the
 5        headquarters office.  Additionally I had direct contact
 6        with the FSDO managers and the supervisors.
 7   Q    Who -- what was the name of your supervisor?
 8   A    When I first came in it was Kris Conquergood.  If I'm not
 9        mistaken.
10   Q    And.....
11   A    Then Naomi Christensen followed.
12   Q    And who -- during your time period as the senior
13        management consultant who was the Division Manager?
14   A    The Division Manager, the initial Division Manager was
15        Richard Gordon followed by John Duncan.
16   Q    And then under the Division Manager was there an Assistant
17        Division Manager?
18   A    That's correct.  And Kent Adams was the person for that
19        period of time.
20   Q    Would Naomi Christensen have reported to Kent Adams?
21   A    If I'm not mistaken she would.  All branch managers
22        reported to the deputy.
23   Q    And the deputy was?
24   A    Kent Adams.
25   Q    Prior to being the Senior Management Consultant for Flight
```

1         Standards Alaska Region what did you do?

2     A   I spent eight years in Human Resource management in the --

3         as branch manager for the organizational effectiveness

4         branch which did Regional training along with management

5         consulting.

6     Q   And prior to working with the HR department -- and that

7         was here in the Alaska Region?

8     A   Here in the Alaska Region.

9     Q   Prior to doing that what did you do?

10    A   I was the training officer for Bureau of Land Management,

11        Alaska Region, and the single organizational development

12        specialist for BLM Alaska.

13    Q   And prior to working for BLM what did you do?

14    A   I was the Senior Customs Officer, the Department of

15        Treasury, dealing with marine enforcement activities.  And

16        air cargo activities at the airport.  You're taking me a

17        long way back.

18    Q   Okay.  Bringing you back to the time period involved in

19        this particular case, which would have been '99 -- 1999

20        and the year 2000.

21    A   Okay.

22    Q   Were you serving as the Senior Management Consultant in

23        Flight Standards here in the Alaska Region?

24    A   That's correct.

25    Q   What duties did you have and responsibilities in that

1    position?

2  A  When I came over I took responsibilities for the OTNA

3    which was -- the OTNA training program which was the --

4    which was basically operational needs, training needs

5    assessment program which was fairly new to Flight

6    Standards nationally and to the Region as a whole.  And I

7    did organizational development work plus I did labor

8    relations.  To include employee relations as liaison and

9    to include EEO activities as the liaison with the Office

10    of Civil Rights for Flight Standards.

11  Q  And did you do any meeting facilitation type work when

12    you.....

13  A  Part of the organizational development skills that I had

14    as meeting management and facilitation as the -- as the

15    management facilitator I -- from '96 when I came on board

16    with Mr. Gordon through John Duncan I facilitated the

17    quality management team meetings for the Division Manager.

18    And if I'm -- if my memory hold true I was almost 90 -- I

19    attended almost 90 percent of those that were scheduled.

20  Q  And that's during the entire time you were serving as the

21    Senior Management Consultant in Flight Standards, '96 to

22    when you left for D.C?

23  A  '96 until when I left.  That's correct.

24  Q  As a facilitator for these QMC meetings did the managers

25    in Flight Standards ever -- well, and let's take that

1       back.  Typically who was it that attended the QMC

2       meetings, what managers?

3  A   QMC meetings were attended by the Division Manager, by the

4       deputy, by the division branch managers here at the

5       Regional Office and by the three FSDO managers, Anchorage,

6       Fairbanks and Juneau.

7  Q   If you can think back to say October of '99 through August

8       of 2000, in that time period.  Who would the Division

9       Manager have been that attended these meetings?

10  A   The Division Manager whether it was -- at that period of

11      time would have been Kent Adams as a couple times as

12      acting Division Manager and it would have been John

13      Duncan.  If my memory serves me right.  I'm fuzzy on when

14      Dick Gordon exactly left.

15  Q   Okay.  And you indicated that the deputy would have

16      attended.  Would that have been -- during this time

17      period.....

18  A   That's correct.  Kent Adams would have been acting in the

19      ab -- would have been in the absence of the Division

20      Manager.

21  Q   And if the Division Manager were present would Kent Adams

22      have then attended as the deputy?

23  A   That's correct.

24  Q   The branch managers in late '99 or -- and early 2000,

25      which people, and if you can give me the names, would have

1      been?

2   A   I can, I just have to go down.  Jerry Paterson was in 230,

3      Chris Conker -- no, it'd be Naomi Christensen if I'm not

4      mistaken for the 210 branch, 230, 210.  Rick Girard who

5      was a special assistant also attended those meetings.  And

6      I'm drawing a blank on the other players.

7   Q   So you.....

8   A   210, 230, Rick Girard for special assistant.

9   Q   Was there an international manager that worked in.....

10  A   There was, Chuck Lund.  And Chuck Lund was initially on

11     the QMC but then the decision was made when they did a

12     little bit of reorganization that he would be taken off of

13     that.

14  Q   Okay.  The FSDO managers then, which FSDO manager served

15     by name that would have been involved?

16  A   Larry Darwopple from Fairbanks, Terry Gordon from Juneau

17     and at various times Ike Borgen was there and his deputy

18     was John Copenhaver.  John attended quite a few times when

19     there was a void of leadership at the Anchorage FSDO.

20  Q   Do you recall if Johnnie Wallace ever attended those for

21     the Anchorage FSDO?

22  A   Yes, you're -- thank you for refreshing me.  Johnnie

23     Wallace also attended and from time to time, if I'm not

24     mistaken, Johnnie had also represented Jerry Paterson at

25     the QMC at least one time.  But then when he went out to

1        the Anchorage FSDO Johnnie as the acting FSDO manager

2        attended when there was a vacancy.

3   Q    So while Johnnie Wallace was out there as -- do you know

4        whether Johnnie Wallace became the assistant FSDO manager

5        at the Anchorage FSDO?

6   A    I -- yes, I know that he made -- he was the assistant.  He

7        was also the -- he was also left as acting manager for a

8        period of time.

9   Q    And would this been around the 1999, 2000 timeframe that

