648

1                    P R O C E E D I N G S

2      (On record at 8:19 a.m.)

3      THE REPORTER:  We're on the record.

4      THE COURT:  All right.  Mr. Girard, I am Zulema Fall for

5   the EEOC on this matter.  Let me go ahead and swear you in first

6   of all.

7      MR. GIRARD:  Oh, okay.

8      THE COURT:  If you would stand, raise your right hand.

9      (Oath administered)

10      MR. GIRARD:  I do.

11                    **RICHARD GIRARD**

12   a witness, called for examination by counsel on behalf of the

13   Agency, was duly sworn, examined and testified as follows:

14      THE COURT:  All right, please be seated.  State your full

15   name and spell your last name for the record.

16      THE WITNESS:  It's Richard Wood Girard, that's G-I-R-A-R-

17   D.

18      THE COURT:  All right Mr. Girard, the attorneys will both

19   be asking questions of you and I may have some questions as

20   well.  If you do not understand a question please ask that it be

21   repeated or clarified.

22      THE WITNESS:  All right.

23      THE COURT:  All right?

24      THE WITNESS:  Uh-huh (affirmative).

25      THE COURT:  Thank you.  You may inquire.

Exhibit __G__

1                          **DIRECT EXAMINATION**

2    BY MS. JONES:

3    Q    Mr. Girard, are you currently working for the FAA?

4    A    Yes.

5    Q    And in what position are you?

6    A    All Weather Operations and Programs manager for Flight

7         Standards Division.

8    Q    And where is your office located?

9    A    Right now I'm across the street at 801 B Street.  There

10        wasn't enough room in the Division so I had to move across

11        the street.

12   Q    Okay.  Have -- is your background basically in aviation?

13   A    Yes.

14   Q    Could you take us through your background beginning with

15        however you got into aviation and take it up through the

16        present?  You don't need to dwell any of the areas, but

17        just to give us an idea of whether you've got military

18        background or private experience and then what experience

19        within the FAA.

20   A    Okay.  I joined the Marine Corps in 1968 and I went to

21        Pensacola, to naval flight school and became a naval

22        aviator.  And I flew helicopters and C-130's and other

23        aircraft in the Marine Corps for 10 years.  I got out in

24        1978, I came to Alaska and I went to work for some 120 --

25        a 121 operator and I flew for some 135 operators for four

1   years.  And then I went on with the FAA about 1982, late
2   '82, and went into Air Traffic initially.  And I was also
3   in the Army National Guard when I came to Alaska, I joined
4   the Army National Guard in 1978 right after I got out of
5   the Marine Corps and I was flying helicopters with them
6   over at Fort Richardson here in Anchorage.  And I was in
7   Air Traffic for about a year and a half and -- well,
8   actually coup -- about two years.  And then I bid on a job
9   with Flight Inspection, which is FAA, and was accepted and
10  I flew several aircraft for flight inspection out of
11  Anchorage for four years.  In 1988 I went to work for
12  Flight Standards in 1988 and been with Flight Standards
13  ever since.  I retired from the Army National Guard in
14  late 1990 after 20 years.

15  Q   When you went to Flight Standards what was the first
16      position you held with them?

17  A   Essentially the same one I have now.  It was a different
18      title but it was air space and procedures.

19  Q   Air space and procedures.

20  A   Right.  At the Regional Office.

21  Q   Have you ever had an opportunity to supervise people
22      during your FAA career?

23  A   Yes.  Yes, I was the 220 branch manager which was Air
24      Space and Procedures Branch for five years in the Region.

25  Q   And is that the only place where you've had the

1  opportunity to supervise people?

2 A In the FAA, yes.

3 Q And that's as a full-time permanent job.

4 A Yes.

5 Q Have you ever been detailed into a supervisory role in any

6  other slot?

7 A Well, I was detailed out at the Anchorage FSDO for about a

8  total of 15 months on two separate occasions out of about

9  an 18 month period as the acting assistant manager.

10 Q Okay, I'll come back to that in a minute.  When you were

11  in private industry were you ever a chief pilot?

12 A No.

13 Q So you were just basically a line pilot.

14 A Yes, that's correct.

15 Q Did you have over you a chief pilot in.....

16 A Yes.  Uh-huh (affirmative).

17 Q And did those companies also, any of them have in addition

18  to a chief pilot a Director of Operations?

19 A Yes.

20 Q Was the chief pilot your first line supervisor?

21 A Yes.

22 Q Would the Director of Operations been the second level

23  supervisor?

24 A My relationship with the Director of Operations was such

25  that I had very little to do with that level.  But they

1        basically supervised the chief pilot, yeah.

2  Q   Okay.  Now back to this detail you had, was that out at

3        the Anchorage FSDO?

4  A   Yes.

5  Q   Could you tell me time wise, whether it's dates or if you

6        could remember manager people that would help us place it

7        in a timeline when you went out to the Anchorage FSDO?

8  A   The first time I went out it was Spring, early Summer, and

9        Ike Borgen was the manager of the FSDO, he was a real

10       full-time manager, and that was in '99.  And I say Spring

11       time, summer because it was warm.  So I'm just -- and I

12       was out there for a few months as acting assistant manager

13       with Ike Borgen.

14  Q   So Ike Borgen was the manager.....

15  A   Yes.

16  Q   .....of the FSDO, and that is the highest position at the

17       FSDO?

18  A   Yes.  He was the office manager.

19  Q   And you were then?

20  A   Acting assistant manager.

21  Q   So you -- that would have made you the number two

22       person....

23  A   Correct.

24  Q   .....at the FSDO?

25  A   Correct.

1   Q   And under you when you first went out there who was the
2       next management level?  The type of position maybe and
3       then.....
4   A   The Unit Supervisors would have been the next level at
5       that time.
6   Q   And how many Unit Supervisors were there if you can
7       recall?
8   A   I think that structure had nine at the time.
9   Q   And do you remember about how many employees were there?
10  A   About 110 to 115 at that time at least, right in that
11      ballpark.
12  Q   Were there any problems or issues created by that
13      structure or did it seem to work well?
14  A   The structure to me wasn't an issue, no.  It gave all the
15      appearances of a good corporate structure you might say.
16      It wasn't working real well, but -- that wasn't really --
17      in my mind it wasn't anything to do with the structure.
18  Q   So were there problems out there at the FSDO experienced
19      by the managers and supervisors?
20  A   Well, yeah.  The -- Ike Borgen's office was an open door,
21      I mean it was nonstop people standing outside the door all
22      day long going in there, which I was thought was kind of
23      an odd way to do business when you had nine supervisors.
24      Everybody and his uncle was in there continuously going to
25      Ike, but it wasn't any of my business to really say

1      anything, but -- so, in other words, we had nine

2      supervisors but it seemed kind of strange that the manager

3      was having to deal with -- or at least spend time all day

4      long with everybody in the FSDO it seemed like down there.

5  Q   And was there any reason all these people were going in to

6      see Mr. Borgen?

7  A   The reason I -- I don't know, but I felt that they should

8      have been going to their supervisors first and, you know,

9      the proper way it should have functioned probably was the

10     supervisor would go down to Ike if there was a real issue

11     that they couldn't resolve or whatever.  That was my

12     opinion.

13 Q   Okay.  So you were out there for a few months.  Did the

14     management structure then change, what happened after --

15     that caused you to leave the FSDO?

16 A   I'm trying to recall.  I went back to the RO after, you

17     know, a few months and -- I don't remember why they let me

18     go back, I don't remember to tell you the truth.  I don't

19     know if that's when they created the two unit supervisory

20     positions was before Ike left or not.

21 Q   When you were -- when you went -- first went out to the

22     FSDO was Johnnie Wallace out at the FSDO?

23 A   Yes, yes.

24 Q   And do you recollect what position he was in?

25 A   He -- I don't know, I don't remember if he was the

1        assistant manager or not.  I'm not -- I don't remember

2        exactly how I ended up being asked to go out there.

3        Somebody left and John Duncan and Kent Adams basically

4        asked me to go out and fill in.  For about -- a few

5        months.

6    Q   But you were out there when Ike was there.

7    A   Yes, right.

8    Q   Okay.  And then you went back to the RO.  When you were

9        out there on detail were you still doing your Regional

10       Office avion type job?

11   A   Yes.

12   Q   Or Flight Procedures.

13   A   Yeah, the reality of it was I had to do a lot of that,

14       yeah, because it wasn't going to get done.

15   Q   Okay.  So then you said you went back out to the FSDO.

16   A   Right.

17   Q   Do you remember about when that was?

18   A   Well, Ike left and it was a vacuum as far as the manager

19       of the FSDO.  And Johnnie was made acting manager and then

20       they sent me out shortly thereafter as acting assistant

21       manager again.  That -- I don't recall how long that was,

22       but it wasn't too long because then they -- they finally

23       got around to bidding the manager's job and Doug Dalbey

24       from Texas was selected as the manager, which created a

25       situation where I could go back to the RO and Johnnie

1       could I guess go back to being the assistant manager.

2  Q   So Dalbey was then.....

3  A   Yes.

4  Q   .....the head.  And did you end up going back out to the

5       FSDO another time?

6  A   Yeah, I guess there actually was three times now that I

7       think about it.  There was these like breaks, you know.

8       Doug Dalbey lasted about 90 days out there and he just

9       magically ended up at the RO one day and it was like, you

10      know, news to me, in asking.  It was shortly thereafter

11      Johnnie was put back in as the acting manager and I was

12      back out there as the acting assistant manager.  During

13      this time those two Unit Supervisor positions had been

14      created by John Duncan at the FSDO.  That was done just

15      prior to the second time I think that I went out there.

16      When Johnnie was acting, I think that's when it actually

17      -- those two positions were created.

18  Q   So.....

19  A   I may be wrong on that.

20  Q   So Johnnie Wallace would have been the acting manager at

21      the FSDO this last time you're discussing when you were

22      out there?

23  A   The last time, yes.  Yeah, yeah, he and I.

24  Q   So he was an acting.....

25  A   Yes.

1  Q    .....manager of the FSDO.

2  A    Correct.

3  Q    You were an acting assistant manager.

4  A    Correct.

5  Q    And then you indicated that there were two section

6       supervisor positions created.

7  A    That's right.

8  Q    Were they filled permanently at that time or on another

9       acting detail?

10  A   Initially they were appointed, therefore they were acting.

11  Q   So in Airworthiness there was whom?

12  A   Jerry Martelli.

13  Q   And in the Ops, do you remember who held that?

14  A   I think initially it was Bob Christensen.  Of course he

15      was a section supervisor, so I don't know what -- you

16      know, whether he was having to kind of -- I'm sure they

17      had an acting section supervisor but he was probably

18      almost having to balance both.

19  Q   So Bob Christensen.....

20  A   Yeah.

21  Q   .....and then after him was there someone else?

22  A   Well, Tom Carter was in there too.

23  Q   And was him -- he acting at the time also?

24  A   Yes.  Yes.  They had not bid the positions and filled them

25      permanently at that time.

658

1  Q    Were -- when you were out there this third time were there
2        any issues going on at the FSDO that made being a
3        supervisor or a manager out there difficult?
4  A    Yes.  I mean the union was not happy with the two
5        positions being created at all, period.  They were kind of
6        holding management up to ridicule, you know, that you had
7        nine 14 supervisors and you had two 15's overseeing them
8        and here we were creating two more 15's, so they were
9        holding management up to ridicule to that.  And they were
10       also demanding, well, if you're going to have the
11       positions fill them, you know, permanently, bid them in
12       other words, so there was pressure to do that.  And there
13       were grievances generated over this, over those issues.
14  Q    Do you remember if there was any -- an inordinate number
15       of grievances?
16  A    Yes.
17  Q    So what do you mean by that?
18  A    I went out there -- I think it was the third iteration,
19       I'd have to look at my 52's to actually break this down,
20       and I think there were 40 grievances generated in one day
21       or two days over that -- over those positions.  They
22       brought them to me so that's why I -- I had a stack of
23       them.  They were all the same, but they were all
24       complaining basically -- actually I was even named in the
25       grievances, they were complaining that I was an actor and

1       I was -- you know, we had all these actors. So there was

2       just -- there was even complaining about me coming back

3       out there and acting as the assistant manager. They told

4       me it wasn't personal, but that's fine. They gave me 40

5       grievances and they were all the same and I informed them

6       -- you know, it only takes one answer to answer all 40 of

7       these, they're all the same. So, anyways.