10        Johnnie Wallace was serving as the acting manager of the

11        Anchorage FSDO?

12  A    That would be correct.

13  Q    So would it have been Johnnie Wallace that attended the

14        QMC's rather than John Copenhaver?

15  A    They -- Johnnie Wallace would have been prime, but again

16        when you talk at scheduling and you talk about leave and

17        you talk about other priorities there's going to be times

18        when -- one or the other was there.  The key for QMC was

19        that each FSDO had a management presence that could speak

20        for the FSDO.

21  Q    At these QMC meetings were there ever any discussions

22        concerning the development or promotion of specific

23        individuals by name?

24  A    No.

25  Q    Did John Duncan ever state during one of these QMC

1     meetings that he wanted Verene Miller promoted as soon as

2     possible?

3  A    That never occurred, when I was present.

4  Q    Why do you feel that way?

5  A    John Duncan has stated to me professionally that he had to

6     make selections of the people who were going to do the

7     best work for the organization. And it wasn't a case of

8     being a -- you know, a fishing buddy or somebody you would

9     socialize with, that he just would not -- he put the needs

10     -- and he wanted to be very clear on that in the

11     conversations that he had with me, that it was the best

12     fit of the individual to get the mission of the

13     organization done.

14  Q    So you never heard while you were facilitating these QMC

15     meetings John Duncan say that he wanted Verene Miller

16     promoted as soon as possible.

17  A    That's correct. But the piece that makes that story

18     implausible to me is that the QMC also had a union

19     presence and that the past Regional Business Agent was a

20     member of the committee. And here was a union source and

21     we did not discuss management decisions on personnel in

22     that forum.

23  Q    So in that forum you wouldn't have discussed who was

24     applying for a particular job or who had just recently

25     been selected for a particular job?

1    A    What -- yes, what you would have is an announcement of the

2         selection -- selecting official's decision, but you would

3         not have a discussion of personnel policies or practices

4         at that point in time because you had a union presence

5         there, it was inappropriate for that discussion to be

6         held.

7    Q    Did you ever feel yourself that in working with the

8         managers in Flight Standards that John Duncan wanted

9         anyone in particular promoted?

10   A    No.  What I heard from John Duncan was he wanted people to

11        be competitive, put their hat in the ring and to go

12        through the process of applying if they wished to get

13        promoted.  Be competitive.

14   Q    Did you ever hear anyone say that John Duncan wanted --

15        anyone else other than Mr. Duncan say that John Duncan

16        wanted Verene Miller promoted as soon as possible?

17   A    I have never heard that said.

18   Q    Did you ever hear Kent Adams indicate -- you yourself or

19        from anyone else that Kent Adams wanted anyone in

20        particular promoted as soon as possible?

21   A    No.  That's -- that is not something that either Kent or

22        John Duncan would use.  It was not a request that would be

23        made.

24   Q    When a selecting official initially makes the decision to

25        -- in the Flight Standards Division makes a decision about

1        whom he wants to select for a particular position, what

2        role did John Duncan plan in that, if any, with regard to

3        the supervisors and managers of Flight Standards?

4   A    John Duncan has always been clear that the selecting

5        officer is the selecting officer.  He's also been clear

6        that when it comes to management positions that he likes

7        to have a discussion with the selecting official to go

8        over the reasons and the rationale for the selection.  He

9        has -- in conversations that I have been a party to, has

10       been clear that the authority rests with the selecting

11       official, but as the selecting official's boss, quote,

12       unquote, he just wants to know how that decision was

13       arrived at.

14  Q    Were you present at any of these discussions wherein a

15       selecting official would relate to Mr. Duncan the reasons

16       for the selection they were making?

17  A    Yes I was, I was present when Dave McGlothlen was selected

18       off of a list for a promotion to supervisor and Johnnie

19       Wallace I think was present in the room along with Tom

20       Carter and the presentation was made to Mr. Duncan and Mr.

21       Adams and myself being in the room, and I can't think of

22       who else was there, about the selection that was going to

23       be made of Dave McGlothlen and the rationale for why of

24       the candidates that were presented why that selection was

25       the most meritorious.

1   Q    I am going to hand you a document and ask that it be --

2        hold on one second, (indiscernible) few others first.

3   A    These tables are so.....

4   Q    And ask you if you have seen this particular document

5        while you were working here.

6        THE COURT:  All right.  Would you identify it?  I think

7   it's in the record, is it not?

8        MS. JONES:  This is one of the ones that I am uncertain

9   of, Your Honor.  And if it's in it's in in this complete format.

10       THE COURT:  All right.  Then let's mark it.  And that's

11  Agency's Exhibit then.....

12       MS. JONES:  A.....

13       THE COURT:  .....26.

14       MS. JONES:  Six.  That's what I would have.

15  MS. JONES RESUMES:

16  A    Yes, I have seen this document.

17  Q    Okay.  Could you go ahead and identify what this document

18       is?

19  A    This document is a merit promotion plan certificate of

20       qualified applicants.  It gives the less -- it gives a

21       listing of those people who have been through a -- what I

22       would call a rating and ranking process by -- that takes a

23       look at knowledge, skills and abilities and experience and

24       are found to be, as it says in sta -- in section one, well

25       qualified candidates from which a selection can be made.

1      These say has not been ranked, but there was a select --

2      there was a ranking process that went to it.  The other

3      piece of.....

4  Q   Before you.....

5  A   Yes.

6  Q   .....before you go further, this is a certificate of

7      qualified candidates for the Dave McGlothlen selection?

8      Is that correct, this was for the position that Dave

9      McGlothlen received as a Unit Supervisor?