8   Q   Were there any particular people in the union that seemed

9       to be the most vocal?

10  A   Oh yeah.

11  Q   And.....

12  A   Well, John Elgee without question. Paul Raker, David

13      Lucher, Janet Clark. I'm sure I'm missing a couple more.

14  Q   But those names stand out.

15  A   Yes. Yeah.

16  Q   In the union's dealings with management did you have an

17      opinion about how you would characterize those dealings

18      between the union and management out there?

19  A   Yeah. The issues that were brought forward in my mind

20      weren't really the issue. And I had told John Duncan this

21      in private, in my opinion there was only one issue and

22      that was who was going to run the FSDO. Okay? All the

23      rest of it was just a smokescreen.

24  Q   Did you have an opinion with I guess maybe the character

25      or the way they carried out their grievances, the union

                         KRON ASSOCIATES
                  1113 W. Fireweed Lane, Suite 200
                     Anchorage, Alaska  99503
                        (907) 276-3554

1    folks out there?

2  A  Well, they used it as punishment, intimidation, you know,

3    bog management down so they can't do their job. It was a

4    war, it was trench warfare is what I called it, yeah.

5  Q  And in their dealings were they upfront?

6  A  Absolutely not.

7  Q  How would you characterize that? If they're not upfront

8    what.....

9  A  Well, they had ulterior motives. They -- I saw them with

10    Ike and especially with Johnnie because I thought they

11    could roll him over pretty easy. They would continuously

12    come in and try to get -- and I may be using the wrong

13    term here, but side agreements which would abrogate or

14    water down the contract, you know, which we were strictly

15    forbidden to do, however Ike had done it. We had an

16    office manual, an office procedures book, and in it were

17    all such documents that I could allow them to go ahead and

18    execute. You know, such as -- I mean the most famous one

19    was the ability to en route to first stop, no questions

20    asked, things like that. And -- I don't know if I need to

21    explain what in routing is, but.

22  Q  Go ahead.

23  A  Well, Aviation Safety Inspectors can ride in the cockpit

24    of aircraft and they have a badge and credentials and it's

25    an FAR that backs it up. And -- however, it has been

1    determined that -- by order, and even the IG inspections
2    and so forth, that the only reason you should ever be in
3    that cockpit is to perform a job function, an FAA job
4    function, and that's one that's been approved, you don't
5    get to determine that yourself as an individual ASI, your
6    supervisor has to approve all en routes.  In other words
7    you can't do it for personal reasons such as to go visit
8    your Aunt Tilly or go a high school reunion or go on
9    vacation or anything like that.  So -- however, Ike had
10   allowed them to execute a document that was don't ask,
11   don't tell, that basically you could go -- what they
12   called at first stop, so you could go on any airline
13   anywhere, the first stop no questions asked.  The second
14   one theoretically had to have a job function attached to
15   it.  Or -- either at the end of the trip or during the
16   trip.  And that raised my eyebrows, I kind of looked at
17   that and I knew that was going to come to a head because
18   that was in direct conflict with the IG report and the
19   order and so forth.  And there were a number of things
20   like that.

21 Q  When you say IG report, was that something that was done
22   just here.....

23 A  No.

24 Q  .....in the Alaska Region so this was.....

25 A  No, that was a national investigation that was conducted

KRON ASSOCIATES
1113 W. Fireweed Lane, Suite 200
Anchorage, Alaska  99503
(907) 276-3554

1       and a report issued. And they attempted things. Johnnie

2       and I spent many, many hours in the office with the union

3       people in there and -- trying to get Johnnie to roll over

4       on like standby issues, things like that, you know.

5       And....

6  Q   Did you while you were out there at the FSDO attend any of

7       these Monday morning telecons?

8  A   Oh yes.

9  Q   And exactly where do people attend these at?

10  A   Second floor there's a large meeting room, basically the

11      entire FSDO can fit in it just about. Yeah.

12  Q   So who was supposed to be going to these Monday morning

13      telecons?

14  A   I looked at it -- it was an all hands meetings, everybody

15      should be there. Obviously if you had a job function to

16      perform I mean it's perfectly fine, you know, excusable.

17      But it was an all hands meeting. And generally most

18      everyone in the FSDO would show up, if they were there,

19      you know.

20  Q   When these all hands meetings were conducted did the --

21      where were -- were you all on the phone with someone else

22      or was the meeting right there at the FSDO?

23  A   No, we'd also have the telecon with the Regional Office.

24      And usually Fairbanks and Juneau were also -- it was a

25      conference call.

1  Q    And so during these Monday morning telecons did people at
2       the Anchorage FSDO have, ever have opportunities to speak
3       up and discuss whatever issues that were on their mind?
4  A    Sure, sure.
5  Q    So how was that typically done?
6  A    Well, if -- I mean if somebody wanted to speak all they
7       had to do was indicate -- you know, either just speak up
8       or, you know, raise their hand and indicate to myself or
9       Johnnie or whoever was basically up at the front table and
10      -- you know, anyone could speak actually, anyone at all if
11      they wanted to.
12 Q    So if they did speak up was there any way in which they
13      were identified or they identified themselves so that the
14      people in the Regional Office knew who was talking?
15 A    In most cases, yeah.  I would say the major -- sure, it --
16      either we would identify the person possibly or they would
17      just say, you know, this is Wendell Williams and I got a
18      question about 337's or something, you know, yeah.  Sure.
19 Q    Did David Lucher attend those meetings?
20 A    Sure, quite often.
21 Q    When -- do you recollect specific times, not maybe, oh, he
22      was here on this day and on that day, but oh yes, I have a
23      recall of him being there?
24 A    Yeah, I think with David if he was in the office he'd be
25      at the meeting, if he wasn't out doing a job function or

1     on leave or something like that.

2  Q  Did he personally participate in these telecons?

3  A  Oh yes.  Yeah, fairly often he would have something to

4     say.

5  Q  Do you recollect for him whether -- when he would

6     participate whether he identified himself?

7  A  Yeah.  Yeah, he's -- he would generally say this is David

8     Lucher and then he'd go into whatever he was going to say,

9     you know.

10  Q  Do you have any opinion as to David Lucher's voracity in

11     dealing either with you personally or that you've heard

12     of?

13     MR. FLEISCHER:  Your Honor, I'm going to object on the

14  basis of the nature of the question.  I don't think that it

15  meets a reasonable experience in setting out a foundation for

16  the question.  In terms of whether there is a history or actual

17  knowledge -- more broad knowledge of reputation.

18     THE COURT:  All right.  Mr. Girard, answer the question if

19  you know, if you have any personal experience with Mr. Lucher's

20  voracity or if you've had occasion to form an opinion regarding

21  his voracity based on personal experience.

22  A  I feel that I do.  I associated with him over a number of

23     years in different capacities.  He was a Regional Business

24     Agent for the union when I was a manager here at the

25     Regional Office.  And so I had dealings with him during

1    the Quality Management Council meetings and things like

2    that.  Plus when I was at the FSDO I went to lunch with

3    him several times, things like that, and plus we spoke on

4    occasion.  I don't have a very high opinion of David

5    Lucher.  He amazingly says things to people that -- you

6    know, I mean I'm in management and he basically would tell

7    me that he basically would do whatever he pleased and --

8    to achieve whatever he wanted.  And I thought that was

9    kind of ironic to tell somebody like myself.  But I guess

10   he felt I was benign or not a danger to him.  So, I don't

11   know if that helps you with the voracity question,

12   but.....

13 Q  So if he were to tell you something would you take that at

14   face value?

15 A  Absolutely not.

16 Q  Have you been involved with Flight Standards' hiring

17   process?

18 A  Yes.

19 Q  In what capacities, in what ways have you been involved?

20 A  I've been on selection panels as a member for different

21   divisions, including Flight Standards.  And I've conducted

22   some panels for Flight Standards.

23 Q  When you say you've conducted some panels, does that mean

24   you served as the chairperson?

25 A  Correct, correct.  Right.

1  Q  When was approximately about the first time you remember

2     being involved in the selection process?

3  A  Well, I'm not real sure because I've been on quite a few.

4     And.....

5  Q  Would your first time have been prior to your serving as

6     -- in details out at the FSDO?

7  A  Oh yes, oh yes.  Yeah, that's what I was saying, it goes

8     back quite a number of years, I've been in Air Traffic,

9     Airways Facilities and.....

10 Q  And in Flight Standards?

11 A  .....avion.

12 Q  And in Flight Standards prior to that.

13 A  Yes, in Flight Standards.

14 Q  When you were on these panels were you participating in

15    positions that were new hires or were they selections in

16    Flight Standards for supervisors and managers?

17 A  They were not new hires, no.

18 Q  So you did not do the new hire.....

19 A  No.

20 Q  .....process.

21 A  No.  New hire of ASI's, is that what you mean?  No.

22 Q  Yeah.

23 A  No, I did not participate in that.

24 Q  When you first started back prior to 2000, 1999, prior to

25    your details, did they have a structured process?

1   A   No.  No -- no, they didn't.

2   Q   Did that change?

3   A   Yes, at -- I think the first time I was asked to chair a
4       selection committee I -- you know, I was interested in how
5       they wanted this conducted and so forth and Naomi
6       Christensen basically showed me a draft process that they
7       were working on and she handed me several documents, you
8       know, and said this is where we're going and -- but they
9       were still in draft form you might say and I used that,
10      I.....

11  Q   When was the.....

12  A   .....because that's what they wanted, you know.

13  Q   .....you're discussing the first time you were asked to
14      chair.  What position are you talking about?

15  A   Well, I know it sounds funny, I just -- I don't recall to
16      tell you the truth which one it was, first time I got
17      involved.

18  Q   Did you have an opportunity to chair the selection panel
19      for the Operations section supervisor and Airworthiness
20      section supervisor positions at the FSDO?

21  A   Yes.

22  Q   Do you remember if that was the first time or a second
23      time?

24  A   I think that was the second time I chaired, yeah.

25  Q   I'm going to show you what's -- the Agency's -- been

1     admitted as A-5.

2  A   Actually I'm absolutely sure that it was not the first

3     time because the process had become a little bit more

4     formalized by that time when we did the section

5     supervisors. It wasn't really a draft process anymore,

6     yeah.

7  Q   I'm going to hand you this document, it's A-5. Is this

8     the documents that Naomi shared with you and that you

9     followed when you were chairing the panel for the Ops and

10    Airworthiness section supervisor positions?

11  A   Yes, it was. And the first time I used this process the

12     documents were even a little bit more sketchy. That's why

13     I say -- yeah.

14  Q   You can hang onto it, you may want to look at it for some

15     of these next questions.

16     (Whispered conversation)

17     MS. JONES: Yes, A-5 is our Exhibit and you all should

18  have a copy of all of the Agency's Exhibits.

19     MR. FLEISCHER: Yeah, we do. I just didn't -- I was

20  thinking it was in the ROI, but it's not.

21     THE COURT: All right, go ahead.

22  Q   Do you remember how you became the section chair? I mean

23     the panel chair for this process.