10 A   That's correct.

11 Q   And is this the selection about which you indicated you

12     were present during a discussion that explained the

13     rationale to Mr. Duncan?

14 A   That's correct.

15 Q   And who was the selecting official in this case?

16 A   If I'm not mistaken the person who made the selection in

17     this particular case was Tom Carter.

18 Q   If you look on the front, the first page, did Tom Carter

19     sign this as the selecting official?

20 A   That's correct.

21     MS. JONES:  I would like to ask that this be admitted into

22 evidence.

23     THE COURT:  Any objections?

24     MR. FLEISCHER:  Well, I have this voir dire question if I

25 may.  Mr. Wedemeier, you indicated that the candidates listed

1    here were ranked.  That doesn't appear in this document through,

2    the ranking itself does not appear in the document, is that

3    correct?

4        THE WITNESS:  It's not on the certificate, there is

5    another document that came out of the selection panel process

6    that did rank them.  You're correct, I was incorrect on that,

7    there is no rating and ranking on this one but it does show in

8    alphabetical order that these people were found on the first

9    part of the process to be well qualified candidates.  If you

10   turn to section two you will also find additional candidates who

11   are marked as well can -- well qualified candidates.  So you

12   have here the total universe from which a selection could

13   possibly be made.

14       MR. FLEISCHER:  Okay.  Well, I would ask that the document

15   that -- the related document of the ranking be added to make it

16   a complete Exhibit Your Honor.

17       MS. JONES:  I believe that's at A-13.  And I will have him

18   talk about that too.

19       THE COURT:  All right.

20       MR. FLEISCHER:  Very well.

21       THE COURT:  A-26 is admitted.  And.....

22                              (Agency Exhibit A-26 admitted)

23       MR. FLEISCHER:  No objection Your Honor.

24       THE COURT:  ....let's make sure that C-15 has been

25   admitted.  There was -- I had reserved ruling on that, Mr.

1   Fleischer had moved for C-15 to be admitted, it will be

2   admitted.

3                    (Complainant Exhibit C-15 admitted)

4        MR. FLEISCHER:  Thank you.

5   MS. JONES RESUMES:

6   Q   And Mr. Wedemeier, I'm also going to hand to you another

7        Exhibit.  This is in the record of investigation at tab A

8        -- well, actually it's Exhibit A-13.  Mr. Wedemeier, did

9        -- if you take a minute and look over this document and

10       let me know if you had -- at the time you were here in the

11       Alaska Region had you had a chance to see this document?

12  A   I did have a chance to see this document as part of my

13       responsibilities to labor management relations.  Because

14       this particular infor -- this particular memorandum

15       outlines evaluation panel results and how the scoring was

16       done and that we'd had some union issues that had impacted

17       the panel results and that the chairman of the panel, and

18       I think if I'm not mistaken John Madden had had to do some

19       adjustments of the numerical score because of how the

20       union members of the panel had done their thing, had

21       voted, or had -- voted's not quite the right word, but how

22       they had rated and ranked.

23       MS. JONES:  I'd like to ask that Agency Exhibit A-13 be

24  admitted.

25       THE COURT:  Any objections?

1          MR. FLEISCHER:  No objection.

2          THE COURT:  It's admitted.

3     MS. JONES RESUMES:

4     Q    Mr. Wedemeier, when did you first -- and you don't have to

5          give me an exact date, but some rela -- give some sort of

6          a timeline.  When did you first become aware of the issue

7          and was that prior to the actual meeting that you

8          attended?

9     A    I was aware and saw this on -- probably on 5/19, this

10         memorandum.  And I don't remember exactly -- Tom signed --

11         Mr. Carter signed out the -- on 5/23.  And I -- and we

12         have another -- along with the merits MPP there's also the

13         memorandum that states the reasons for the selection.  And

14         that was the meeting where this was discussed.  So I was

15         aware of this because the concerns on the rating and

16         ranking union panel members had come to a head.  The panel

17         chair had discussed how he was going to level the playing

18         field for all candidates who were in the process and to

19         assure there was a fair and equitable method of

20         evaluating.

21    Q    So your meeting -- if you look at the justification

22         statement that Tom Carter signed on May 23rd.  This

23         indicates the actual decision that -- of Dave McGlothlen

24         being selected.  Would your meeting have taken place

25         before or after this?  It looks like it's the recommended

1      decision from Tom Carter, there's a signature John and

2      R.G.  Do you know who the John would have referred to?

3      Maybe.....

4   A  I'm sorry, I'm lost.

5   Q  Okay.  Look at the last page.

6      MR. FLEISCHER:  Last page of?

7   Q  Of.....

8      MR. FLEISCHER:  Twenty-six or.....

9   Q  A-26.  It -- yes.

10  A  This one.

11  Q  Of this Exhibit, yes.  And it's a memorandum dated.....

12  A  Right.

13  Q  .....May 23rd.  If you look at the bottom where it's

14     signed, it indicates that Tom Carter signed it and there

15     are two other initials I think.  Do you recognize those

16     initials?

17  A  One looks like John Duncan's.

18  Q  John Duncan or would that be John.....

19  A  Or Johnnie Wallace.

20  Q  And the R.G. would have been?

21  A  That would have been -- that would have probably been

22     during that period -- I don't remember when Rick Girard

23     went out as acting and headed up the FSDO.  That could

24     have been Rick Girard.

25  Q  Okay.  Now we've discussed a meeting where Tom Carter was

1  explaining his rationale for wanting to select Dave

2  McGlothlen.  With -- in the presence of Johnnie Wallace,

3  John Duncan, yourself and Kent Adams.  Would that

4  discussion have taken place before or after May 23rd?

5 A That would have taken -- that should have taken place

6  prior to the Division Manager's signature on 5/25.

7 Q Okay.  So.....

8 Q And the purpose of that at that stage, and let me try to

9  clarify, the decision on who was hired was delegated to

10  the person who made the selection.  This was not a -- this

11  was -- explain the rationale, talk about how you made your

12  decision, connect the dots on why you're doing what you're

13  doing.  But the selecting officer was Tom Carter.

14 Q Okay.  So your discussion took place prior to the 25th and

15  after 5/19.

16 A That's correct as far as I can see the paperwork.