24  A   I don't remember who really literally asked me. There --

25     I think there was some discussion around it, it was

1     logical that -- Johnnie Wallace was named the selecting
2     official and I think Naomi Christensen and others felt it
3     was logical that the assistant manager would run the
4     panel.
5  Q  So once you had taken on the job of running the panel did
6     you interact at all with Ms. Christensen in how to carry
7     out your duties as.....
8  A  Yes.
9  Q  .....chairing this panel?
10 A  Yeah.
11 Q  I'm going to show you what has been marked as
12    Complainant's Exhibit 8, page 14 and 15.  If you could
13    take a look at that, it has an opposite side, and ask you
14    if you recognize these e-mail exchanges.
15    (Pause)
16 A  Yeah.  I mean it's been a long time, but these are e-mails
17    that we had back and forth, sure.  During the process.
18    MS. JONES:  I'd like to ask at this time that
19 Complainant's Exhibit 8, pages 14 and 15, be admitted into
20 evidence.
21    MR. FLEISCHER:  No objection.
22    THE COURT:  All right, they're admitted.
23         (Complainant Exhibit C-8, pages 14 and 15 admitted)
24 A  Do you need this back?
25 Q  You can hang onto it just in case you might want to refer

KRON ASSOCIATES
1113 W. Fireweed Lane, Suite 200
Anchorage, Alaska  99503
(907) 276-3554

1        to it.  Do you remember what you did throughout this
2        process of chairing the panel and could you take us
3        through that please?
4   A    Once I was tasked and accepted it basically I started the
5        process, went up to talk to Naomi to get the RO's process
6        again from her because it could have evolved from the
7        previous time.  And basically got these documents here
8        from when we talked about it.  And she gave me some
9        suggestions on panel members, because it was just her
10       personal suggestions, and that I should get some questions
11       developed and so forth and once I got the panel members,
12       at least in my mind, selected to let them know who they
13       were going to be and also the questions.  Which is pretty
14       much the same way as the previous time I had done it, I
15       just wanted to make sure that the process was about the
16       same and it was.  And -- and then just turned me loose at
17       that point and I started trying to find people that were
18       willing to serve on the panel and people that would
19       provide a diverse background and things like that.  It
20       took me awhile but I finally put a panel together.  And I
21       developed the questions and I ran the questions through
22       Kent Adams basically.  He's -- he basically passed
23       judgment on the questions as to whether or not they were
24       adequate.  And also they looked at them to make sure I
25       wasn't asking any, you know, inappropriate type questions,

1       things like that.

2   Q   You indicated you put a panel together.

3   A   Uh-huh (affirmative).

4   Q   Did you provide this panel with any.....

5   A   Oh, right.

6   Q   .....information?

7   A   Once I got a confirmation that a person was willing to

8       serve and I had enough folks then I wrote up a letter to

9       them and in the letter I include -- I explained what was

10      going to occur and I included a copy of the actual bid

11      announcement, a copy of the position description.  I can't

12      recall.  I included everything that was supposed to be in

13      here.  With a letter to each person, yeah.

14  Q   Did you give them copies of the applicants' bid packages?

15  A   Yes.  Yes.  Uh-huh (affirmative).

16  Q   And at that time in that letter did you give them any

17      instruction as to what to do with copies of the bid?

18  A   Right.  There was a score sheet that each one of them got

19      and it had a grade one through five and they were

20      instructed that there were point five discriminators and

21      there was 1.5, 2.5, three five, four five, that they could

22      grade these packages against the KSAO's based on that

23      scoring system.  And that went along with the package and

24      there were I think -- in the Ops position there was, what,

25      six people or eight.  Six applicants for Ops.  So they had

1           six packages and they had my mini package which had the
2           cover letter and the other information with it and the
3           scoring sheet.

4    Q      Okay, I'm going to hand you a couple of documents to
5           ensure that we all know exactly what it was that you had
6           given to the panel with regard to this Ops position.  And
7           I'm handing you now what's been -- I believe, and this is
8           something maybe we should all check, but I believe this is
9           admitted as Agency Exhibit A-20.  What it is is a copy of
10          the vacancy announcement for the Ops positions that's the
11          modified one.

12   A      Yes, I would -- I included this, so that way they knew,
13          you know, what the position was that was being bid.

14   Q      Okay.  So that was the announcement you had.....

15   A      Correct.

16   Q      .....just discussed.

17   A      Uh-huh (affirmative), right.

18   Q      Okay.  I'll take that one back.  Di -- I'm handing you
19          what's now the R -- in the ROI at F-12.  Is this the PD
20          that you were referring to?

21   A      Yes.

22   Q      Did you get a copy from the Human Resources Division of --
23          a listing of the candidates, the applicants for the Ops
24          position?

25   A      Yes, they call it a cert.  And I got two of them, one for

```
1        the Ops, one for the Airworthiness position.

2  Q     I'm going to show you what's in the ROI at F-17 and see if

3        this is the cert that you're indicating you received.

4  A     Yes.  Yeah.

5  Q     At the time you received it was all of it filled out or

6        just the section one?

7  A     No, all I got was the top part.  That's all I got.

8  Q     Okay.  And then you indicated you handed them copies of

9        bid packages.  I am showing you what's in the ROI at F-19,

10       that is Verene Miller's bid package.  Did -- is this the

11       bid package that you gave the panel members to evaluate?

12       If you'd kind of page through it, does it look like the

13       one?

14       (Pause)

15 A     Yeah, this is the package, yeah.

16 Q     I'm -- now I'm going to show you what's in the ROI at F-

17       20, Mr. Carter's bid package.  Does that look like the

18       package you gave the interview panel members?

19       (Pause)

20 A     Yeah, I remember these packages pretty well.  This is

21       Tom's.

22 Q     You had indicated that you asked them to rate their bid

23       packages against the KSAO's and score.

24 A     Correct.

25 Q     I'm handing you what's in the ROI at F-23.  Is this the
```

1       scoring sheet that was put together?

2  A  Yes.

3  Q  And this was for the bid packages.

4  A  Yes.

5  Q  Is that correct?

6  A  Uh-huh (affirmative).  That's correct.

7  Q  When you got this -- the certificate along with the bid

8       packages from HR did you -- what was your understanding of

9       all of those names on the bid package, the certificate

10      that you got?

11  A  They were all referred to me as qualified to bid on the

12      position.

13  Q  So it was your task and your panel's task to figure out

14      through your process which ones were the top candidates?

15  A  Right, in our opinion would be the most qualified, right.

16  Q  And so one of the things you based that opinion on was how

17      well their bid packages met the KSAO's.

18  A  Correct.

19  Q  And when the people were evaluating how well the bid

20      packages met the KSAO's and hence you developed this

21      particular rating summary were you looking at only a piece

22      of their application, each person's application, or did

23      people look at the whole thing?

24  A  They were instructed to look at everything.  I mean you

25      don't just look at, you know, one or leave anything out,

1    you look at the whole package.

2  Q   And so were they instructed to look at everybody's
3       complete package?

4  A   Yes.  Well, I mean -- you know, whether they looked at a
5       technical issue as to a person's social security number or
6       something, I don't -- I can't attest to.  But look at the
7       experience, job experience, education, anything that would
8       be relevant to the KSAO.

9  Q   And you never heard them discuss nor you instruct them to
10      only look at this part of somebody's application and only
11      that part of someone else's?

12 A   Absolutely not, no.

13 Q   You discussed that you developed interview questions for
14      this process.  I'm going to hand you what's in the ROI at
15      tab F-22 and ask you if those are the interview questions
16      that you had come up with.

17      (Pause)

18 A   Yep, these are the ones.

19 Q   How many total questions were there?

20 A   Ten.

21 Q   And how many of those questions went to the person's
22      technical knowledge?

23 A   Two of them were designed to be directly associated with
24      technical knowledge.

25 Q   And the remaining questions were associated with what?

1   A    More general managerial practices and skills and knowledge
2        and background, so forth.

3   Q    Is that typical for hiring into supervisory positions,
4        maybe especially second level supervisory positions, to
5        have it more heavily weighted toward that, the managerial
6        skills?

7        Yes.  I mean managing people and resources more than
8        you're going to be managing certificates, things like
9        that, and airman, so you're definitely looking for
10       managerial skills, you know.  Got to have the technical
11       background though.  So that's the reason for at least two
12       of the questions were very technical in nature.

13  Q    Question.  Would someone -- in looking at the technical
14       questions would someone who hadn't been an employee of the
15       FAA, say someone that worked in private aviation industry,
16       would they have been able to answer the two technical
17       questions?

18  A    Yes.

19  Q    And so did -- in doing the actual interview part of this
20       process did you interview all the candidates for the
21       operations position?

22  A    Yes.

23  Q    Did anyone come up -- out from management to address the
24       panel?

25  A    Before we started John Duncan came by, he was at the FSDO,

1       and he thanked the panel members, you know, for
2       voluntarily to participate and so forth. And then he told
3       us how important the positions were and that -- stressed,
4       you know, the criticality and I guess sort of a pep talk
5       so that we really understand, you know, the importance of
6       this -- these two positions and so forth. That was the
7       prime reason he was there plus to thank us, yeah.
8   Q   And did he say anything about who to pick or the things to
9       look for?
10  A   No. No.
11  Q   Did you yourself give any specific instructions to the
12      panel members with regard to this interview process?
13  A   I had assigned the questions so that a person would ask
14      the same two questions. We didn't vary -- in other words
15      Delores Coates asked the exact same two questions to every
16      panel member. I explained to them the scoring, again, on
17      the interview was also point five discriminators, 1.5,
18      2.5, 3.5. I explained to them that if there was ever an
19      instance where we had more than 2.0 different in any
20      scoring whatsoever that we would stop the process then and
21      discuss that. And I mean just discuss, we weren't trying
22      to influence anybody or get them to change their scoring.
23      But, for example, if somebody gave someone a 1.0 and
24      someone gave him a 4.0 we were going to talk about it, you
25      know, why in other words, just discuss it, yeah. Which

1     never occurred.  There was never one instance on the
2     KSAO's nor the questions where there ever was more than a
3     2.0 difference.
4  Q  Okay, I'm handing you what's marked in the ROI at F-24.
5     Could you tell us what that is?
6  A  This is a summation of the scores on the interview
7     questions.
8  Q  Okay.  And this indicates what the panel -- how the panel
9     determined each candidate to do per each question.
10 A  Right, for each question and then a total for the entire
11    interview.
12 Q  Did the panel or you yourself come up with a composite
13    score of the bid packages and the interviews?
14 A  I did.  They had equal weight, the packages and the
15    interview had equal weight, and they were combined and
16    came up with a composite score.
17 Q  You indicated they had equal weight.  Was there a reason
18    for giving them equal weight?
19 A  Some people do better on paper than in an interview and
20    vice versa.  Gave a person an opportunity to excel, you
21    know.  Either way.
22 Q  Did the panel come to a conclusion as to who the -- who
23    were the top candidates?  And let me back up, were you
24    asked to -- by the selecting official to refer any
25    specific number of names to him?

1   A   I had asked and he said the top three.

2   Q   And did your panel come to a conclusion as to who the top

3       three are?  Or were.

4   A   Yes.

5   Q   Okay.  I'm handing you what's in the ROI at F-25.  Is this

6       your composite scoring for the Operations candidates?

7   A   Yes.

8   Q   And who were the top three?

9   A   Tom Carter, Mr. Bown, we kept misspelling his name, and

10      Verene Miller.

11  Q   I'm going to show you what's been marked as Complainant's

12      Exhibit C-8, page nine, and ask you if you recognize what

13      that is.

14  A   Uh-huh (affirmative), yes.

15  Q   And what is that?

16  A   Just an acknowledgement to Johnnie Wallace that I finally

17      was able to put together the panels and get all the people

18      to show up on the same day, which was quite a feat with

19      that number of bodies.  And that per his instructions I

20      would be submitting the top three from each -- for each

21      position to him.  And I would keep him informed.  We did

22      have one gentleman that couldn't make the interviews on

23      that particular day and we ended up accommodating him at a

24      -- a week or two later, he came up from the lower 48 and

25      we interviewed him.  He insisted on a interview so we

1       accommodated that.

2   Q   Was this for the Operations.....

3   A   No, no.

4   Q   .....position?

5   A   No, this was for Airworthiness.  Yeah.

6   Q   With regard to the interviews, in your mind did anything

7       come, do you remember anything in particular about Mr.

8       Carter's interview?

9   A   He did a great job.  Took -- you know, he was very

10      articulate and took his time and did a good job.