17 Q Would -- noting that Mr. Duncan signed it on 5/25, would

18  the applicants -- the folks up here that applied for the

19  job, would they have been informed that they did not make

20  it before or after 5/25?

21 A I would look at it that the courtesy -- the courtesy stop,

22  the audit function, the signature of John Duncan is --

23  really concludes and puts the imprimatur on the selection.

24  So that the people then are -- would then be told that

25  either they received the job or they did not.  Normal

1     process is that you always tell the people who went

2     through the application process and the interview process

3     what their status is.  Before the general announcement is

4     made.  It's a courtesy that we try to do.

5  Q  So would this have occurred after 5/25?

6  A  That would be my assumption.

7  Q  Back to the discussion that was held wherein Mr. Carter

8     was explaining that he would like to select Dave

9     McGlothlen to everyone, was there any kind of interchange

10    between the people at this meeting?

11 A  There was an interchange and I was at the meeting as a

12    technical advisor to Mr. Duncan.  I was there because of

13    the union issues with the interview panel and the method

14    on how the interview panel was re-scored and how it came

15    out with the different rankings based upon the results of

16    the five panel members.

17 Q  Did Mr. Carter select the top ranked person for this job?

18 A  The top ranked person for this job was not selected, Mr.

19    Kobelnyk.

20 Q  Were there any discussions because Mr. Carter wasn't

21    selecting the top ranked official?

22 A  There was a general discussion taking a look at the final

23    panel results.  And it was noted that there was a break in

24    the panel scores at 100.  And it was commented on that

25    that was a natural break.  The scores ranged from 144 to

1          100, from 100, number nine on down, it was fairly -- you

2          know, it was fairly obvious that there was a numerical

3          differentiation on the -- from the ranking panel's

4          perspective.  I guess where I look at it, that the ranking

5          panel is an aid and a tool to the selecting officer.  The

6          selecting officer is not bound by that because on this

7          list of candidates they are found to be qualified.  So in

8          theory you can select anyplace on that list.  I made the

9          comment at that meeting that it was interesting to me or

10         instructive to me that from 100 points and up there were

11         at least two women candidates who made that selection and

12         that I thought that it was a well qualified diverse pool

13         from which to make a selection.  And that was just an

14         observation of the split.  And the reason I made that

15         observation is when you look at the first panel and you

16         see where the union panel members had heavily rated that

17         it looks different.  It looks different.

18    Q    So you indicated that you made the comment from 100 points

19         up there were two women.  What happened after you made

20         that particular comment?

21    A    Well, that was just an observation to talk about the pool

22         and the fact that the pool was a good universe from which

23         to select.

24    Q    The pool meaning....

25    A    One hundred and above.  That that was a natural break and

1      that was an observation that I made.  In my period of time

2      -- I have approximately 20 years of experience in the HR

3      field, I've sat on many rating and ranking panels, I have

4      done the hard work -- hard HR work and I know that when

5      you look at the results of the panel that these numbers

6      can give you a clue as to who the -- I want to say -- best

7      is probably not the right descriptor, but the most highly

8      qualified candidates are.  So when you look at this

9      particular list and you see the split, that numerical

10     thing, that numerical break is important from my

11     perspective.

12  Q  So was there then any specific discussions about the

13     candidates that were from 100 to -- which I guess would be

14     Verene Miller up through 144, George Kobelnyk?

15  A  There was no discussion of that, what -- if I remember

16     correctly Mr. Carter went through his memorandum and went

17     through his thought processes that he'd outlined in the

18     backup memorandum that is dated May 23rd that explains his

19     rationale for the selecting of David McGlothlen.  And that

20     was the issue.  The issue came down to that final

21     paragraph that Mr. McGlothlen was the best qualified

22     candidate based upon his 12 years management experience in

23     industry and acting supervisory experience within the FAA

24     and his extensive experience in both -- in both parts 135

25     and part 121 operations.

1   Q    So in your opinion then from listening to this

2        conversation did Mr. Carter consider both Mr. McGlothlen's

3        experience as an ASI as well as his private industry

4        experience?

5   A    From what's in the memorandum I would say yes.

6   Q    Did John Duncan himself say anything about the candidates

7        that were from 100 above, including the two women.....

8   A    Other.....

9   Q    .....that you mentioned?

10  A    Other than -- I don't recollect other than my observation

11       that I made at that point.  And I think as technical

12       advisor to the Division Manager that was my role was to

13       say what I was seeing.  There wa -- the next stage of that

14       went to Mr. Carter and Mr. Wallace, actually Mr. Wallace

15       helped to make the presentation because the FSDO manager

16       again, the courtesy stop is to make sure that all the

17       management people are in alignment and have an

18       understanding for the basis for the selection.

19  Q    Did Mr. Duncan say anything about wanting Verene Miller

20       promoted as soon as possible during this meeting?

21  A    Unequivocally that was never discussed at that meeting.

22  Q    Do you remember if he said anything about Verene Miller?

23  A    The only issue I -- that I can -- I have in the back of my

24       mind is that -- some comment to the effect that I -- that

25       Mr. Duncan would -- had felt that both Anne Graham and

1       Verene Miller should have come out a little higher, he was

2       expecting them to be a little bit more competitive, a

3       little more competitive in the process.

4    Q  Did you have an opportunity to discuss this particular

5       selection of Dave McGlothlen for the Unit Supervisor

6       position with Verene Miller?

7    A  I did.  And the conver.....

8    Q  Before you get into it, do you remember if that then would