11  Q   How about Verene Miller, anything stand out there?

12  A   Not -- nothing unusual.  I mean she did a good job.  Yeah.

13  Q   How about Mr. Bown, anything stand out there?

14  A   During the question, the 10 question portion of the -- no,

15      but on each person, both Airworthiness and Operations, we

16      -- at the end we, you know, kind of opened it up and said

17      is there anything you'd like to say, you know, to the

18      panel and some people just thanked us and hoped that

19      they'd get the job and left and whatever and -- and this

20      Mr. Bown started basically saying he knew there was

21      problems at the FSDO and he was the man that was going to

22      clean it up if we hired him, you know.  And this had -- we

23      did not change a thing, and I'll tell you right out, I

24      mean after he left some of the panel members looked at me

25      kind of like, you know, can I change my vote, and I says

| 1 | | no.  But -- that was the way it went. |
|---|---|---|
| 2 | Q | Okay.  Did you -- once you came up with the top candidates |
| 3 | | for each position did you in the end put together a letter |
| 4 | | for Mr. Wallace? |
| 5 | A | Yes. |
| 6 | Q | I'm going to be handing you real shortly what's in the ROI |
| 7 | | at tab F-18.  And ask you if this is the letter that you |
| 8 | | prepared. |
| 9 | A | Yes, this is it. |
| 10 | Q | Once you put this letter together then what did you do? |
| 11 | A | I gave it to Johnnie, Johnnie Wallace. |
| 12 | Q | And when you say you gave it to him, does that mean you |
| 13 | | personally delivered it to him? |
| 14 | A | Yes, I handed it to him. |
| 15 | Q | And when you handed it to him was there any exchange, do |
| 16 | | you remember what was said?  If anything. |
| 17 | A | Yeah, I explained to him, I said that Tom Carter had |
| 18 | | scored the highest and I explained to him that Verene |
| 19 | | Miller and Mr. Bown had basically scored the same -- well, |
| 20 | | they had scored the same score.  So there was sort of like |
| 21 | | a one and a two position you might say versus a one, two, |
| 22 | | three.  And kind of left it at that, but -- didn't discuss |
| 23 | | it. |
| 24 | Q | Prior to this selection process did you have any personal |
| 25 | | experience in working with and or supervising Verene |

1     Miller?

2  A   I had what I'd say limited, I didn't get involved with her
3     unless there was some issues going on. You know what I
4     mean, not on a day to day basis. But yes.

5  Q   Do you have an opinion in the dealings that you did have
6     with her about her working style or competency level?

7  A   Competency, no. Working style, she's very businesslike,
8     very short and to the point. She's a little -- you know,
9     a little gruff manner and does not tolerate fools or lack
10    of performance or whatever at all. That type of style.

11  Q  Do you have any reason to suspect that she wasn't
12    competent in what she did?

13  A  No.

14  Q  And you indicated you had worked with her. What positions
15    was -- did she have or you have in your working with her?

16  A  Well, I was the acting assistant office manager and under
17    me I had a -- quite a variance of people all the way from
18    the office secretary. She was what they call a Training
19    Program Manager. She basically oversaw what they call the
20    OTNA program. The FAA has a -- now, finally, Flight
21    Standards has a program where based on your job
22    description and the current position you hold they have
23    basically culled out what courses you need to take and so
24    forth training wise and -- so she was the coordinator for
25    that and she worked with the supervisors every year and

1        during the year to put together the OTNA submission for
2        all the ASI's in the office.  And she also oversaw the
3        King Air program, the EBC, Event Based Currency flying
4        program.

5   Q    When you said she put together the OTNA submissions, two
6        questions.  One, what's the abbreviation for OTNA, do you
7        know?  It's okay if you don't, but if you do it might help
8        us.

9   A    Yeah.  I used to know.  I should know.  I forgot.
10       But.....

11  Q    Okay, that's all right.  When you say put together the
12       OTNA submission, what is it that you're talking about?

13  A    Well, each supervisor is supposed to review their
14       employees' training profile, see what they've already had,
15       what haven't they had, you know, what do they need in
16       their current position, things like that, what's
17       appropriate.  Because the OTNA process, what they've done
18       is eliminate a lot of the subjectivity in this.  In the
19       past it was a -- kind of a good old boy system, you know.
20       And also it worked in the opposite, some people were
21       denied training you might say inappropriately.  So what
22       they did is they said you're an 1825, you're in charge of
23       a 121 operator, you're working here, da, da, da, and
24       there's a profile and you should have had those courses or
25       you should get these courses.  And so each ASI, you know,

684

1    sits down with the supervisor and they work out what
2    they're going to submit for this next coming year.  And it
3    has to fall within the OTNA process.  You can't put say a
4    general aviation Airworthiness mechanic in for 727 type
5    rating.  It's going to bounce, they got to -- the people
6    back in Washington that basically monitor this whole
7    process.

8  Q  So the final approval comes out of Washington?
9  A  Yes, it does ultimately.  In other words if the office in
10    the Region submitted inappropriate training for people it
11    should bounce at AFS-400 in Washington.  Yeah, they should
12    question.

13  Q  Do you know whether at the time Verene was the Training
14    Program Manager and you were over her whether she had an
15    easy time, the supervisors did a good job at evaluating
16    their employees' training, getting the right information
17    to Ms. Miller?

18  A  No.  Several occasions I had to help her kind of get their
19    attention, the supervisors, not the ASI's.  They weren't
20    doing their job.  They were submitting inappropriate
21    training, they were submitting incorrect training, or in
22    some cases they weren't submitting any training, you know.
23    Or they had ASI's coming directly to her rather than tr --
24    you know, going through the supervisor type thing.  So
25    there was a bit of turmoil there, couple of occasions I

1     had to get involved.

2  Q  A couple of vacations you had to get involved, meaning

3     when you were on vacation you had to.....

4  A  Occasions.

5  Q  Occasions.

6  A  Yeah.

7  Q  Okay.  Did Verene Miller have any supervisory or direct

8     control over these Unit Supervisors?

9  A  No.

10  Q  So when she ended up having problems with the supervisors

11     not doing what they were supposed to be doing she needed

12     you to.....

13  A  She didn't need me, but there were a few times when she

14     wasn't getting what she needed, even out of the supervisor

15     even having spoken with them.  And so I had to intervene

16     and kind of say hey, do it, do it right and quit playing

17     games, you know.

18  Q  Did you ha -- oh, you had talked about she worked with

19     this EBC.  What's that?

20  A  It's called Event Based Currency.  The -- at one time the

21     ASI's were required to get a certain amount of flight

22     hours, period.  And it basically I think came down to a

23     matter of money.  They came up with a program where if you

24     do so many iterations of different maneuvers and that's

25     all that was required, you didn't necessarily have to get

1    50 hours or 100 hours of flight time as long as you got

2    two of these, four of those and so forth.

3    Q   When you're.....

4    A   So it's called Event Based Currency.

5    Q   When you're talking about maneuvers are you talking about

6        like so many landings in a plane or.....

7    A   Sure, landings, takeoffs, you know, instrument approaches,

8        V-1 cuts, different things.  Whatever was appropriate to

9        the aircraft, but, you know.

10   Q   And so her involvement in that was what?

11   A   She had been involved in the development of EBC, she was

12       on some panels back in D.C. when it was first created.

13       And then she monitored the EBC program in the office.

14   Q   You also indicated she was involved with the King Air

15       program.

16   A   Right.

17   Q   What was her involvement with that?

18   A   Well, the Region has a King Air, basically it's had one

19       for a number of years.  And I never got too involved in

20       the flight program side of it.  It just didn't impinge on

21       my world much.  But she was involved with the appointment

22       and selection of training pilots, instructor pilots.  And

23       she also on occasion I know, because I had a few people

24       that weren't real happy, got involved with who was going

25       to do what in the aircraft, you know.  It was a finite

1   resource and when it -- you know, I'd hate to bring out an
2   example or something.  But there was one individual who
3   wasn't performing real well and they wanted a lot more
4   flight time in the aircraft but somebody has to make a
5   decision on, you know, how many hours are you going to
6   spend on this guy, you know, type thing.  So she got
7   involved in those type of discussions and so forth.  Yeah.
8   Q   And was she part of the making the decisions on how much
9       time people were going to fly in the King Air?
10  A   Yes, but quite often those would get elevated sometimes
11      because she wasn't an actual manager as far as authority
12      you might say.  So I think people might have questioned
13      her authority to make a decision so occasionally it would
14      filter downstairs even to my office on Smedley (ph)
15      getting eight more hours you might say in the King Air,
16      you know, which is expensive and -- or do we cut him off
17      or do we stick him in a Super Cub and let him go, you
18      know, that type of thing.
19  Q   Did you have any working relationships or interaction with
20      Tom Carter?
21  A   With Tom Carter?
22  Q   Yes.
23  A   Yes.
24  Q   And what -- in what capacity did you work with Mr. Carter?
25  A   At the FSDO?  He was acting section supervisor of

1      Operations.

2  Q  And did you have any opinion as to his competency?

3  A  Yes, he was very competent.

4  Q  Do you recall a meeting back in April of 2000 when Kent

5      Adams came out to the FSDO and met with you, Johnnie

6      Wallace, Tom Carter and Jerry Martelli?

7  A  Yeah, yeah, I remember Kent coming out, yep.

8  Q  Do you remember anything specific about the meeting, about

9      the conversations that occurred, why he came out?

10  A  The reason he came out was -- at least from the Regional

11     Office point of view, the office wasn't performing, wasn't

12     delivering products, various things, it was just, you

13     know.  Some of it might have been EIR related

14     Congressional FOIA's, things like that.  I don't think it

15     was R items.  I may be throwing out a lot of acronyms here

16     or -- you know, Flight Standard.

17  Q  You say you think it was -- FOIA's would be?

18  A  Freedom of Information Act Requests.  They have timelines,

19     you know, when you have to respond and so forth.  And I

20     recall -- I mean definitely there was one -- we had a --

21     there was a computer program in the office and it was

22     touted as being this great program that they tracked

23     everything on.  Well, heck, there was stuff getting lost

24     right and left on that computer and it was out of sight,

25     out of mind, you know, and all of a sudden you get a phone

1        call from the Region, hey where's this FOIA stuff, it's 30
2        days overdue or -- that was -- happened more often than I
3        cared to live with, you know.

4    Q   Do you remember if as a result of this April meeting that
5        you came to any conclusion in your own mind or had any
6        discussions with anyone that you were going to leave
7        Johnnie Wallace out of the loop, work around him or bypass
8        him?

9    A   No, I had come to the conclusion that I was going to have
10       to track what I was involved with, I couldn't rely on the
11       office to do it anymore.  So in other words I was going to
12       have to create a tickler file or so something.  When I
13       first went out to the FSDO that system, and I think they
14       used to call it like Delores' book or something, and it
15       was supposedly tracking everything in the FSDO, like every
16       enforcement action, the whole nine yards.  And I found out
17       that it wasn't working either because of operator error or
18       something.  And it became apparent that I was going to
19       have to track, you know, what was important to me and the
20       office and other people needed to do that too.  Because
21       things were falling through the crack as far as the
22       Regional Office was concerned.  But no, not really
23       bypassing anybody, no.

24   Q   So would you ever have bypassed Mr. Wallace in any
25       decisions that were something that he should have been

1        involved with at his level?

2  A    Not if he was -- if he should have been involved, no, I

3        wouldn't bypass him.

4  Q    When you were doing the interview process, or any time

5        period, had you ever heard that John Duncan wanted Verene

6        Miller promoted as soon as possible?

7  A    No.

8  Q    Had anyone ever said that John Duncan wanted Verene

9        promoted as soon as possible?

10  A    I never heard that, no.

11  Q    Did you ever hear John Duncan say that he wanted anyone

12        promoted?

13  A    No.

14  Q    Did you ever hear anyone else say that John Duncan wanted

15        someone in particular promoted?

16  A    No, I never heard that.

17  Q    Did you ever have a feeling that John Duncan wanted Verene

18        Miller promoted?

19  A    No.

20  Q    Did you ever have a feeling that John Duncan wanted anyone

21        in particular promoted?

22  A    No.

23  Q    The issue of retirement and age in Flight Standards has

24        come up in this case.  Were there discussions amongst

25        people about retirement?