9       have been after May 25th that you had this discussion?

10   A  Yes.  By.....

11   Q  Okay.  Go ahead and let us.....

12   A  By the time I had the discussion the announcement had been

13      formally made and Verene came up and talked with me.  I

14      worked extensively with Verene as Training Program Manager

15      so I was very comfortable in doing that.  I have served as

16      a sounding board and kind of a coach for folks who are

17      doing job applications, taking a look at their development

18      to see how they can improve what -- where they're going.

19      And so in that light Verene came to me and talked about

20      the fact that she was disappointed and the fact that she

21      did not get the job for which she had applied.  And at

22      that point I said, you know, I'm sorry that you weren't

23      selected.  I mean I knew at that time that she hadn't been

24      and it was announced.  And she said -- I said, you know,

25      when you go through -- actually the discussion stands out

1    in my mind.  Because I told her, I said, you know, I've
2    got 41 years of experience in this business, there's been
3    jobs I've been selected for, there's been jobs that I
4    haven't been selected for, and there's always a residual
5    hurt that goes when you're not found to be selected.  So I
6    said Verene, have you gone and have you talked to -- Tom
7    was the selecting officer, I said have you gone and gotten
8    some feedback from Tom as to what's the rationale for --
9    or what -- not the rationale, but what can she do
10    differently or better next time to make sure that she's
11    competitive for the position.  And her comments to me
12    were, yes, I did have a conversation.  When I talked with
13    Mr. Carter he stated that he had looked at her resume, she
14    did not have the requisite 121 experience that he was
15    looking for and did not have the supervisory or management
16    experience that he was looking for.  And Verene said I
17    challenge that and I pulled my application package which
18    she'd kept a copy of and I went through it.  And when she
19    was done she said Wheatie, you know what I was told, I was
20    told oh jeez, I must have missed that in the application
21    process because when you pointed it out it's there.  Now,
22    remembering this is Verene and I talking and that's from
23    her standpoint.  So I again talked with Verene and I said
24    well, if your application doesn't clearly state what you
25    have done in your experience in your career, for the next

1        one you need to make sure that you have clearly described

2        your experience, your second level managerial experience

3        in industry, and to make sure that you -- your 121

4        experience, that you point it out to Mr. Carter that you

5        had would be there.  And we left it at that.

6  Q    You indicated that you worked with Verene Miller closely

7        in the Training Program Manager.  Do you know in your work

8        with Verene as well as the managers in Flight Standards if

9        she was highly thought of?

10  A    I know in working with her on the technical training

11       program that Verene -- from -- handled the Operations side

12       of the house, the piloting.  That she was well versed in

13       the process for identifying the technical training needs

14       and represented the FSDO extremely well in our annual

15       process where we consolidated all the training requests in

16       the Region and took a look at what was going forward to

17       AFS-500 for final approval and to match with dollars.

18  Q    With regard to training, is there a -- do you know whether

19       or not Verene served as the Training Program Manager out

20       at the Anchorage FSDO?

21  A    She did, she served as Training Program Manager for the

22       Ops side of the house.  We had Sylvia Vialla who served as

23       -- for the Airworthiness side of the house.  So we had two

24       program managers, one in each specialty that monitored

25       training.

1  Q   How does training get allocated?  When you were here in
2      the Alaska Region how did training get allocated to a
3      particular employee?

4  A   If I may, I would rather go back and talk about the
5      changes in the training program and build this up.
6      Training in 1993 nationwide in Flight Standards was a
7      tremendous problem.  We had training going to probably not
8      the inspectors who needed it as much, it was operationally
9      essential, it didn't get viewed as operationally
10     essential.  In '93 we put in together the OTNA,
11     Operationally -- Operation -- Operationally -- Operational
12     Training Needs Analysis program.  It was excellent.  You
13     know, you can remember the acronym, you can't remember
14     what they stand for.  The OTNA process took particularly
15     expensive flight program courses and set up a hierarchy on
16     who could go and who could not go.  And that within those
17     flight courses if you -- or the Airworthiness side of the
18     house, any of the courses for which you did not meet the
19     prerequisites, you either didn't have the right skills,
20     the right aircraft that you needed, if the aircraft
21     changes and you needed some program changes you would be
22     eligible.  You met the prerequisites and then you could go
23     to the training course when dollars and budget came
24     together.  The problem was that when you looked at some of
25     the training courses you wanted folks to get ready for

1      them.   And when you did that they didn't have the

2      prerequisites.   So the OTNA training program, the OTNA

3      process, had a waiver provision and that waiver provision

4      would have to go not just to -- from the FSDO manager to

5      the Region, but on up to AFS-500 who would make the final

6      determination if we would waive the requirements and send

7      a person to training that was normally not within their

8      purview.

9  Q   Okay.   In Flight Standards then in trying to put together

10     a training plan for the employees, exactly -- not exactly,

11     but generally how is that done?

12     THE COURT:   Let me interrupt.   I don't find that the --

13  that we require any testimony regarding Ms. Miller's involvement

14  as the Training Program Manager.   I'm satisfied that that's been

15  covered appropriately.

16  Q   Okay.   Do you know then in your work with the managers in

17     Flight Standards if Verene Miller was -- what opinion they

18     had of her?

19  A   The opinion from the training standpoint, and I can quote

20     John Copenhaver, was extremely favorable for the work that

21     she had done with the OTNA process and with the training

22     at -- the training management activities at the Anchorage

23     FSDO.   In the 4040 program, which is the flight training