1  A    Well, I mean he might have talked about retirement and I
2       got a kid in high school so I'm not retiring for awhile.
3       But, yeah, I mean, you know, older guys are -- where
4       retirement's within sight you're always talking about
5       where you're going to end up or -- you know, to live or
6       what you're going to do or something like that.  But --
7       yeah, not anything beyond that really.

8  Q    Had -- did you ever have any conversations with Johnnie
9       Wallace about retiring while you were out there at the
10      FSDO?

11 A    Other than like what I just stated, no.  I mean Johnnie
12      was getting pretty fried, he told me he was -- if he had
13      to stay in that job much longer he -- he was going to
14      retire as soon as he was eligible and that was about it.

15 Q    Did you have any conversations or knowledge about Tom
16      Carter and retirement?

17 A    I mean, you know, there -- you know, Tom had talked about
18      it, mentioned it, yeah.  That was about the only elud --
19      you know, the only thing that was eluded to, yeah.  But
20      nothing of any length or seriousness.

21 Q    Did you know what he was going to do if he didn't get the
22      permanent position of Ops section supervisor out there at
23      the FSDO?

24 A    Well, I mean if I recall it, prior to them bidding those
25      positions, I -- Tom asked me to fill out a form for a

```
1          college, you know, that he was going to go to down in
2          southwest, I think become a gunsmith or -- master
3          gunsmith.  That was -- I'm pretty sure that was prior to
4          them announcing them bidding the positions because they
5          had drug their feet on it.  You know, it was just sitting
6          with actors for quite awhile.  But other than that, that
7          was all.
8      Q   In Flight Standards if there was a -- I guess a typical
9          age of Flight Standards Aviation Safety Inspectors, what
10         would you say that age was?
11     A   I would -- I don't know, 45.  At least.  Maybe even
12         higher.
13     Q   Do you hire people that are fairly old in Flight Standards
14         or -- I mean initial hiring?
15     A   Yes.
16     Q   Do you recollect anyone in particular and about what age
17         they were?
18     A   Well, there's been a number of furloughed or even retired
19         airline people, you know pilots and so forth that have
20         completed a career or they were well into a career, you
21         know, and then -- Jack Seymore come out of Northwest.
22     Q   Do you know about how old Jack Seymore was?
23     A   He's got to be in his 60's now, yeah.  I don't remember if
24         he re -- no, he got -- he left Northwest or something.
25         But he was not young by any means when he came on board,
```

1      late 50's, yeah.

2  Q    I have.....

3  A    He was just not one, there's quite a number of folks like

4      that.

5  Q    Do you know currently in Flight Standards, whether at the

6      Anchorage FSDO or anywhere else, is there -- what -- who

7      the oldest person is working and how old they are?  Just

8      asking, I don't know if you know.

9  A    I wouldn't -- I don't have a clue, no.  No.

10  Q    Do you know if anyone's ever retired from Flight Standards

11      in their 70's?

12  A    Yes, I'm almost positive we've had a couple folks been up

13      there, 70's.  Yeah.  You know, early 70's.

14      MS. JONES:  Okay.  I don't think I have any further

15  questions at this time.

16      THE COURT:  All right, thank you.  Cross examination.

17      MR. FLEISCHER:  Yes.  Your Honor, could -- I respectfully

18  ask for a brief -- just a very brief break.

19      THE COURT:  All right.  Let's take a 10 minute break.

20      THE REPORTER:  We're off the record.

21      (Off record at 9:34 a.m.)

22      (On record at 9:51 a.m.)

23      THE REPORTER:  We're on the record.

24      THE COURT:  Go ahead Mr. Fleischer.

25      MR. FLEISCHER:  Thank you Your Honor.

1                          **CROSS EXAMINATION**

2    BY MR. FLEISCHER:

3    Q    I'm Hugh Fleischer, I represent Tom Carter.

4    A    Okay.

5    Q    Mr. Girard, good morning.

6    A    Good morning.

7    Q    In regard to your testimony about David Lucher, you gave

8         an example, did you not, in response to a question that

9         Ms. Jones asked you about Lucher in which he was basically

10        telling you something that you considered to be

11        inappropriate about his own way of dealing with the

12        section.  Is that right?

13   A    Oh, it was just the way he operated, you know, that -- his

14        views on what's.....

15   Q    But in terms of the example that you gave, the example

16        that you actually gave in your testimony about him, he was

17        giving you a statement that you considered to be

18        inappropriate, is that correct?

19   A    Yes.

20   Q    But there wasn't anything in that statement in which he

21        was misstating a fact of his intention or otherwise, was

22        he?

23   A    Not a fact, no.

24   Q    Yeah.  All right.  Okay.  You were asked by Ms. Jones

25        about the position description at F-12.  And looking at

1       that again, the first document in F-12 is there.  And that
2       bears what date on it?

3    A  I'll have to.....

4    Q  Where the signatures are, up here.

5    A  The two signatures?

6    Q  Correct.

7    A  8/22/2000, 8/14/2000.

8    Q  And those dates actually postdated the actual decision of
9       the selecting official, did they not?

10   A  I don't know to tell you the truth.

11   Q  Okay.  All right.  You indicated that the interview panel
12      had met in July, is that right?

13   A  Yes.

14   Q  Of 2000.

15   A  There was a bit of a delay getting the last individual
16      done and -- pretty sure it got done in July.

17   Q  All right.  Okay.  How long have you known Tom Carter, Mr.
18      Girard?

19   A  Well, let's see.  About 14 years.  I mean he was in
20      different capacities.  You know, I think when I first met
21      him he was the Safety Program Manager I think downtown I
22      think was the first time.

23   Q  Yeah.  And what capacities have you served with him in --
24      during that time over the last 14 years?

25   A  Well, he was acting 230 branch manager at the Regional

1          Office, he was a supervisor -- or a section supervisor out

2          at the FSDO.  He was a Operations Specialist in the 230

3          branch.  It may have been titled differently because he

4          was there for quite a period of time.  They got 250, 230,

5          same functions.  Up in the RO for a number of years, I'd

6          say five at least or so.

7    Q     Have you had occasion to work directly with him during

8          that period?

9    A     To a limited degree.  Our -- you know, our paths didn't

10         cross that much, but on occasion, yes, we had some common,

11         you know, issues and things.  Right.

12   Q     Did the both of you work together on an issue about

13         Northern Air Cargo concerning NDB approaches to Aniak?

14   A     Yes.

15   Q     And did you find that Mr. Carter's work in that area was

16         proficient and was good?

17   A     Yes.

18   Q     You do remember that issue.

19   A     Yes.

20   Q     Did he also prepare correspondence and coordinate it

21         through you and the principal operator inspector?

22   A     Yes, he did on occasions, right.  He had me review some

23         things sometimes that wasn't even my job, just to look at

24         it, you know, to -- second set of eyes type thing.

25   Q     Which was kind of an appropriate management type of

1      approach, was it not?

2   A   Yes.

3   Q   And what -- were his work functions dealing with the air

4      space issues with you along the same line would you say?

5   A   Yes.

6   Q   In other words quite positive?

7   A   Yes.

8   Q   Did you ever work special IFR routes on the North Slope

9      for airplanes and helicopters?

10   A   Yes, I have.

11   Q   And did you work those issues with the principal operators

12      inspector or did you bypass him?

13   A   Well, I would have had to get involved with the POI at

14      some level. They -- those are issued via what they call

15      op specs, operation specifications, and the POI is the one

16      that actually cuts them. So I'm not sure exactly which

17      instance you're referring to, but normally we deal with

18      the POI's and the operators on that. Or potentially the

19      supervisor in the FSDO too could get involved depending on

20      how complex it was.

21   Q   Did you ever work special IFR approaches into Valdez with

22      Lou Gossen while he was principal operations

23      inspector.....

24   A   Yes, I did.

25   Q   .....for ERA?

1   A   Yes, I did, many years ago.  Right.

2   Q   Did you work special IFR approaches into Juneau?

3   A   Yes.

4   Q   Did you work those with Alaska Airlines and the principal

5       operations inspector for Alaska or did you bypass the

6       principal operations inspector?

7   A   No, I've worked them the airline and the POI.  There was

8       more than one POI over the years.

9   Q   Do the POI's and the supervisors deal with air space

10      issues?

11  A   They do, when it affects their operator they'll get

12      involved.  It's not that often, but on occasion, yes.

13  Q   But it's somewhat infrequent, is that correct?

14  A   Yes.  Yeah.

15  Q   Are you an Aviation Safety Inspector, Mr. Girard?

16  A   Yes.

17  Q   All right.  And do you have those credentials as an

18      Aviation Safety Inspector?

19  A   Yes.

20  Q   And what do those credentials specifically provide?

21  A   Essentially it just identifies he is an Aviation Safety

22      Inspector and it also allows me cockpit access.  That's

23      about their only function.

24  Q   And do you know if Tom Carter has the same credentials

25      that afford him the same opportunity?

| 1 | A | Yes, as long as he was an ASI.  Yes. |
|---|---|---|
| 2 | Q | Has anyone to your knowledge ever worked in your |
| 3 | | department that was not an Aviation Safety Inspector?  The |
| 4 | | professional positions of course I'm talking about. |
| 5 | A | Right. |
| 6 | | MS. JONES:  When you..... |
| 7 | A | No.  I mean they -- Flight Standards always required them |
| 8 | | to become qualified, yeah, as an ASI.  They might come in |
| 9 | | initially as not an ASI and then have to become one. |
| 10 | Q | As an applicant, yeah. |
| 11 | A | Right.  Well, they might have come out of another part of |
| 12 | | the FAA even and then they -- but they qualified to become |
| 13 | | an ASI, had the qualifications, and then they might |
| 14 | | require them to go down to Oklahoma City and go through |
| 15 | | some schools and so forth. |
| 16 | Q | While you and Tom Carter were at the Anchorage FSDO were |
| 17 | | you his direct supervisor? |
| 18 | A | Yes. |
| 19 | Q | And how long would you say that Carter worked for you? |
| 20 | A | Well, it was at least -- three to four months at least. |
| 21 | | It may have been longer, you can correct me if I'm wrong, |
| 22 | | but it was several months. |
| 23 | Q | To the best of your recollection what was his work |
| 24 | | assignment?  That's Carter's work assignment. |
| 25 | A | He was the section supervisor over all the Operations Unit |

| 1  |   | Supervisors. For Operations.                               |
|----|---|------------------------------------------------------------|
| 2  | Q | And how would you describe his work in that capacity?      |
| 3  | A | It was excellent.                                          |
| 4  | Q | I presume that he wasn't a procrastinator but was really a |
| 5  |   | proactive worker, was he not?                              |
| 6  | A | Yes, he was.                                               |
| 7  | Q | As well as being a self starter?                           |
| 8  | A | Yes, he is.                                                |
| 9  | Q | And would you say that Tom Carter is a team player?        |
| 10 | A | Yes.                                                       |
| 11 | Q | All right. You sent an e-mail message trying to get Tom    |
| 12 |   | Carter extended, did you not?                              |
| 13 | A | If I could see it would.....                              |
| 14 | Q | Yeah, let me.....                                          |
| 15 | A | .....refresh my memory.                                    |
| 16 | Q | Let me show it to you. This is.....                        |
| 17 |   | (Whispered conversation)                                   |
| 18 | Q | Yeah, I think this is from C-8, it's 16, 17 and 18.        |
| 19 |   | (Whispered conversation)                                   |
| 20 | Q | It's my understanding that that Exhibit.....               |
| 21 | A | Right.                                                     |
| 22 | Q | .....is only the reply, but.....                           |
| 23 | A | Right, yeah.                                               |
| 24 | Q | .....does not include the request. But does that refresh   |
| 25 |   | your.....                                                  |

1   A   Yeah, yeah it does.

2   Q   .....recollection on the question?

3   A   Yeah.  Yeah, I remember the technical jargon in my -- the

4       response I got about asking for the extension.

5   Q   In fact did you in -- did you make that request

6       though......