24     portion of which she was also responsible, John Duncan had

25     reflected to me in an open forum that he felt that he --

1    that with Verene out there monitoring and managing the

2    4040 program that it had the credibility that he needed to

3    make sure that that operation was working successfully.

4    Part and parcel of that, if my memory is correct, is the

5    4040 program, the flight program, was originally in 230

6    branch and I think handled by Bill Missal and then it was

7    transferred out to the FSDO to be run and Verene Miller I

8    think was the first person that was assigned against it

9    but I could be a little incorrect in that.

10  Q    Have you -- did you know and have worked with Jerry

11        Paterson?

12  A    Jerry Paterson was the 230 branch manager, so I have

13        worked issues with Jerry not only to help him design some

14        strategies within his branch but also as a member of the

15        QMC.

16  Q    So you've attended some of the same meetings then with

17        Jerry Paterson.

18  A    On occasion I have been in the same area with Jerry, same

19        meetings.  Hunter guide came -- comes up to mind as an

20        example of a meeting that I attended with him.

21  Q    Well, you indicated that you facilitated meetings for the

22        QMC.  When you indi -- when you say that does that mean

23        you were there in attendance the whole time?

24  A    When you're facilitating you are there and in attendance

25        for the whole time.

1    Q    And Jerry Paterson attended some of those meetings?

2    A    Jerry Paterson probably attended 80 to 90 percent in his

3         capacity as branch manager.

4    Q    Did you ever have any occasion to learn whether Jerry

5         Paterson had the same opinion of what was said as you for

6         a meeting that you both attended?

7    A    I facilitated the hunter guide discussion at the QMC.  It

8         was a particularly high visibility headquarters,

9         Washington headquarters involvement process, extremely

10        important to the center and the Congressmen and to the

11        industry as a whole.  And I facilitated that, we had the

12        direction that was agreed upon to go and I was -- about

13        two or three weeks after the meeting coming back and

14        working with Jerry I found that he had taken a little

15        different tact on what he thought he had heard in that

16        particular discussion.  And I talked to him about what I

17        had heard from being there and I reviewed a couple of my

18        notes that I had and it still didn't work and we had to

19        kind of pull in some other players to get it back on

20        track.  And that was just from the process of the

21        direction that had been set at the QMC for how this

22        particular hunter guide issue was going to be coordinated,

23        worked and marketed to headquarters and to the industry.

24   Q    So you're saying that Jerry's take on what was said and

25        yours were different?

1   A    They were different.

2        MS. JONES:  I don't believe that I have any further

3   questions at this particular time.

4        THE COURT:  All right.  Cross examination?

5        MR. FLEISCHER:  Thank you.

6                    **CROSS EXAMINATION**

7   BY MR. FLEISCHER:

8   Q    Mr. Wedemeier, I'd like to show you from the ROI, it's

9        under tab F-19, otherwise known as the application of

10       Verene Miller, show you this page.  It appears to list

11       yourself as a reference for Ms. Miller, is that correct?

12  A    That is correct.

13  Q    Yeah.  And how is it that you were a reference for Ms.

14       Miller?

15  A    I am -- I was a reference on that, Verene asked me to be

16       used as a reference, I said based upon my work with her as

17       her -- as the Training Program Manager I was happy to give

18       her a reference.

19  Q    And that was on her application for the subject position

20       that's an issues in this matter, that being the

21       Supervisory Aviation Safety Inspector's position that she

22       obtained.

23  A    I didn't see the rest of that, I have not seen that

24       application.

25  Q    Oh.  You didn't know that she was making that application?

1    A    No, I did not know that she was making that -- I didn't

2          know that -- I did not know that -- I had not seen the

3          application that I'm reference to.

4    Q    Oh, is that right.

5    A    That's correct.  She didn't share with me what she was

6          submitting.

7    Q    So she never advised you nor did you otherwise know that

8          she had applied for the.....

9    A    No, that wasn't what I said.  I said that she had asked me

10         if she could use me as a reference.  So that I knew that

11         she had applied, I did not know the specifics of her

12         application.

13   Q    Okay.  All right.

14   A    Did I answer -- I mean.....

15   Q    Yeah, I....

16   A    Okay, because I was.....

17   Q    I understand.

18   A    Okay.

19   Q    I understand.  Now let me ask you this, Mr. Wedemeier.

20         From  -- going back to 2000, starting on or about the

21         first of January up through April or early May were you in

22         attendance at each and every QMC meeting or did you have

23         some times when you had to have a substitute or had to

24         have some acting person on your behalf?

25   A    I think as I testified to from the period of 1996 on

1      through that I attended approximately 80 to 90 percent of

2      the QMC's.  At that particular time if I had leave or I

3      was out on travel status then somebody else would fill in

4      for me.

5   Q  And it's a fact that there were occasions when you were

6      out on travel status or otherwise not available to go to

7      the QMC meetings.

8   A  That's correct.

9   Q  Yeah.

10  A  QMC was also moved around to the FSDO's.  Besides it

11     wasn't just done at the headquarters, so they would have

12     it in Juneau and Fairbanks and so at those times if it --

13     if our schedules didn't mesh I had to either find a

14     substitute or they self facilitated.

15  Q  Now wasn't -- during the time of those meetings though

16     wasn't Rick Girard working at the FSDO?

17  A  Rick Girard went out from his air space job as special

18     assistant, the AVN job, out to the FSDO and was acting

19     during a period of months there while they were filling

20     the vacancy, yes.  The specific -- I'd have to refresh

21     myself on the specific timeframes.

22  Q  And while he was in fact acting as -- in the FSDO capacity

23     was he in attendance at those meetings or not?

24  A  Yes, but he was also in attendance in his other capacity

25     as special assistant for -- and attended in that capacity.