7   A   Yes.

8   Q   .....for an extension?  All right.

9       MR. FLEISCHER:  I would offer Complainant's Exhibit 8,

10      pages 16 through 18 Your Honor.

11      THE COURT:  Any objections?

12      MS. JONES:  None.

13      THE COURT:  Admitted.

14      (Complainant Exhibit C-8, pages 16 through 18 admitted)

15  MR. FLEISCHER RESUMES:

16  Q   Do you remember a meeting in mid April of 2000 when -- and

17      this was I believe the same meeting that Ms. Jones asked

18      you about, and that meeting was about why work was not

19      being accomplished and assignments, you know, were overdue

20      and so on, when you met with Kent Adams in April of 2000?

21  A   Right, I remember it.

22  Q   Was there a finding at that meeting that Johnnie Wallace

23      was withholding assignments and he was not passing the

24      work to you to assign to the Airworthiness and Operations

25      sections?

1  A  I wouldn't phrase it that way.  I -- like things were not
2     getting accomplished, I don't think that Kent Adams came
3     right out and said that Johnnie Wallace was losing stuff
4     or it was piling up on his desk or something, you know,
5     direct accusation.  But that's why I was -- I eluded to --
6     that things were falling through the crack, they weren't
7     getting accomplished because they weren't seeing the light
8     of day, they were more or less being lost or misplaced or
9     whatever.  I think that was the conclusion you might say
10    of the meeting, you know.

11 Q  Isn't it a fact, Mr. Girard, that if that phenomenon was
12    occurring as you've described it that Johnnie Wallace as
13    the acting office manager would have the responsibility
14    therefore?

15 A  Yes.

16 Q  All right.  And were some of the -- those work assignments
17    overdue at the time of the meeting?

18 A  Yes, they were.

19 Q  And did you also find that some of them had never actually
20    been assigned?

21 A  Yes.

22 Q  Do you remember how many there were that hadn't been
23    assigned?

24 A  No.  No.  It was more of a general discussion than a real
25    specific discussion.  You know what I'm saying?

KRON ASSOCIATES
1113 W. Fireweed Lane, Suite 200
Anchorage, Alaska  99503
(907) 276-3554

1   Q    But did you get the impression that there were quite a few
2          that in fact.....

3   A    Yes.

4   Q    .....had not been assigned?

5   A    Kent Adams was not real happy.  He wasn't, you know, real
6          upset, but I mean it was -- he was serious about the
7          meeting.  Yeah.

8   Q    Do you remember a meeting shortly after that meeting with
9          Tom Carter and possibly Jerry Martelli when you told them
10         that you had been -- that you had been proactive and
11         completed as much a routine as you could on your own and
12         that that didn't involve Johnnie Wallace in anything that
13         was not necessary to involve him because he delayed the
14         work?  Do you remember any meeting to that effect where
15         you had that discussion?

16   A    Yes from the perspective that -- I would never bypass my
17         boss if he -- if it was something he needs to see.  Okay?
18         Because that just isn't the way I do business.  But if
19         it's something that I can do or should be doing anyways
20         and or the Unit Sups and the section supervisors, they
21         should be taking action and just do it.  So -- in other
22         words I would not suggest to bypass the boss on something
23         he should be seeing, let's put it that way.  But if he
24         doesn't need to see it, fine.  You know.

25   Q    And you were emphasizing that same position with Unit

1    Supervisors and others that were working there, is that
2    correct?
3  A  Units, I would go below.....
4  Q  Units.
5  A  Yeah, Unit Supervisors, section supervisors, you
6    definitely wouldn't want to go down to that level with
7    that much latitude.
8  Q  Did Tom Carter acknowledge those instructions, that is to
9    make sure that anything that had to go to Wallace did go
10   but those things that were more routine in fact could be
11   -- should be done independently of him?
12 A  I feel quite certain that Tom would not keep something
13   from the office manager that by all rights that person
14   should be involved in, especially decision making.  Other
15   than that assume the authority and do the job, you know.
16 Q  You indicated in -- at the outset of your testimony, Mr.
17   Girard, that you had had military experience.....
18 A  Yes.
19 Q  .....is that correct?
20 A  Uh-huh (affirmative), yes.
21 Q  And you were a military pilot?
22 A  Yes.
23 Q  And were you also a commanding officer in a military unit?
24 A  Yes.
25 Q  I'd like for you to look at Tom Carter's application.

1        Twenty, I believe it's F-20 of the ROI.

2        (Whispered conversation)

3    Q   I'd like to show you what is page six, numbered page six

4        of the F-20 and where it says relevant military experience

5        and ask you to review that to yourself if you would.

6        (Pause)

7        MS. JONES:  What are we looking at?

8        MR. FLEISCHER:  It's right down.....

9        UNIDENTIFIED MALE:  (Indiscernible), page six.

10       MS. JONES:  Okay.

11       UNIDENTIFIED MALE:  It's the 23rd page (indiscernible).

12   A   I've read it.  There was two pages.

13   Q   All right.  And the next page as well?

14   A   Right, there was a page six and seven.

15   Q   All right.

16   A   Yeah, the relevant military experience?

17   Q   Right.

18   A   Right.  I read that.

19   Q   Okay.  And what were the -- just the headlines of the

20       respective positions that he held in relative military

21       experience, Mr. Girard?

22   A   Well, I mean you have to be a staff sergeant in the Air

23       Force, he's a pilot in command, PIC, in Army helicopters

24       and he's a -- what they call a stand pilot,

25       standardization pilot.  That's a pilot that ensures

1       standards within the unit.  He was an ops officer in --

2       twice in two different units.  And then he was the

3       commanding officer.  All aviation units.

4   Q   Right.

5   A   I have 20 years in the Army so I cut to the quick, I.....

6   Q   Right.

7   A   .....know what they all are.

8   Q   Thank you, I appreciate that.  And you also indicated in

9       your response to questions from Ms. Jones that you'd

10      worked in civil aviation, is that correct?

11  A   That's correct.

12  Q   Based on your own military experience and your experience

13      in civil aviation would assignments as a mission

14      commander, command and control officer for operations and

15      special forces, recognizance teams and long range patrols

16      and commanding officer for the aerial surveillance and

17      target acquisition platoon with 70V1 Mohawks and

18      responsible for a $25 million property book be equivalent

19      to the duties and responsibilities of a chief operating

20      officer of an air taxi operation as far as you -- based on

21      your own knowledge and experience?

22  A   Yeah, I would say easily.

23  Q   All right.  In your opinion would being an operations

24      officer for VIP flight detachment scheduling, both

25      helicopter and airline pilots, to two countries and

1       supervising 12 pilots and 15 to 20 crew chiefs and door
2       gunners be equivalent to a position of Director of
3       Operations?
4   A   Yes.  Yeah.
5   Q   Even though most DO's aren't dealing with.....
6   A   Different worlds, but yeah.
7   Q   .....guns, but -- okay.  And would being assigned as an
8       operations officer for the same aerial surveillance and
9       target acquisition platoon that I mentioned before
10      previously with duties of scheduled flights and assigning
11      flight crews to all points in Alaska and arranging all
12      logistics for deployments be equivalent to the duties of a
13      Director of Operations?
14  A   Yes.
15  Q   Tom Carter was also a chief warrant officer as you
16      mentioned.  Do you agree that the duties described for
17      that position are normally performed by a commissioned --
18      by the commissioned officers?
19  A   They are everywhere else except the Army.
20  Q   Do you think Tom Carter's commanding officer and battalion
21      commander had a high degree of confidence and trust in Tom
22      to allow him to be assigned to those duties?
23  A   I can guarantee you they did.
24  Q   In your opinion would being a chief standardization
25      instruction pilot and only instrument examiner in the unit

1     and supervising three other instructor pilots and
2     scheduling all training and check rides for 20 pilot
3     flight detachment be equivalent to those duties as chief
4     pilot of an air taxi operation?

5  A   Yes.

6  Q   Now let me ask you this, Mr. Girard, in -- regarding your
7     work as the chairman of the interview panel, did the panel
8     look to that experience that we've just recounted in
9     evaluating the level of credit that you were to give Mr.
10    Carter or this position?

11  A   I did not question anybody concerning the review of the
12    bid packages and no one asked me any specific questions
13    about the individual bid packages. So I really can't
14    speculate as to how much weight anyone gave to the
15    military experience versus civilian and so forth. And of
16    course there were no questions in the interviews that --
17    about military experience or anything like that.

18  Q   Right.

19  A   If that answers your question.

20  Q   Well, I think it does, but I have several others that
21    relate to the same subject.

22  A   Sure.

23  Q   Now of the six applicants is it true, Mr. Girard, there
24    was only one applicant that was relying on what's so
25    called equivalency for purposes of making the cut to

1     actually be considered?

2  A  Yes.

3  Q  All right.  So in regard to Ms. -- and that was Verene

4     Miller of course.

5  A  That's correct.

6  Q  Okay.  In regard to the panel's consideration of Ms.

7     Miller's application, did you as a panel member look to

8     those equivalency statements of fact that she had made in

9     her application in determining whether or not she was the

10    most qualified?

11  A  No, not in that respect.  I looked at it for equivalency

12    to rate the KSAO's.  In other words I looked -- I had to

13    -- and I assume that the other folks did also, looked at

14    what was in the bid package and tried to equate it to

15    government service, in other words in Flight Standards

16    experience or airline experience, things like that.

17  Q  Okay.

18  A  So we kind of had to do our own equivalency balance as we

19    went through the package.

20  Q  Okay.  My question to you then is this.  You of course

21    having gotten the packets from Naomi Christensen before

22    they were given to all of the members of the panel, is

23    that true?

24  A  That's correct.

25  Q  And you reviewed those after you got them from Ms.

1    Christensen.

2  A   Yes. I only reviewed them for the purposes of scoring, I

3        didn't look through them for any other purpose. Yeah.

4  Q   Well, I mean after you got them from Ms. Christensen

5        though did you review them before you actually submitted

6        them to the other panel members?

7  A   I don't recall if I scored them first or whether I just

8        gave them out to the folks and waited till they were all

9        done and then got them back and -- I think I gave them out

10       first, I didn't want to delay anything. Because there's

11       always people coming and going, going on vacation, so I

12       may have given them to Mel Williams first and asked him if

13       he -- of course take his time, there was no rush, and to

14       go ahead and do them and I think I did them last. Yeah.

15  Q   All right. Did you know -- at what point in the process

16       did you know that Ms. Miller's application was unique in

17       that it was relying on the equivalency of civilian

18       experience?

19  A   I knew before she bid.

20  Q   Okay. So you did know that at the outset.

21  A   Right.

22  Q   All right. Okay. Well, my question is this. As chair

23       and given the fact that you knew that her civilian airline

24       experience, or civilian air experience, was going to be

25       used by the panel in determining whether or not she had

| | | |
|---|---|---|
| 1 | | met respective KSAO's, why did you not then ensure that |
| 2 | | each and every of the candidates had equivalent |
| 3 | | information about their civilian air experience, if in |
| 4 | | fact they had any such experience? |
| 5 | A | I did not ensure, I looked at it as though there's a bid |
| 6 | | on the street and it's up to the individual to put in the |
| 7 | | package whatever them deem fit and necessary for the bid. |
| 8 | | You know..... |
| 9 | Q | Well, I mean..... |
| 10 | A | In other words, if they omitted something I would not know |
| 11 | | they omitted something. I don't..... |
| 12 | Q | If someone applied for this position were they as a |
| 13 | | proposed applicant told what the other applications were? |
| 14 | | By anyone? |
| 15 | A | No. |
| 16 | Q | No. So the other members would not know presumably that |
| 17 | | there was an applicant who was relying on equivalency of |
| 18 | | civilian air experience. |
| 19 | A | That's correct. |
| 20 | Q | Do you believe that the process, whether -- in HR or |
| 21 | | otherwise should have ensured that the interview panel had |
| 22 | | equal information about the respective candidates as to |
| 23 | | civilian air experience if it was being considered for Ms. |
| 24 | | Miller? |
| 25 | A | I don't know really how to answer -- I -- not -- I'm just |

1        not putting you off here, I'm just.....