```
 1   Q   All right.  On the meeting that you indicated that you
 2       attended after the position that Ms. Miller did not get in
 3       May of 2000 you indicated that the meeting included John
 4       Duncan as well as Kent Adams as well as Johnnie Wallace?
 5   A   That's correct.
 6   Q   And Tom Carter of course.  And yourself?
 7   A   Correct.
 8   Q   Was there anyone else there?
 9   A   No one else that I can recall.  There may have been, but I
10       don't believe so.
11   Q   Were you within the hearing of what everyone was saying at
12       all points in time in the course of that meeting?
13   A   In that -- I was in the room at the round -- sitting off
14       from the roundtable and I was with -- I was within -- I
15       could hear whatever was going on in that room.  Okay.
16   Q   And you did hear Mr. Duncan say that he was surprised by
17       the fact that Verene Miller and this Ms. Graham had not
18       ranked higher, Anne Graham?
19   A   That's correct.
20   Q   But you're certain that there was no further statement
21       made in regard to Ms. Miller other than that?
22   A   I am certain of that.
23   Q   Okay.  Did you hear from any other quarter any statements
24       attributed to John Duncan to the effect that he wanted
25       Verene Miller promoted as soon as possible?
```

```
 1   A    I have never heard that statement.

 2   Q    And you were here through 2000, here at the.....

 3   A    2001.....

 4   Q    .....Anchorage Region?

 5   A    2001, February if I'm not mistaken.

 6   Q    Were you familiar with the process that the interviewing

 7        panel used in making the recommendation, final

 8        recommendation to the selecting official in the position

 9        that's set out in Exhibit A-13?  Which -- excuse me.  And

10        that was the.....

11   A    Mr. Fleischer.....

12   Q    .....Supervisory Aviation.....

13   A    Oh, good.

14   Q    .....Safety Inspector, Operations position.

15   A    I am familiar with this document and this memo that

16        captures it.  I'm familiar with the process that was being

17        used be -- with the problem that we had with the scoring

18        because I had discussions with John Madden on that same

19        subject because of.....