2   Q    No.

3   A    .....going to explain my thought process that.....

4   Q    Sure.

5   A    .....normally.....

6   Q    Please, go ahead.

7   A    .....in the -- when you bid on a job a person -- it's
8        expected that a person puts down all the relevant, you
9        know, information, hopefully they put all the relevant
10       information.  I -- I'm not real clear as to whether or not
11       we needed to indicate to the other bidders that we have
12       someone bidding, they're choosing a -- some sort of an
13       equivalency, you know, process here.  I haven't.....

14  Q    Well.....

15  A    .....seen that occur before so I -- it's hard to say a yes
16       or a no, but I tend to think that if we had told them it
17       probably wouldn't have changed the other bid packages.  I
18       -- just having remembered what they looked like and the
19       types of experience those people had.  I hate to run on
20       like that.

21  Q    Well, but isn't it a fact -- I mean first of all, as
22       you're indicating, this equivalency business was kind of
23       unique in this case, was it not?  You didn't see that --
24       you certainly didn't see it in the other interview panels
25       that you worked on, or did you?

1   A   She was the only one in this entire process, in this

2       particular bid.

3   Q   Right.

4   A   Right.

5   Q   And so that -- and that was the general situation

6       presumably, that it was very rare, if at all, used.  Isn't

7       it a fact that persons making application for promotions,

8       as this was for these various people who made the

9       promotions here, assume that their FAA experience was

10      going to be the critical determinant as to whether or not

11      they were going to get the job?

12  A   My experience is within the FAA that's a true statement,

13      from my experience.  If you're hiring off the street we go

14      with equivalency quite often.  If we're hiring like a --

15      what I mean by that is.....

16  Q   By definition.....

17  A   .....we hire a lot of airline pilots, mechanics.

18  Q   By definition you go equivalency because they haven't had

19      FAA experience.

20  A   Right.

21  Q   Right.  But in term.....

22  A   Yeah.  In military it's quite common.

23  Q   Right.

24  A   For equivalency.  And -- even though it's the same a lot

25      of people don't understand the military world unless they

1        lived in it.

2    Q   Right.

3    A   So we call it equivalency quite often.

4    Q   Right.  But in terms of promotions from within the Agency,

5        particularly the supervisory positions, such as the one

6        here that we're talking about.

7    A   Yes.

8    Q   The experience that persons have in the Agency, the --

9        kind of the common experience is that the determining

10       factors are going to be based on their actual FAA

11       experience.....

12   A   Yes.

13   Q   .....are they not?

14   A   I agree with you there.

15   Q   Yeah.  And -- so isn't it a fact that those people, those

16       applicants who are listing their FAA experience and

17       omitting, because they don't believe that it's going to be

18       considered by the panel, civilian experience were really

19       not given credit for the very kinds of things that they

20       may -- they had that Ms. Miller had.

21   A   It may have occurred.  I -- it's possible some of them may

22       have omitted something and -- because of that.

23   Q   Okay.  Let's see.  Do you believe that the other members

24       of the interview panel were qualified to evaluate military

25       experience?

1   A   Not all of them, no.

2   Q   Was there any kind of training of the panel as to those

3       questions?

4   A   No.

5       (Whispered conversation)

6   Q   So in looking at F-24, which is the Operations and

7       Airworthiness section supervisor interview ratings, you've

8       got that in front of you there?  Yeah.

9   A   Okay.  Wait a minute.  All right, got it.

10  Q   I mean isn't it a fact that the various ratings that Ms.

11      Miller had for the various KSAO's, one through 10.....

12  A   Wait a minute, maybe I'm on the wrong one here.

13  Q   I'm talking about F-24, which is a one page document

14      that.....

15  A   What I've.....

16  Q   .....has the interview ratings.

17  A   Interview ratings, right.

18  Q   Yeah.

19  A   Right.  You said -- yeah.  KSAO's, I thought you meant --

20      referring to the review of the packages, yeah.

21      (Whispered conversation)

22  Q   Well, let me ask you.  Regarding that document, you have

23      it in front of you?

24  A   This one right here, correct?

25  Q   Yeah.  Yes, thank you.

1   A   Okay.

2   Q   Do -- what do the numbers one, two, three through 10, are

3       those.....

4   A   Those are the questions.....

5   Q   Respective.....

6   A   .....question number one, question number two.

7   Q   Right.  And then on page -- on F-23.....

8   A   Those are the review of the packages, the bid packages.

9   Q   Right.  And these are the actual KSAO's.....

10  A   Correct.

11  Q   .....is that right?

12  A   Correct.

13  Q   So isn't it a fact, and looking at again 23, F-23, Mr.

14      Girard, that the response to KSAO number one in which Ms.

15      Miller was given a 4.0 and Ms. Jokela was given a three --

16      I can't tell whether that's a seven.

17  A   Seven.

18  Q   Okay.  And Mr. Garroute was given a 3.0 and Carter was

19      given a 4.3, Bown was given a 4.1, Brice was given a 3.3

20      That Ms. Miller's equivalency experience was being used to

21      determine that she got a 4.0 as to KSAO one.  True?

22  A   I'd have to look at which KSAO it was.  I don't know

23      whether it.....

24  Q   Okay.  Well, let's go to the KSAO's.  Let's see here.  I

25      believe.....

1    (Whispered conversation)

2    Q    In F-19 in Ms. Miller's application, I think those KSAO's.

3         MS. JONES:  Probably the fastest way to find the KSAO's is

4    to go to the announcement and they're listed out very succinctly

5    in that.

6         MR. FLEISCHER:  Okay.

7         (Whispered conversation)

8         THE COURT:  That would be at F-14.

9         MR. FLEISCHER:  Thank you Your Honor, yes.  The amended

10   announcement, right.

11   A    Okay, yeah.  KSAO number one, knowledge of and ability to

12        apply Federal Aviation regulations, FAR's, FAA policies

13        and technical procedures as it relates to Flight Standard

14        program.  Yes, then I would say -- to your question.....

15   Q    Okay.

16   A    .....that would be -- I'm sorry, I just wanted to make

17        sure it wasn't.....

18   Q    Sure.  Yeah, I appreciate that.

19   A    .....ability to, you know, orally communicate and.....

20        THE COURT:  Well, let me clarify something Mr. Girard.

21   Did each of the panel members independently rate each of the

22   candidates as to each KSAO?

23        THE WITNESS:  That's right.

24        THE COURT:  All right.

25        THE WITNESS:  That's correct.

1        THE COURT: So how do you know what criteria each of the

2   panel members used in determining their own individual KSAO

3   rating for question number one?

4        THE WITNESS: I don't. I don't know.

5   MR. FLEISCHER RESUMES:

6  Q   You do know as to your own determination though, do you

7     not, Mr. Girard?

8  A   Yes.

9        THE COURT: All right. And would you.....

10  Q   Okay. Go ahead, I'm sorry, I didn't mean to interrupt.

11        THE COURT: No, that's fine, that's -- and what was your

12  own determination when you looked at ques -- at KSAO number one

13  in assessing the individual candidate's experience? Was it

14  based on the information provided in each candidate's packet?

15        THE WITNESS: Yes.

16        THE COURT: All right. In the totality of each

17  candidate's packet?

18        THE WITNESS: Yes.

19        THE COURT: All right. Go ahead Mr. Fleischer.

20        (Whispered conversation)

21  MR. FLEISCHER RESUMES:

22  Q   Okay. And then as to KSAO number two, which again in F-

23     14.....

24  A   Right.

25  Q   .....relates to organizing, planning, coordinating and

1      follow through skills. The same question, did you -- when

2      you determined her score for KSAO number two, that is Ms.

3      Miller's score, did you relate that to the equivalency

4      information that she had provided?

5  A  To the total package, which would include that, yes.

6  Q  And the same as to the other.....

7  A  Yes.

8  Q  .....two KSAO's.

9  A  Right.

10  Q  Yeah. Now in KSAO number one Mr. Carter got three points

11     more than Ms. Miller. On KSAO number two Mr. Carter

12     received one point less than Ms. Miller.

13     THE COURT: Well, let's clarify the record. It's not

14  three points more, it's point three.

15     MR. FLEISCHER: Point.

16     THE COURT: And it's.....

17     MR. FLEISCHER: Point three is.....

18     THE COURT: All right.

19     MR. FLEISCHER: .....what I meant to say, I'm sorry.

20     THE COURT: All right.

21  Q  And there's one point difference, Ms. Miller exceeded Mr.

22     Carter by point one in KSAO two and point one in KSAO

23     three and then Mr. Carter exceeded her by two points in

24     the -- in four. But as to two and three, which are,

25     again, organizing, planning, coordinating and follow

1       through skills, based on your own review and knowledge of

2       the experience that Mr. Carter has, both in terms of his

3       military experience, his private aeronautical experience

4       and his quarter of a century of FAA experience, how do you

5       believe that he rated lower than Ms. Miller on that

6       subject?

7   A   I don't know.  I mean I could only attest to my evaluation

8       of his package is I didn't question or second guess anyone

9       else's rating which obviously had an overall effect on the

10      final scoring.  And I -- I might point out that the Flight

11      -- right now the Flight Standards policy here, this

12      process only uses a one, two, three, four, five.  I

13      interjected the point five discriminators because

14      otherwise we'd only have three's and four's here on the --

15      on this document.  And there would have been hardly any

16      discrimination at all between bidders, but I'm not -- I

17      don't know, all I can say is the other reviewers must have

18      for some reason on that particular KSAO rated Tom a little

19      bit lower than Verene.  I know I did not.

20  Q   Who else was on the interview panel, Mr. Girard?

21  A   There was Mr. Ruben Saldana and there was Mel.....

22  Q   Who's  Mr. Ruben  Saldana, could  you describe  who he

23      is?

24  A   He's a Airworthiness inspector at the FSDO.  Mel Williams,

25      he's the Civil Rights Manager here in the Region.  Jerry

```
1        Nunnalley, he's an Operations ASI and Delores Coates,
2        which she's acted in several capacities, LMR, Human
3        Relations, and myself.
4    Q   And I would ask, as to KSAO three, which is the ability to
5        apply interpersonal skills in a model work environment,
6        identify those experience and -- which demonstrates your
7        ability to work effectively in a team environment.  Are
8        you familiar with -- are you -- do you know why it is that
9        Ms. Miller exceeded Mr. Carter in that category?
10   A   No, I don't at all.  Again, I had rated him higher myself,
11       just -- I had to go with whatever people submitted so long
12       as it -- there wasn't a great discrepancy.
13   Q   Yeah.  And based on the testimony you gave on direct
14       examination in that regard, under that KSAO, ability to
15       apply interpersonal skills in a model work environment,
16       you had volunteered that based on your own experience that
17       Ms. Miller was a gruff person at times, is that true?
18   A   That's correct.
19   Q   And do you know if -- in looking at the candidates that
20       are listed on F-24 -- 23, excuse me, do you know if M.
21       Brice listed in the application civilian air experience?
22   A   He listed experience where he was an instructor pilot, I
23       think it was for a private entity in Iran, he did
24       instructing over there.  I suspect some of it was CIA or
25       something, but -- you know, he did have some non-FAA
```

1    aviation experience.

2  Q  What about Mr. Bown?  Well, let me just go back to Brice

3     though.  Do you know if he listed any and all of the

4     civilian experience or non-FAA experience he had had?

5  A  I don't know if he listed all of it, but he did list -- it

6     appeared to be all that he had.

7  Q  All right.

8  A  Yeah.

9  Q  As to Mr. Bown, same question.

10  A  Mr. Bown basically if I recall only listed pretty much his

11     FAA experience.

12  Q  All right.

13  A  I think.  He -- well, no, he was -- he did work as a

14     instructor, ground school instructor, for a corporation.

15     Which was not as a pilot, but he was a ground school

16     instructor for a number of years.

17  Q  What about Mr. Garroute, do you know if he listed.....

18  A  Yes, he did.  His aviation experience was all civilian.

19  Q  And Ms. Jokela, do you know -- same question.

20  A  You know, Val had civilian experience and FAA experience

21     and she listed that.