20   Q    Right, the union.....

21   A    .....of the union implications.

22   Q    Yeah.  I understand.  Okay.  Well, what was your

23        understanding as to the specific criteria, the specific

24        standards that that interviewing panel used in coming up

25        with the ranking that they did in the first instance as
```

1      well as the -- and, of course as you say, you adjusted

2      them for leveling the playing field essentially.

3  A   I did not adjust them.

4  Q   But that was adjusted.

5  A   It was adjusted by the panel chairman, John Madden.

6  Q   Right.

7  A   And that was designed to level the playing field for all

8      the candidates who went through.

9  Q   Okay.  But other than the union problem what was the

10     nature of the specific criteria and standard that the

11     panel used in making the ranking that they did make in

12     that case, if you know sir?

13  A  I do not know that, I would not get into that level.  That

14     was the purview and the leadership provided by John

15     Madden.  I mean I wouldn't go into the -- to how -- what

16     questions were used, I would not go into how you would

17     score those questions.  Those things would be handled by

18     the panel as a -- this is a tool in the process for making

19     a selection.  It is still the selecting officer's

20     responsibility to choose from that list.

21  Q  Was it your -- based on your vast experience though in

22     working with employee relations and so on was it your

23     specific understanding, Mr. Wedemeier, that there was a

24     common theme among those selections that were under at

25     least the same Division Manager as to how persons in

1       comparable positions are being selected?

2    A  Do we have a selecting process, is that what you're

3       asking?

4    Q  Well, was there essentially kind of a uniform means of

5       making those selections under the FSDO, under the -- under

6       this particular area for supervisory positions?

7    A  You've got to help me with your question.

8    Q  Okay.  Well, my question is simply when this panel met and

9       made their decision regarding persons that were to be

10      selected -- or recommended to the selecting official, they

11      used some system or plan or some means for making that

12      recommendation.

13   A  An accredited plan of some kind.

14   Q  An accredited plan of some kind, yes.  Did -- was it your

15      understanding that whatever that accredited plan was that

16      was being employed here for this position was being also

17      employed in other supervisory positions that were held at

18      the same general period?

19   A  I don't know of any other selections that were made during

20      that same general period.

21   Q  Well, what about the selection that was made in August of

22      2000 regarding the Supervisory Aviation Safety Inspector?

23   A  Okay.  If that's your -- if that's your period the process

24      -- the process that was designed with this, as designed by

25      the panel, it's my understanding that the panel with its

1      chairman comes together, they take a look at the positions

2      that is to be filled, they design the questions in the

3      areas that they're going to ask in.  And they make their

4      determination as what that -- what I would call an

5      accrediting plan would look like.  Is that helpful?

6   Q   Well, yes.

7   A   I mean helpful from the standpoint of understanding.

8   Q   And is that all in conjunction with the -- with HR

9      Department?

10   A   That would be in conjunction with advice from the HR

11      Department, it would be -- it would -- certainly from my

12      frame of reference require that the FSDO manager have a

13      discussion with these people who are doing the assessment

14      as to what he or she is looking for in this particular

15      position and what the needs -- what the -- how to fit all

16      of this together for the good of the organization.

17   Q   All right.  Okay, thank you.  Did you know that the QMC

18      had a policy of not inviting persons in acting positions

19      to attend as a general proposition?

20   A   As a general proposition that's correct.  But again, with

21      all general propositions there are exceptions.

22   Q   Do you know when John Copenhaver retired?

23   A   Off the top of my head, no.

24   Q   Do you know who selected in regard to this position that

25      we've been discussing John Madden to act as the chair of

1    that selection panel?

2  A   I do not know who made that selection.

3  Q   Who would normally make the selection for -- of panels

4      that the interview.....

5  A   The panels within the purview of the FSDO would be made by

6      whomever is at the FSDO level.  I mean that's designed for

7      the selecting official as a tool for making the selection,

8      so the convening authority.

9  Q   So it's fair to say the selecting official would normally

10     be the one who would select it.

11 A   Normally be the one.

12 Q   And in this case, as we know, Tom Carter was the selecting

13     official.

14 A   Correct.

15 Q   So it is reasonable to assume that he would have chosen

16     Madden?

17 A   I would think that he in consultation probably with his

18     boss would have chosen Madden.

19 Q   And did you feel that Mr. Madden was able to adequately

20     deal with what were viewed as union improprieties?

21     MS. JONES:  I'm going to object as to the relevancy of

22 whether John Madden did or didn't deal with him.

23     THE COURT:  Sustained.

24     MR. FLEISCHER:  Very well.

25 Q   Do you know if under the circumstances of selection of

1   this kind whether Mr. Carter would have gotten concurrence

2   from Johnnie Wallace as the acting Director of the FSDO?

3 A I would make the assumption that the courtesy stops were

4   made.

5 Q Okay.  When you counseled with Verene Miller about the

6   position regarding the Supervisory Aviation Safety

7   Inspector, Operations position did she tell you that she

8   thought that she had blown the interview?

9 A I don't remember that specific discussion.  What I do

10   remember is the fact that she felt very strongly that she

11   had identified the requisite experience in her 171 packet

12   that dealt with her supervisory experience and with her

13   121 experience and that she felt that she had been

14   disregarded when Tom had reviewed the package.

15 Q Did -- well, did she tell you that Tom had recommended

16   that she rewrite her package so as to properly reflect her

17   experience?

18 A That didn't come up because my recommendation was the

19   same.

20 Q All right.  Was Ms. Miller's work as a Training Program

21   Manager at the 13 level?

22 A Yes.

23 Q Do you know if Ms. Miller developed any of the controls

24   you discussed about the Operational Training Needs

25   Assessment program?

1   A   The OTNA program outlines clearly the programmatic issues

2       for how the process is to be run.  The program is about,

3       oh, two or three inches thick and deals with -- it

4       provides a structure for how we do training needs

5       analysis.  Pretty standardized training needs analysis

6       approach, I mean it's fairly generic.

7   Q   Are you certain that when Mr. Duncan made reference during

8       the meeting in the post mortem of the tentative decision

9       by Tom Carter on who was going to be selected that he

10      mentioned Anne Graham, or is it possible he only mentioned

11      Verene Miller?

12  A   I'm comfortable that he mentioned -- and it wasn't a

13      tentative selection at that time.  Tom was empowered to

14      make the selection and that was the selection that was

15      made.

16  Q   All right.  Do you know that Carter was an original member

17      of the committee when the controls were developed?

18  A   Yes, I was aware of that because he worked closely with my

19      predecessor, Gary Childers.

20  Q   When you had the discussion with Ms. Miller after she had

21      failed to obtain the Operations Supervisory position did

22      she indicate to you that the panel had missed her

23      experience?

24  A   No, she did not indicate that to me.  What she foc -- what

25      was focused in on was the feedback that was provided by

1        the selecting official to her on the inadequacies of her

2        experience in those areas that I previously described.

3   Q    And no personal failings on her own part, is that right?

4        As far as she telling you that.

5   A    Well, I -- the personal feelings that came out for

6        me......

7   Q    Failings is what I said, not feelings.

8   A    I'm sorry?

9   Q    And she didn't reference any personal failings.....

10  A    Oh, failings, I'm sorry.

11  Q    .....in regard to the way in which she had applied for

12       that position.

13  A    I think there's always an acknowledgement that you can --

14       that the application has to reflect what is and it has to

15       be there so that it can be read.  So from that stage she

16       was certainly aware of it, that she needed to make sure

17       she adequately described that -- those knowledge, skills

18       and abilities that the selecting official and the

19       selecting panel was looking for.

20       MR. FLEISCHER:  Nothing further at this time Your Honor.

21       THE COURT:  All right, thank you.  Anything else?

22       MS. JONES:  I have maybe one area.

23                    **REDIRECT EXAMINATION**

24  BY MS. JONES:

25  Q    Mr. Wedemeier, we've discussed the Dave McGlothlen

1      selection and the fact that there were union issues within

2      the panel.  Do you know whether or not the interview

3      process within Flight Standards at that time got changed

4      because of these issues that came up with regard to the

5      union?

6  A   That's correct.  This panel had identified union members.

7      Panels that we've conducted before and we've conducted

8      after have always had -- have had the option of having

9      bargaining unit members on the panel to be subject matter

10     expert, but not wearing a union hat.  Having a subject

11     matter expert on a panel is not prohibited.  Having a un

12     -- a clearly identified union member on the panel

13     representing the union is.

14  Q   So you're saying that the process was changed such that no

15     longer would they allow a union member to strictly be

16     serving as a union member.

17  A   That's correct.

18  Q   They could -- a union person would only then be able to

19     attend if they were filling in as one of the subject

20     matter experts.

21  A   Correct.

22  Q   Do you know whether or not there.....

23  A   The presence of a union member for -- in a selecting

24     process for a management official is inappropriate.  I was

25     not aware of the comp -- of that composition until after

1    the fact.  Putting my labor relations hat on I would not

2    have allowed it to go forward at that -- so constituted.

3  Q  Do you know whether or not during this time period, May of

4    2000, and later if the Flight Standards Division was

5    developing any kind of a draft policy on the selection of

6    -- of their selection process?

7  A  That I don't know.

8  Q  You currently don't remember.

9  A  I don't remember that.  We have always had -- we have a

10   process for new hires coming into the Agency which

11   describes in depth the interview process and the quals.

12 Q  And that's for new hires.

13 A  For new hires.  Initial hires.

14 Q  And did you then in Flight Standards develop a process

15   here in the Alaska Region for selecting supervisory folks,

16   like Unit Supervisors, do you remember?

17 A  I don't remember.

18 Q  Okay.

19 A  I just don't remember.

20   MS. JONES:  No further questions.

21   THE COURT:  All right, thank you.  We'll be off the

22 record.

23   THE REPORTER:  Off the record.

24   (Off record at 4:53 p.m.)

25              TRANSCRIBER'S CERTIFICATE

KRON ASSOCIATES
1113 W. Fireweed Lane, Suite 200
Anchorage, Alaska  99503
(907) 276-3554