22     (Pause)

23     (Whispered conversation)

24  Q  Let me ask you to look here.....

25  A  Oh, want this back?

1   Q   This is F-20 and it's the page -- it's a continuation of

2      the SF-171 and it starts at the top -- it's a full page

3      and it has Jerry Paterson's name and it's C at the top.

4      Want to make sure everybody has that.  Do you have it

5      Cheryl?

6      MS. JONES:  Not yet.  So what am I looking.....

7      MR. FLEISCHER:  It says -- down at the bottom it has I

8 have also served on a number of national committees.  It's

9 this.....

10     MS. JONES:  So experience block C of Tom Carter's

11 application.

12     MR. FLEISCHER:  Correct.

13     MS. JONES:  With you.

14     MR. FLEISCHER:  Additional work experience blocks.  Okay.

15 MR. FLEISCHER RESUMES:

16   Q   Looking at that last paragraph that's on that page, Mr.

17      Girard, in terms of those national committees do you know

18      as a matter of fact whether he received credit from the

19      panel for service on those committees?

20   A   I don't really recall whether he received any -- you know,

21      like letters of appreciation or whatever.

22   Q   No, I'm talking about the panel's consideration.

23   A   Oh, oh, oh.

24   Q   The panel's consideration, that is your interview panel

25      that you chaired.

1   A   No, I don't know what the other people -- you know, what
2       they took into consideration or not.
3   Q   Could you state who your current supervisor is, Mr.
4       Girard?
5   A   James Gardner, he's the assistant division manager.
6   Q   Okay.  And how long has he been your supervisor?
7   A   How long has James Gardner been here?  Six months.
8   Q   Okay.
9   A   I think -- yeah, not very long.
10  Q   Did you ever have occasion to supervise Bob Christensen
11      while you were assigned as acting assistant manager at the
12      FSDO office?
13  A   Yes.
14  Q   And did you consider him a good supervisor and set good
15      examples for the office employees?
16  A   No.
17  Q   Was Bob Christensen allowing his employees to claim
18      compensatory time on their T and A records for the time
19      they served on weekend accident standby and under the
20      claim that they were reviewing manuals?
21  A   Yes.
22  Q   Was claiming compensatory time for weekend standby against
23      official FAA policy and directives?
24  A   Yes.
25  Q   And Regional guidelines as well?

1    A    Yes.

2    Q    Were you having any other problems with him besides the T

3         and A claims?

4    A    Yes.

5    Q    Without being specific would you say that people were

6         having ethnic integrity issues with Bob Christensen?

7    A    Yes.

8    Q    Did you ever meet with John Duncan and Kent Adams and ask

9         them to reassign Bob Christensen out of the Anchorage

10        office?

11   A    Yes.

12   Q    And why did you want him reassigned please?

13   A    Because I figured he'd do less damage here at the RO than

14        he was doing at the FSDO.

15   Q    And based upon your own experience with him and as one who

16        supervised him do you have an opinion on his truthfulness

17        and forthrightness?

18   A    Yes.

19   Q    And what is that opinion?

20   A    I wouldn't necessarily believe anything he said.  And --

21        period, I guess that's the best way to put it.  In other

22        words that I'd ver -- anything important I'd verified.

23   Q    You know that you're protected as a ma -- as one who is

24        actually a witness in a proceeding before the EEO for your

25        testimony here today, do you know that?

1   A   No.

2   Q   Okay.  And if you have any fear of retaliation of Bob

3       Christensen.  Do you in fact have any fear from him?

4   A   No.  No.

5   Q   Okay.

6   A   But, you know, I would not feel real comfortable if I knew

7       he didn't like me, put it that way.

8   Q   Yeah.  Okay.  Going to the issue of Ms. Miller's

9       performance within the FAA, you were talking about the

10      training program and that there was a profile developed

11      that related to specific positions for the training that

12      was needed for that position.....

13  A   Correct.

14  Q   .....is that correct?

15  A   That's correct.

16  Q   And isn't it a fact that that was done on a national

17      basis?

18  A   Yes.

19  Q   So that tho -- because the positions, of course, are

20      national in scope, are they not?

21  A   That's right.

22  Q   There are ASI's throughout the nation.

23  A   Yes, that.....

24  Q   And indeed abroad for that matter, to some extent.

25  A   Correct.

1  Q   Yeah.  And so was it a question of implementing the
2      national profile that had in fact been developed?
3  A   Yes.  Yeah, and sharing that we weren't submitting
4      incorrect requests, you know, for training, non-
5      appropriate requests and so forth.
6  Q   Were there standards that were put together regarding the
7      training though here at the local FSDO or at the Regional
8      Office?
9  A   I think that they just deferred to the national standard
10     is what they were supposed to do.  I mean they weren't --
11     really much allowance for deviation.  If you had a person
12     who was in an unusual position, i.e., you may have an
13     airplane in Alaska that doesn't exist anyplace else, you
14     might have to request, you know, something that didn't
15     quite fit the profile and you could justify that.  They
16     did have a process for justification of non-standard
17     request.  Did that.....
18 Q   Okay.....
19 A   Okay.
20 Q   .....I understand, yes.  But let me ask you, do you -- did
21     you know that Tom Carter was on a committee that worked to
22     some extent regarding the standards for this training?
23 A   I don't recall if I really knew that or recall that he had
24     been on that committee or not.
25 Q   Okay.  You also mentioned King Air, and I think for the

1        record could you describe what King Air is?

2   A    It's a Beechcraft, it's a -- what they call a light twin

3        engine airplane, it's less than 12,500 pounds, it's a twin

4        engine turban.  Don't know what else to really tell you.

5        It holds about maybe eight people.  There's several

6        variations of them.

7   Q    Just looking, again, at the C, additional work experience

8        for Mr. Carter which is under F-20.

9        MS. JONES:  Objection in that, one, we've already talked

10   about the fact that each panel had -- got a chance to review the

11   whole package.  If it was in the package they had an opportunity

12   to look at it and score it appropriately.  So I don't see the

13   importance of pointing out each individual little item.

14       MR. FLEISCHER:  I'm not going to point to each.....

15       THE COURT:  All right, let me hear the question.

16       MR. FLEISCHER:  I'm -- I simply wanted to point out to the

17   witness the second level which talks about operational training

18   needs assessment, which apparently stands -- which stands for

19   the acronym OTNA which was a question that was posed on direct

20   examination.  Is that correct?

21   MR. FLEISCHER RESUMES:

22   A    That's true.

23   Q    So does that appear that he did in fact serve on such

24        a.....

25   A    Yes.

1   Q      .....a committee?

2   A      Yes.

3   Q      And then that is a national committee, is that not right?

4   A      Yes.

5   Q      Okay.

6          (Whispered conversation)

7   Q      Did you regularly attend the QMC meetings, Mr. Girard?

8   A      I did until when John Duncan came on as the division

9          manager he uninvited me within about six months or less.

10         I think he didn't think I really needed to attend them.

11  Q      I see.  So how -- when did John Duncan come on board, if

12         you know?

13  A      I think it was five years ago this month.  So that would

14         have been '98.

15  Q      So sometime in late '98 perhaps you were.....

16  A      Right.

17  Q      .....no longer on the -- on.....

18  A      Correct.

19  Q      Do you know if any of the other persons who served on the

20         interview panel were -- attended the QMC meetings?

21  A      No, they would not have been.....

22  Q      Mel Williams would not have attended?

23  A      No, no.  No.  No, that group is the management team for

24         the Division, the FSDO managers and assistant FSDO

25         managers and probably if -- as in Anchorage we have the

| 1 | | Unit Supervisors might be a part of it. Folks like that. |
|---|---|---|
| 2 | Q | Right. Johnnie Wallace would normally attend? |
| 3 | A | Yes. |
| 4 | Q | All right. Okay. One moment Your Honor. |
| 5 | | (Whispered conversation) |
| 6 | | MR. FLEISCHER: Nothing further at this time Your Honor. |
| 7 | | THE COURT: All right, thank you. Very short redirect. |

8                          **REDIRECT EXAMINATION**

9       BY MS. JONES:

| 10 | Q | If -- speaking of David Lucher, if Mr. Lucher told you |
|---|---|---|
| 11 | | something factual oriented would you take that at face |
| 12 | | value or would you verify it for yourself? |
| 13 | A | I would not take it at face value, no. |
| 14 | Q | With regard to the military, is it typical in the military |
| 15 | | that officers carry out directions and orders from their |
| 16 | | above commanding officers? |
| 17 | A | Yes. |
| 18 | Q | And isn't it true that Mr. Carter's experience with the |
| 19 | | military was some 35 to 40 years ago -- prior to this |
| 20 | | selection, sorry, in the 50's and early 60's? |
| 21 | A | It went through at least the mid-70's in his package here. |
| 22 | Q | With his..... |
| 23 | A | Yeah, I think -- well, I have -- go through all this |
| 24 | | paper, I'm not sure. |
| 25 | Q | But your recollection is somewhere in the mid-70's. |

```
 1  A   Yeah, it was -- that's what I recall, just looking at it
 2      it was somewhere in the mid-70's when he retired out of
 3      the Army.
 4  Q   Did the -- was military experience required for the second
 5      level supervisory position?
 6  A   No.
 7  Q   Did the panel -- you testified that the certificate from
 8      Human Relations, the HR folks, came over with a list of
 9      candidates that were all qualified.  Did the panel have
10      any say in who should have been on that list?
11  A   Oh no.
12  Q   So then the panel didn't determine whether or not the
13      folks met the minimum qualifications for the job.
14  A   No.
15  Q   Thinking of the interview questions, you indicated that
16      two were technically related and eight were managerial
17      supervisory questions.  If someone had been a manager for
18      say like IBM could they have answered the managerial
19      supervisory questions from their experience as a
20      supervisor?
21  A   Can I take a quick look at them just to make sure?  I
22      don't have them in front of me.  Just want to refresh my
23      memory.
24  Q   Okay.
25  A   I don't think there was anything specific in those other
```

1        eight questions that was FAA specific.  But......

2  Q     Make sure you have an opportunity to do that.

3  A     Take up your time here, but just real quick.  Yeah.  I

4        think you just have to explain what a FSDO was to the

5        person from IBM, you know, and they would have to equate

6        that to some sort of a work unit within that corporation

7        similar.

8  Q     So a person with managerial supervisory experience in a

9        company that even wasn't aviation related could have

10       answered those.....

11 A     Yes.

12 Q     .....types of questions.

13 A     Sure.

14 Q     You indicated that even from your recollection today that

15       Mr. Bown had experience working for a private com --

16       aviation company as a ground instructor.....

17 A     Right.

18 Q     .....and that Mr. Brice had experience and that Mr.

19       Garroute, all of his experience before the FAA was

20       civilian related and that Ms. Jokela also had civilian

21       experience in aviation.  And that experience you gleaned

22       from reviewing the bid packages, is that correct?

23 A     That's correct.

24 Q     And then with this experience in their bid packages would

25       it have been looked at by each of the panel members?

733

1  A    It should have been, yes.

2  Q    Isn't it true that in the bid packages the applicants were

3       to relate how their experience met each of these KSAO's?

4  A    That's right. Uh-huh (affirmative).

5  Q    And is it true that each applicant could not have added

6       anything to their packages after the closing date of the

7       announcement?

8  A    That's correct.

9  Q    And it was or wasn't the job -- was it the job of the

10      panel to inform the applicants that they should have added

11      more information?

12 A    No.

13 Q    You indicated that you supervised Bob Christensen at the

14      FSDO. Do you remember if that was like a month or six

15      months or about the time period?

16 A    It was probably -- oh, the periods of time that I was out

17      there, at least -- I'd say about six months worth of time.

18      When I supervised him.

19 Q    Okay.

20      (Whispered conversation)

21      MS. JONES: I don't think I have any further questions.

22      THE COURT: All right. Thank you Mr. Girard for coming

23 in.   You're excused.

24      THE WITNESS: You're welcome.

25      THE COURT: Let's be off the record for a moment, I want