1  Q    Do you know whether or not Tom Carter had ever been

2       detailed into the assistant division manager position?

3       Actual detail via HR and all the paperwork that goes with

4       it.  Do you know?

5  A    I don't believe so.  I don't know that for a fact.

6       MS. JONES:  I don't think I have any further questions.

7       THE COURT:  All right.  Thank you Mr. Adams for....

8       THE WITNESS:  Thank you.

9       THE COURT:  .....coming in, you're excused.  We'll be off

10 the record.

11      THE REPORTER:  Off the record.

12      (Off record at 2:59 p.m.)

13      (On record at 3:14 p.m.)

14      THE REPORTER:  We're on the record.

15      THE COURT:  Mr. Duncan, would you put on a.....

16      THE WITNESS:  Yes.

17      THE COURT:  Mr. Duncan, I'm Judge Fall with the EEOC.  If

18 you would stand I'll swear you in.  Raise your right hand.

19      (Oath administered)

20      MR. DUNCAN:  I do.

21                        **JOHN DUNCAN**

22 a witness, called for examination by counsel on behalf of the

23 Agency, was duly sworn, examined and testified as follows:

24      THE COURT:  All right, please be seated.  State your full

25 name and spell your last name please.

KRON ASSOCIATES
1113 W. Fireweed Lane, Suite 200
Anchorage, Alaska  99503
(907) 276-3554

Exhibit _5_

```
 1          THE WITNESS:  My name is John Steven Duncan, D-U-N-C-A-N.
 2          THE COURT:  Mr. Duncan, the attorneys will have some
 3   questions for you, I may have some questions as well.  Please
 4   respond to the questions to the best of your ability.  If you do
 5   not understand a question please ask that it be repeated or
 6   clarified.
 7          THE WITNESS:  Thank you.
 8          THE COURT:  All right.  You may inquire Ms. Jones.
 9                          DIRECT EXAMINATION
10   BY MS. JONES:
11   Q    Mr. Duncan, do you currently work for the FAA?
12   A    I do.
13   Q    In what capacity?
14   A    I'm the Flight Standards division manager for the Alaskan
15        Region.
16   Q    And how long have you been in that particular position?
17   A    Five years.
18   Q    So you would have come into the Alaska Region in 1998?
19   A    Correct.
20   Q    In order to give us a picture of your background and
21        experience could you take us somewhat quickly through when
22        you started in aviation up through whatever military or
23        private experience you have in your background and then
24        through your managerial supervisory experience in the FAA?
25   A    Okay.  I started flying when I was 16.  I flight
```

1    instructed for a great deal of time when I was in college.
2    I had various part 135 jobs.  I was chief pilot in --
3    chief pilot for a couple of 135 operations, chief flight
4    instructor for a couple of FAR part 141 operations.  I did
5    a considerable amount of corporate flying, I flew for the
6    State of Missouri.  Went to work for the FAA in Cincinnati
7    in 1986.  I was an Aviation Safety Inspector there,
8    supervisor, unit supervisor, Operations unit supervisor,
9    and I was hired as the FSDO manager for the Houston FSDO
10   in '93 as I recall.  I was there about four years.  I
11   acted as the assistant division manager in the southwest
12   region for about six months.  I was the assistant division
13   manager in the central region for a year, half of that
14   time I was acting division manager.  And then in '98 I was
15   selected as the division manager in the Alaskan Region.
16 Q When you got up here to the Alaska Region what did you see
17   as being one of the important tasks you needed to do as
18   the new division manager in Flight Standards?
19 A Probably the first thing that I encountered was that a lot
20   of the stuff that was going on here in the Region was
21   outside national policy and guidelines, national policy
22   guidelines, and we had to move to start working within
23   those guidelines.  In particular the use of the en route
24   program was outside of guidelines, we had to move back in,
25   we had some problems with the selection process as a

1       matter of fact being outside of guidelines.  But generally

2       speaking it had become sort of a normal course of business

3       to operate outside the guidelines.

4    Q  That being here in the Alaska Region.

5    A  Correct.

6    Q  As far as a management team, when you came in did you --

7       what did you find with regard to the management team

8       itself as it existed at that time?

9    A  The team was basically just joint team is probably a

10      stretch.  The first thing I noticed was that even within

11      the FSDO the individual units saw -- sort of saw

12      themselves -- supervisors saw themselves as autonomous.

13      And so there were differences in the way policy and

14      procedure were done within units.  And there was a

15      considerable amount of in flighting for resources.  They

16      didn't have a clear understanding of what their corporate

17      responsibilities were to the rest of the organization.

18   Q  Did you become involved in addressing any issues or

19      concerns specifically related to the Anchorage FSDO?

20   A  Yes.  Excuse me.  The -- there were a number, of course,

21      but in general one of the issues that developed over time

22      was that the manager who was there when I first got here

23      left and went to Atlanta I believe.  And we filled the

24      position and the person who filled the position came to us

25      from the southwest Region.  And during the -- during his

1    initial -- the initial part of his tour he was having

2    difficulty keeping up with all the issues that were

3    developing.  At the time his management structure was an

4    assistant manager and a number supervisors, I can't

5    remember now whether it was eight or nine supervisors.  So

6    he recommended that the management structure be altered to

7    include two -- excuse me, two section supervisors or

8    assistant managers depending on how you looked at it.

9    And.....

10   Q   Are you referring -- when you speak of the manager from

11       the southwest Region, are.....

12   A   Doug Dalbey.

13   Q   Doug Dalbey?

14   A   Yes.

15   Q   And the manager who left would have been?

16   A   Would have been Ike Borgen.

17   Q   Okay.

18   A   Anyway, he made the recommendation.  He subsequently had a

19       medical problem which caused him to have to leave that

20       position.  But we continued to work his recommendation and

21       eventually reorganized the management structure there to

22       include -- my recollection is we called them section

23       supervisors at the time.  They've since become assistant

24       managers.

25   Q   Did you have a philosophy that you communicated to any of

1        your managers who served as selecting officials for other
2        management jobs, was there anything in particular you said
3        to those folks about who you would like to see selected
4        into management, supervisory positions?

5    A   We spent a lot of time developing -- with the management
6        team developing an understanding of what of the skills and
7        -- the skills that were required for a supervisor.  And
8        those included the existing supervisors getting a better
9        grip on what their corporate responsibilities were,
10       responsibilities to -- beyond their unit, to their -- to
11       the FSDO and to the Region and to Flight Standards as a
12       whole.  And we talked about those particular corporate --
13       the understanding of corporate responsibilities as being
14       one of the things we were looking for in supervisors.  The
15       -- also the ability to hold folks accountable in a
16       appropriate way for the work that they were supposed to be
17       doing.

18   Q   Was that an issue for you when you came here as the
19       division manager, this accountability question?

20   A   Yes, it was.  The -- my perception was that folks weren't
21       being held accountable for the work, for accomplishing the
22       work that we had to do.

23   Q   Anything else that you communicated that was important to
24       you in man -- in a manager or supervisor?  Any other
25       skills?

1  A  Well, we were looking for folks who were good leaders.  We
2     were looking for leaders, folks that could bring the team
3     together.  Understood those were corporate
4     responsibilities and would hold people accountable and
5     support the whole organization.
6  Q  Did you have an opportunity yourself to become involved in
7     the permanent selection for the section supervisor jobs,
8     the Airworthiness and the Operations section supervisor
9     jobs, in any direct way?
10 A  Because the -- because hiring folks into the management
11    team with those -- the characteristics I just explained
12    was important to me I asked that -- as I had in other
13    Regions, asked that as management selections were made
14    that those be coordinated with me so that I could hear the
15    selecting officials describe what the characteristics were
16    of the persons that they had selected and make sure that
17    we were headed in the right direction in that regard.  We
18    didn't get down to the level of discussion about
19    validating whether the persons selected had those skills
20    or not, we simply talked about the skills they were
21    looking for and I took the selecting official's word that
22    they believed that they had those skills.  In some cases I
23    knew the folks and could validate for myself and others I
24    didn't.
25 Q  In the selections for Mr. Martelli as the Airworthiness

```
1        section supervisor and Ms. Miller for the Operations
2        section supervisor position were you able from you own
3        personal work experience validate those selections?
4   A    In both those cases I was familiar with the work those
5        folks had done for me.  While it was more limited, my
6        exposure was limited compared to the selecting official, I
7        did feel that they met those characteristics, yeah.
8   Q    What work had you done with Ms. Miller?
9   A    Ms. Miller's case I was aware of the work that she was
10       doing as a -- as the Training Program Manager.  And in
11       particular the training program was -- training in general
12       was something that had been sort of a perk in -- dealt
13       with sort of as a perk in Flight Standards over a long
14       period of time.  It hadn't been dealt with in a structured
15       way and the organization was trying to move to a more
16       structured approach to dealing with training.  So that --
17       it was called true needs training meaning we got their
18       training where it was needed, when it was needed.
19  Q    When you say that it had been dealt with as a perk are you
20       referring to how people got training or the fact that
21       someone was or wasn't a Training Program Manager?
22  A    No, no, I'm talking about training in general.  In other
23       words, years ago training was -- you frequently got
24       training because you wanted it, you asked for it and your
25       supervisor or supervisors were influential enough to get
```

1        that training for you.  So there was no analysis about
2        whether the training was really needed or not.  In -- by
3        that particular person in that particular place.  And from
4        an organizational standpoint we were trying to get a
5        handle on that and so we were working with what was called
6        true needs training.  And what caught my attention is that
7        it appeared to me from my exposure to the -- to what Ms.
8        Miller had done was that she was -- she did have the
9        corporate understanding of what we were trying to do and
10       she was holding folks accountable to appropriately justify
11       the training that they got.  So that we were getting the
12       training to the right place at the right time, both
13       locally and from a Regional and national standpoint.
14   Q   When you say a national standpoint, did she have any
15       involvement with this on a national basis?
16   A   She did, she was involved in some of the committees that
17       were associated with both formal training and OJT.
18   Q   Did you get any feedback yourself on how she did with that
19       work?
20   A   The feedback's all been positive on that work and others
21       that she's done.  With that and the flight program.  That
22       was the other piece that she was involved in and that was
23       our flight program.  And of course I was very aware of
24       what she was doing there because I was directly involved
25       in that and she exhibited the same skills, the ability to

1    organize and manage and hold folks accountable, and that

2    included me because every once in awhile I'd say hey, want

3    to go do this, and the answer was no, you can't go do that

4    for these reasons.  So she built a great deal of trust by

5    handling it that way.

6  Q  When you mentioned the flight program, we have had some

7    discussions from other witnesses about the 4040 program

8    and the King Air program.  Are those both under this broad

9    flight program category or are they different?

10 A  Well, there's sort of three segments.  There's the 4040

11   program which is the program we use to keep inspectors

12   current and -- flight current.  And that involves the use

13   of rental aircraft and we use the King Air as part of that

14   program.  The King Air itself needs to be managed since

15   it's our aircraft, so that's a piece of it.  And third, we

16   operate the King Air under a part 135 certificate and she

17   dealt with that as well.  She managed that as well.

18 Q  And did you work with her in all three of those areas?

19 A  In a -- yeah, in a general sense, particularly the 135.

20   And -- but the King Air -- operation of the King Air is a

21   high risk issue for us and it's something that I watch

22   closely.

23 Q  And what do you mean it's a high risk issue?

24 A  Meaning considering all of the -- all the opportunities

25   for mistakes and errors and those kinds of thing, it's

1    something we need to pay close attention to.

2  Q  Do you recollect any other area that you had personal

3    involvement with that -- such that you could validate Ms.

4    Miller's selection?  Anything else other than those --

5    these topics?

6  A  Primarily the training -- yes, the -- to my recollection

7    the training and King Air program.

8  Q  So when you heard that Mr. Wallace intended to select

9    Verene for the position what was your reaction?

10 A  I was -- you know, I was not surprised.  I knew that she

11   had the capability to do it and so I was glad to hear that

12   we were going to have somebody in there after --

13   particularly after hearing him explain his rationale for

14   doing it.  I was glad to hear that we were going to have

15   somebody in the position who I had confidence could do the

16   work.

17 Q  Had you had any personal experience in working with Mr.

18   Carter?

19 A  Yes, yes.  Tom was the -- was a specialist in the

20   organization when I got there.  So we had occasional

21   contact as a result of him being a specialist.  He also

22   acted as the section supervisor for a period of time.

23 Q  And did you know whether -- know if Tom was one of the

24   recommended individuals to Johnnie Wallace for the

25   position?

```
 1   A    I think I did, yes, uh-huh (affirmative).

 2   Q    What was your reaction when you heard that Tom wasn't

 3        selected?

 4   A    I felt after talking to Johnnie that he had made the best

 5        choice and I validated that choice.  I've work with Tom

 6        for awhile, I have a lot of respect for Tom personally and

 7        from a technical standpoint.  But I concurred with Mr.

 8        Wallace's conclusion that based on what we were looking

 9        for, the characteristics that we were looking for, the

10        skills that we were looking for for that position, she had

11        the best -- she was the best selection.

12   Q    Did you have an opportunity to look at the MPP certificate

13        for the Ops section supervisor, do you recall?

14   A    No doubt, but I'm -- it's been a long time.

15   Q    Okay.  I'm going to hand you what's in evidence at ROI F

16        -- tab F-17.  Do you recollect if you had seen this?

17   A    I don't know specifically whether I've seen this or not.

18   Q    If you took -- take a look at the section where it

19        indicates Mr. Wallace's reasons for selecting Verene

20        Miller.  It's on the first page, section two, above Mr.

21        Wallace's name.  Could you take a minute and just read

22        that to yourself?  Does that pretty much encompass the

23        discussion that you had with Mr. Wallace about his

24        selection of Verene?

25   A    Yes, it's paraphrased, but in general that's the
```

1    discussion, yes.

2  Q   So one of the things that were important was

3      communications, communication skills.  Did you have any --

4      your own personal opinion of Verene's ability to

5      communicate?

6  A   I've worked with Verene on a number of occasions of

7      course, particularly around the flight program.  And her

8      communications were always clear, concise, she worked with

9      folks at the Regional administrator level and dealt with

10     them appropriately.  She dealt I know with some

11     controversial situations around the training program,

12     dealt with those effectively.  The reason that the King

13     Air was -- and the Flight Program was being managed out of

14     the FSDO was -- and this is basically anecdotal from me

15     because it was before I got here, but I understand was

16     because there were personality issues with the folks who

17     were running the King Air program at that time.  I didn't

18     encounter any of those issues with Verene during the time

19     that she was -- she's still running the flight program.

20     And she had to work with all three of the FSDO's,

21     including -- well, yeah, with all three of the FSDO's

22     besides just with -- not just with the Anchorage FSDO in

23     dealing with that, supplying instructors, doing

24     instruction, that sort of thing.  And from a -- from the

25     standpoint of personality conflicts, I don't remember an

1       event that occurred.

2   Q   With Mr. Carter do you have any recollection of your
3       opinion of his communication skills back then in August of
4       2000?

5   A   We worked sporadically together.  My -- we didn't have as
6       much contact probably as I have with Verene.  We worked on
7       a personal level -- I mean we knew each other on a
8       personal level of course, still do.

9   Q   When you say a personal level you're referring to you and
10      Mr. Carter?

11  A   To -- yes, uh-huh (affirmative).  Right.  Right.  We -- he
12      was involved in a number of briefings over time and gave
13      adequate briefings.  The -- on technical subjects.  It was
14      -- there was one event at the FSDO that had to do with an
15      en route issue in which we had some conversation.  He had
16      made a decision, the word came back to me through channels
17      since this involved a union issue, that we needed to make
18      sure that we were making the choice that we'd made, which
19      in this case was to deny an en route for the right
20      reasons.  Tom and I talked about that because I wanted to
21      make sure it was done for the right reasons.  And there
22      was a communications breakdown there somewhere because the
23      en route was approved.  Denial was probably appropriate,
24      but not for the reasons that were given in terms of the
25      fact that the guy was going to union negotiations.  So

1       there was a breakdown there in communications over the --
2       that particular issue.

3   Q   So let me see if I understand this right.  You had some
4       initial conversations with Mr. Carter about an en route.
5   A   Actually the en route was -- the word came to me that the
6       en route was approved, it came from Washington that the en
7       route was denied.  The folks in Washington were concerned
8       because if the en route was denied because the person was
9       going to be involved in contract negotiations as a union
10      representative at the end of the trip then that was an
11      inappropriate reason to deny the en route.  Tom and I had
12      a discussion about that in which I tried to explain the
13      parameters of -- or reiterate the parameters of the policy
14      that is related to en routes and that what happens in the
15      end of the trips is not a piece of it.  But the context of
16      do we need to do this business, this piece of work, is the
17      real question.  Now, my intent was to simply make sure
18      that we were doing the right things for the right reasons.
19      After we had that conversation I got back word that the en
20      route had been approved and that -- my intent was not to
21      turn it around, just to make sure we were doing it for the
22      right reason.  So there was a communication issue there
23      between us on that particular issue.

24  Q   Between you and.....

25  A   Tom.

1  Q    .....Mr. Carter.

2  A    Right.

3  Q    It also indicates in Mr. Wallace's reasons accountability,

4       he felt that Verene did that the best. In your own

5       experience with Ms. Miller on accountability did you have

6       an opinion as to how well she did in that area?

7  A    As I described before around the training program in

8       particular and also around the flight programs where it's

9       very important to make sure that we maintain discipline.

10      She did an excellent job and I was aware and part of the

11      reason I was aware was because it was sort of

12      extraordinary for the rest of the Region in effect.

13  Q    I just had a thought. This en route problem,

14       communication issue that came up with Mr. Carter, do you

15       recollect who the inspector was that wanted to do this en

16      route?

17  A    I'm sorry, who was -- who wanted the en route?

18  Q    Yeah, who wanted the en route?

19  A    My recollection it was David Lucher having to do with a --

20       it was a negotiations session.

21  Q    And would this.....

22  A    Contract, during contract negotiations.

23  Q    Would this en route for Mr. Lucher have been appropriate?

24       I think your -- I'm trying to clarify your testimony. Was

25       that -- for him to do the en route, was that within our

1         guidelines?

2    A    Well, that was -- as I recall the session was in Florida

3         and it was in CMD.  From a business standpoint the

4         question is do we have reason to do an en route on

5         carriers all the way to Florida, and the answer to that

6         question I believe is no.  In this case the word had come

7         back that we had said no solely because the employee was

8         going to -- because Mr. Lucher was going to union

9         negotiations.  So the conversation I had was around that

10        issue.  We don't say no because they're going to union

11        negotiations, we got to evaluate whether this is something

12        that we want to spend our resources on, is it appropriate

13        for us to use our resources to do this piece of work.  And

14        I think the appropriate answer was no on that question.

15   Q    The other reason Mr. Wallace gave was team player skills.

16        Did you have an opinion as to Ms. Miller's team player

17        skills?

18   A    Yes, I -- you know, I thought she had -- she did very

19        well.  All of the FS -- I've already described a lot of

20        things that relate to that, the fact that she able to

21        manage the flight program without -- in a team environment

22        for all practical purposes without a significant --

23        without any for that matter personality related push

24        backs.  The airplane generally got where it was -- aside

25        from maintenance issues it got where it was supposed to

1       be, when it was supposed to be and got the job done.  From

2       the standpoint of the training program she certainly

3       understood what all of her responsibilities were, both

4       locally and from a corporate standpoint.  And while there

5       were some confrontational things in holding folks

6       accountable, she did that tactfully and did it well.  She

7       also worked on a number of teams that you articulated a

8       few minutes ago having to do with the training program and

9       the flight program.  She was deeply involved in OJT, on

10      the job training, team that developed that program.

11   Q  And when you say developed the OJT program are you talking

12      about here in the Region?

13   A  Actually -- no, it was a national deal and it was a rework

14      of the national on the job training program.

15   Q  Did she as part of these programs ever give any

16      presentations at a QMC meeting?

17   A  You know, I'm sure she did, because she gave us feedback.

18      I don't know that I can recall specific ones, but I'm

19      certain that she did.  She certainly kept me up to speed,

20      you know, on all the stuff that was going on around the

21      flight program on a regular basis.

22   Q  Do you have -- did you have any personal experience with

23      Mr. Carter with regard to team player type skills?

24   A  I know Tom was involved in some teams, he worked on a op

25      spec program for which he received an award.  My local

```
 1          exposure to his work in that regard was more limited.
 2   Q      With regard to these section supervisor positions, did you
 3          ever at any time indicate to Kent Adams that you wanted to
 4          see a particular person selected for the job?
 5   A      No ma'am.
 6   Q      Did you ever indicate to Johnnie Wallace that you wanted
 7          to see a particular person selected for the job?
 8   A      No ma'am.
 9   Q      Did you know whether or not HR in putting together the
10          qualified applicants used a subject matter expert for the
11          section supervisor job?
12   A      My recollection is that when I returned from travel at
13          some point that I found out that there had been -- that
14          someone -- that Verene in this case had asked to have that
15          experience evaluated and that a subject matter expert had
16          done that with HR.
17   Q      Did you know who the subject matter expert was?
18   A      At that time I found out that it was Bob Christensen,
19          right.
20   Q      So did you ever at any time prior to his serving as a
21          subject matter expert discuss the fact with him?
22   A      No.
23   Q      Did you ever ask or indicate to Mr. Christensen in any way
24          that you wanted Verene Miller put into or promoted into
25          any particular position?
```

1    A    No.

2    Q    You mentioned just a little bit ago, and I guess I'm not

3         sure that I understand what you meant, that -- about

4         Verene asking to have her ex -- her work experience

5         evaluated, do you know if that's part of the HR process?

6    A    Well, I'm making the assumption frankly that we wouldn't

7         seek out to evaluate somebody's experience, they would

8         have to apply and therefore by applying in effect ask for

9         their experience to be evaluated to see if it met the 52

10        weeks of specialized experience.

11   Q    So you're assuming that by the fact that she applied, that

12        was her asking to have that experience evaluated.

13   A    I'm making the assumption, right.

14   Q    Have you ever indicated or said to anyone in Flight

15        Standards, or frankly anyone period, that you wanted

16        someone in particular promoted into a particular position?

17   A    No ma'am.

18   Q    At a QMC meeting did you ever indicate during one of those

19        meetings, either -- well, specifically did you ever say

20        that you wanted Verene promoted into a particular

21        position?

22   A    No ma'am.

23   Q    Did you feel you ever gave any kind of an impression that

24        you wanted Verene promoted into a particular position?

25   A    No.

1  Q   What were your feelings about Ms. Miller's -- prior to the
2      selection of her as a section supervisor, your feeling
3      about her capabilities as a possible supervisor?
4  A   I thought that she had the skills necessary to be a good
5      supervisor.  I also knew that she was interested in being
6      a supervisor.  I didn't have a complete -- only had
7      sketchy knowledge about what her background and experience
8      was.  But yes, I knew she had the skills -- I should say I
9      -- my perception was she had the skills to be a good
10     supervisor.
11 Q   You indicated that she wanted to be a supervisor.  How do
12     you know that?
13 A   She'd indicated to me in the course of a conversation that
14     she was interested in supervision at some time in the
15     future.  That was some conver -- that was a conversation
16     that occurred probably in conjunction with other business
17     that was going on.  But she talked about her aspirations
18     within the FAA.
19 Q   And did you give her any kind of advice or comments?
20 A   I probably said that based on what I saw in her
21     performance that she looked like to me she had the skills
22     to be a supervisor and encouraged her, as I have with a
23     lot of other folks for that matter.
24 Q   With regard to this particular selection process did you
25     have an opportunity -- do you recollect anything about the

1    vacancy announcements that were put out for this -- these

2    jobs?

3  A  I -- well, I have a vague recollection about the -- about

4    some questions raised about the statement of time in

5    grade, that's made about time in grade.

6  Q  And what.....

7  A  In other words there was some question raised about

8    whether you had to actually have 52 weeks of time in grade

9    or if equivalent experience would do that.

10  Q  And how -- you said you had some recollection.  What do

11    you.....

12  A  Right.

13  Q  .....recall about that?

14  A  I honestly don't remember whether I -- when I became aware

15    of this question.  And part of the reason is that I'd been

16    asked on a number of occasions, probably before this, by

17    the Regional Business Agent this same question, is it

18    absolutely -- is it possible that someone could use

19    outside experience to qualify for a higher grade rather

20    than having to wait 52 weeks.  And the answer to that

21    question had been yes, it is possible for that to happen.

22    So -- and I remember the conversation came up around this

23    bid.  I don't remember whether I knew about it at the time

24    it came up or if it was in discussions subsequent to that

25    because somebody would have brought it to me and said hey,

1       this came up and here's what we're talking about doing.

2       So I'm aware that there was some question about it and

3       that the bid was clarified.

4   Q   Did Mr. Paterson attend QMC meetings?

5   A   He did, uh-huh (affirmative).  He was a QMC member, I

6       can't speak to -- you know, he attended most of them, uh-

7       huh (affirmative).

8   Q   Did you ever have occasion to either give instruction to

9       Mr. Paterson or be at a meeting where instruction was

10      given out such that you had an opportunity to compare

11      whether your take on the instruction matched or didn't

12      match Mr. Paterson's take?

13  A   Well, Jerry was a different personality type, I can never

14      remember the Meyers Briggs issues there.  But his -- he

15      has a little different personality type.  So his take on

16      things is often different than mine and most of the folks

17      that are typically in Flight Standards.  And to some

18      extent that was valuable, that was an asset for us because

19      we could always count on Jerry to see things from a little

20      different angle.  I don't know that I recall any specifics

21      at this moment.

22  Q   Did that ever pose any problems, Mr. Paterson's take

23      on.....

24  A   Well.....

25  Q   .....being different?

1   A    As I said, you know, it worked for us, it was an asset.
2        But you also had to be careful because it meant that if we
3        sat down quickly and decided we were going to do something
4        every -- every once in awhile at least we'd end up with a
5        different product than we expected.  We'd give him a task
6        to do and he'd come back with something different than we
7        expected.
8   Q    You indicated that with the Airworthiness and Operation
9        section supervisor jobs that you had listened to Mr.
10       Wallace's rationale for his selection.  Did you have an
11       opportunity to listen to Mr. Carter's rationale for any
12       position out at the FSDO?
13  A    Yes, my recollection is that when Mr. Carter was the
14       acting we hired a first level supervisor there and that he
15       came in as the selecting official and presented the
16       rationale for the supervisor that he had recommended.
17  Q    Do you recall con -- the conver -- who was participating
18       in that meeting?
19  A    To the best of my recollection it was Tom and Johnnie
20       Wallace and Bob Wedemeier and Kent Adams I think.
21  Q    Do you recall essentially the substance of the
22       conversations that came up in general during that
23       discussion surrounding Tom's rationale for his selection?
24  A    Well, there were a couple different elements.  One was
25       that -- at that time I believe we had information about

1      the order in which folks were listed, meaning we knew who

2      the panel saw as first, second, third, that sort of thing.

3  Q  Had you seen the actual panel recommendation letter, do

4      you remember?

5  A  You know, I don't remember. I don't remember, I've

6      subsequently seen it, but I don't remember if I'd seen it

7      then or not.

8  Q  Is this the letter that you had discussion surrounding?

9  A  I think so, because I remember the columns. I mean the

10     fact that there were -- there was an issue with this one

11     over the panel members' performance.

12  Q  And this is A-13, admitted into evidence as A-13. Do you

13     remember any specifics about the conversations regarding

14     these columns?

15  A  I remember that I was particularly interested in the

16     rationale since Mr. McGlothlen wasn't -- which was the

17     recommended individual wasn't at the top of the list. So

18     I was interested in what the rationale was. And it seems

19     to me that the rationale had to do with Mr. McGlothlen's

20     outside experience as a supervisor. Meaning outside the

21     FAA.

22  Q  Were there any issues about what break points to use in

23     considering which applicants?

24  A  Yes. Mr. Wedemeier I believe raised an -- made the

25     suggestion that the break point might be farther down the

1   list and that down the list -- I honestly don't remember
2   where, I think it was at the 100 mark which would have
3   included Verene Miller in this particular case.  And Mr.
4   Wedemeier's suggestion was that the group to select for
5   would be a more diverse group to work from.  And we talked
6   about that for awhile, decided that the appropriate -- as
7   I remember the appropriate break point was at the 118, 124
8   as I recall and we accept -- and I accepted Mr. Carter's
9   recommendation.

10  Q   Did you at any point in there make any comments about
11      Verene Miller that you can recall?

12  A   I don't recall specifically, but I may well have expressed
13      my confidence in her ability to be a supervisor, yes.
14      Because I had said that before and -- I may also have
15      expressed -- I was -- I can remember that I was surprised
16      that she didn't perform any better -- or that she didn't
17      show up better in the outcome than she did.  So I may have
18      mentioned that as well.

19  Q   There's been some allegations that you wanted Ms. Miller
20      promoted and that it would enhance your career.  Were you
21      subject to any type of a performance evaluation?

22  A   Yes, I'm subject to performance evaluations, yes, yearly.

23  Q   And were you subject to some sort of a performance
24      evaluation for the fiscal year 2000?

25  A   Uh-huh (affirmative).

1   Q   And do you remember what categories you were being

2       evaluated in?

3   A   Oh jeez.  There's a number of categories that range from

4       technical to administrative to personnel management

5       categories.  And I'd have to look at the -- honestly I'd

6       have to look at the document to.....

7   Q   Was there anything in your performance evaluation that

8       indicated anything to do with how many minority candidates

9       were selected while you were the division manager for the

10      year?

11  A   There is a personnel -- there's a category that deals with

12      personnel issues which includes EEO and diversity.  But

13      no, the answer to the question is there is no specific

14      mention of how many minority candidates that we hire or

15      anything of that nature.

16  Q   What is measured in your performance about EEO issues?

17  A   Well, EEO issues have to do with whether we're dealing

18      appropriately with those Equal Employment Opportunity

19      issues.  There's also affirmative action which speaks to

20      whether we have programs in place to recruit and -- to

21      recruit for a diverse workforce.

22  Q   And did you have any programs in place to address

23      affirmative action recruitment in the Alaska Region?

24  A   Our program is a really simple one.  I mean we simply

25      recruit folks from within Alaska who contribute to the

```
1        diversity of the organization.  And for that matter
2        outside of Alaska when we're aware of them, but
3        particularly we have contacts here.  And we simply recruit
4        and encourage them to apply.
5   Q    Is there any type of a program you use for those who --
6        minority candidates who are already an employee that
7        you've used to develop them into management positions?
8   A    Up until very recently we'd looked on several occasions
9        through the Quality Management Council at ways to deal
10       with that and had continued to use an informal mentoring
11       process, and I'm using mentoring with a little M, not the
12       -- in other words not a formal program, but simply to
13       encourage folks who have the skills and abilities to do
14       management work and who contributed to the diversity of
15       the organization.
16  Q    So you had no specific formal plan to -- for the
17       development of employees?
18  A    No, not anymore formal than that.  And at this time we
19       have a more formal program coming along which gives --
20       which more formally gives folks the opportunity -- in fact
21       it's intended to give folks who come from industry with a
22       skill set the opportunity to demonstrate that skill set in
23       -- within the FAA, in other words act in managerial and
24       supervisory positions and demonstrate their skills and
25       knowledge in that area.  The program's called LEAD.
```

1  Q  Within Flight Standards and in -- within this case there

2     has been some discussion about age.  In your opinion

3     what's the average age of an Aviation Safety Inspector

4     that's picked up into FAA as an initial hire?

5  A  Well -- oh, gosh.  I'd have to -- you know, I'm guessing,

6     but I would say it's in the 50 -- around 50 is probably

7     the average age for F -- for Aviation Safety Inspectors in

8     general.  We hire folks who come to us with experience.

9     So in many -- in most cases in fact it's second or third

10    career for the folks.  And we hire folks -- you know, I'd

11    like to tell a story about two folks, two new hires I sent

12    to an indoctrination class in Houston who came back

13    telling me that they were the youngest folks in the class

14    and we hired -- and they had retired from an airline

15    career at 60.  So we hire those kinds of folks a lot.

16 Q  Do you know for the Alaska Region what the age is of some

17    of the older people working Flight Standards?

18 A  We have a number of folks in their 70's I believe.

19 Q  Did you have any communications yourself with the Human

20    Relations Division, HR, about who should or shouldn't be

21    minimally qualified for the section supervisor position?

22 A  No.  No, I had no communications with them about it at

23    all.

24    MS. JONES:  I don't think at the moment that I have any

25 additional questions.

1    THE COURT:  All right, thank you Ms. Jones.  Mr.

2    Fleischer, cross examination.

3        MR. FLEISCHER:  Thank you Your Honor.

4                    **CROSS EXAMINATION**

5    BY MR. FLEISCHER:

6    Q   Good afternoon Mr. Duncan.

7    A   Hi, how are you?

8    Q   We've met before, I'm Hugh Fleischer.

9    A   Yes sir.

10   Q   I represent Mr. Carter of course.

11   A   Yes sir.

12   Q   Now you were talking about Ms. Miller's work with the King

13       Air program, that being the one plane for the most part

14       that is used in that program, is that correct?

15   A   One and sometimes two, we had one -- at one time.

16   Q   And you described that as a high risk issue.  Is that also

17       true?

18   A   Yes, it's true.

19   Q   Did she -- was she working in the King Air program when

20       she was cited for the deviation that she had in Homer?

21   A   That's likely.  I don't know the specific dates of that

22       event.  Frankly I'm not sure whether it occurred before or

23       after I arrived.

24   Q   You don't know that it occurred before or after what, I'm

25       sorry?

                    KRON ASSOCIATES
              1113 W. Fireweed Lane, Suite 200
                 Anchorage, Alaska  99503
                     (907) 276-3554

1    A    I arrived.

2    Q    Oh, before or after you arrived.

3    A    Right, in the state.

4    Q    Do you know how long she was operating the King program?

5    A    The King Air program had been transferred to the FSDO and

6         she had been dealing with it when I got here.  I'm not

7         certain how long before that it had occurred.

8    Q    When did you arrive as the division manager sir?

9    A    I think it was actually August 31st of '98.  August,

10        September of '98.

11   Q    Yeah.  All right.  So if this incident report -- deviation

12        report is dated 7/8/98 that was before your arrival of

13        course.

14   A    Okay.

15   Q    Did you hear about it though in fact?

16   A    I heard about it at a later date.  And -- yes, I heard

17        about it at a later time.

18   Q    And do you know that under the report she was observed to

19        be six to eight miles off course and about 4,600 feet

20        below the minimum IFR altitude?

21   A    I hadn't seen the details of the report until this event,

22        till we started talking about them here.

23   Q    Oh really.  No one had actually advised you of the

24        specific details of that.

25   A    I -- no sir.

```
 1   Q   Does that create any question in your mind about her being
 2       involved in this so called high risk issue of the King Air
 3       training program?
 4   A   No sir.  She had -- she performed very well.  I was
 5       concerned about her ability to manage that program and to
 6       do the leadership functions that were necessary to make
 7       sure the program was working properly.  And that didn't --
 8       that piece didn't concern me.
 9   Q   Is it true that Ms. Verene Miller is the only person who
10       while as an Aviation Safety Inspector had such a
11       deviation?
12   A   You know, first of all, exposure to Aviation Safety
13       Inspectors to that kind of thing is limited because of the
14       limited amount of flying that they do, particularly as
15       PIC.  Secondly, I don't have enough information to know
16       that.  I find it hard to believe that that's true, but I
17       don't know that.
18   Q   But you don't have any specific information to
19       suggest.....
20   A   I have no specific information about that.
21   Q   .....that somebody else was also cited while a Aviation
22       Safety Inspector.
23   A   I know that we've had Aviation Safety Inspectors who've
24       had deviations -- not deviations, but have had aviation
25       events, incidents and those sorts of things here and in
```

864

```
 1         other Regions.  But I'm not familiar enough with the

 2         database to know.

 3    Q    Yeah.  Was Kent Adams the acting division manager when you

 4         arrived?

 5    A    Yes sir.

 6    Q    And had he been there for -- how long, do you know?

 7    A    Well, Kent.....

 8    Q    As acting division.

 9    A    Oh, as acting?  Oh gosh.  Maybe a year or two maybe.

10    Q    All right.  Now you made reference to the en route and the

11         David Lucher matter.....

12    A    Yes sir.

13    Q    .....you recall that testimony.

14    A    Uh-huh (affirmative), right.

15    Q    Do you know as a matter of fact that -- you don't know, do

16         you, that Tom Carter approved the en route?

17    A    That was my under -- that was my recollection.

18    Q    Well, who advised you of that please?

19    A    At this point I don't know.  Probably Tom was the

20         supervisor, I got the information that the en route had

21         been denied from the LR folks in Washington and I took the

22         action I described based on that.

23    Q    Wasn't the Unit Supervisor Bruce Walker at the time?

24    A    I don't know.  I don't recall.

25    Q    So you don't know if in fact Mr. Walker may have approved
```

```
1        it?

2    A   No sir, I don't know.  I had the conversation with Mr.

3        Carter.

4    Q   All right.  In terms of Mr. Jerry Paterson, my

5        understanding from your testimony is that you saw him as

6        having a sometimes different perspective than you and

7        others in a matter.  Did you ever see in his behavior

8        though that of stating untruths?

9    A   No sir, not stating untruths.  There were times that he

10       saw things decidedly differently than the rest of us.  But

11       I don't know that I've ever encountered any untruth.

12   Q   Yeah.

13   A   Don't believe so.

14   Q   Ms. Jones asked you a number of questions as to whether

15       you had attempted to get or had stated that you wanted to

16       have Ms. Verene Miller promoted to a particular position.

17       Do you remember that testimony?

18   A   I remember the questions, yes sir.

19   Q   Yeah.  Change that question to did you say to anyone that

20       you wanted to get Ms. Verene Miller promoted as soon as

21       possible?

22   A   No sir.

23   Q   Without noting a specific position.

24   A   No sir.

25   Q   All right.  You recall being interviewed by the EEO
```

```
1       investigator, do you not?

2   A   I do.

3   Q   And that was.....

4       MS. JONES:  Are you talking, Mr. Fleischer, about the EEO

5   investigator, the investigator for the ROI, or the.....

6       MR. FLEISCHER:  I'm talking.....

7       MS. JONES:  .....informal process?

8       MR. FLEISCHER:  I'm looking specifically at the reference

9   in the ROI of B -- I think B just has one section.  Section B as

10  in boy.

11      MS. JONES:  Are you referring to the counselor report?

12      MR. FLEISCHER:  And this is the counselor report, yes.

13  And it's in the B section of the ROI.

14  MR. FLEISCHER RESUMES:

15  Q   I'd like to show you -- this is on page five of the

16      counselor's report.  At the top.

17      (Pause)

18  A   Yes sir.

19  Q   You've read that over?

20  A   I have.

21  Q   The entire paragraph down to where it says B, summary of

22      information?

23  A   Yes.

24  Q   All right.  Isn't it a fact, Mr. Duncan, that you stated

25      that you agreed that you had made various statements in
```

```
 1      the past to Verene Miller and possibly later confirmed
 2      that he did in -- to others to the effect that you wanted
 3      Ms. Miller promoted but that it was more in a mentor
 4      capacity and not in reference to any particular bid?
 5   A  No sir, that's not accurate.  That at the time this
 6      occurred -- this is the interpretation of the -- of Mr. --
 7      or whoever the counselor was.  At the time that it
 8      occurred I challenged it and the response I got was that
 9      they didn't think it was a big deal from the counselor's
10      standpoint, and I'm paraphrasing there.  I at no time said
11      that I wanted Verene Miller promoted.  I have on a number
12      of occasions with regard to Verene and other folks who I
13      believed had the skills and abilities to be good
14      supervisors said that -- expressed that in the context of
15      discussions about transition planning who's available out
16      there to be good supervisors.  So I have not with regard
17      to Verene Miller or anyone else made the statement that I
18      wanted them promoted.  Promotion and putting someone --
19      and encouraging someone to become a supervisor are two
20      different situations.  Promotion's not the issue.
21   Q  So you're saying that this investigator completely
22      misquoted what you said about the matter?
23   A  I didn't see that as a quote.  I'm saying he misstated
24      what was said, yes.
25   Q  All right.  And what part of it is correct?  Let's just
```

1       start with the sentence that starts with the letter --

2       with your name, John Duncan agreed that he had made

3       various statements in the past to Verene Miller.  Is there

4       anything in that part of it that's true?

5    A   Well, I -- yeah, I made various statements to Verene

6       Miller.  The context is obviously significant, I'm not

7       sure I can break it there and answer your question.

8    Q   Okay.  And then -- well, look.....

9    A   In the past to Verene Miller and possibly.....

10   Q   And then it says.....

11   A   .....to others.

12   Q   .....later confirmed that he did in a conversation of

13      9/18/00.  But let's go on, possibly to others to the

14      effect....

15   A   Effect that.....

16   Q   .....that he wanted to see Ms. Miller.....

17   A   Right.

18   Q   .....promoted.

19   A   To the effect is the conjecture of the counselor.  What I

20      probably told him is that I had expressed my belief that

21      Ms. Miller had the skills and ability to be a good

22      supervisor.

23   Q   Okay.  You were recounting to him statements that you had

24      made to others though, is that correct?  To Ms. Miller and

25      others?

```
1   A    Yes.

2   Q    Specifically who -- which others do you recall making

3        statements about the promotability of Ms. Miller?

4   A    Well, first of all, promotability was not the question,

5        supervisory skills was the question.  And I'm certain -- I

6        have no specific recollection, but I'm certain in the

7        context of conversations -- management conversations where

8        we talked about folks who were available to us and had the

9        skills and abilities to be good supervisors, that that

10       conversation may have come up.  Not only with Ms. Miller

11       but with others as well.

12  Q    Well, what about those others, can you tell me would it

13       have specifically included your assistant, Mr. Adams?

14  A    Meaning involved in the conversation?

15  Q    Yes.

16  A    It could well have.  He's part of the QMC, yes.

17  Q    All right.

18  A    Jerry Paterson could have been involved.  Who else is

19       there.

20  Q    What about Bob Christensen?

21  A    Potentially.  Potentially.  Bob has not always been part

22       of the QMC because he wasn't always in the 230 position.

23  Q    What about Naomi Christensen?

24  A    Potentially, yes, uh-huh (affirmative).

25  Q    She was normally in the QMC, was she not?
```

1   A   Since I've been here, yes.

2   Q   Right.  And what about Johnnie Wallace, he was certainly

3       present in the QMC, was he not?

4   A   Johnnie Wallace was -- part of the time was present in the

5       QMC, that's correct.

6   Q   And you also had that conversation with him at the time of

7       the discussion of the Unit Supervisor decision that was

8       made, David McGlothlen being -- having been suggested,

9       having been selected, and there was some discussion of the

10      fact that Verene had scored rather low and you were -- you

11      expressed surprise by that.....

12  A   Uh-huh (affirmative).

13  Q   .....as you testified.

14  A   Right.

15  Q   And again expressed your -- some interest in her skills

16      and her abilities, is that true?

17  A   I expressed confidence in her skills and abilities, yes

18      sir.

19  Q   But you don't remember at all during that meeting

20      specifically stating that you wanted to promote.....

21  A   No sir.

22  Q   .....Verene Miller?

23  A   No, promotion is not the issue.  We needed to have the

24      right people in the right place who have the skills to do

25      the job.

```
1   Q   Did you have any state -- did you make any statement to
2       Mr. O'Neal about the fact that your statements were more
3       in a mentor capacity and not in reference to a particular
4       bid?
5   A   The -- in the conversation I had with Mr. O'Neal, was that
6       his name?
7   Q   Yes.
8   A   Yeah, my recollection.....
9   Q   Michael Shawn O'Neal.
10  A   .....of the conversation with the -- Mr. O'Neal, when I
11      was characterizing the conversations I had had with Ms.
12      Miller I used the term mentor.  Used it in a general sense
13      meaning she had -- at some point along the way had said
14      this is what I'd like to do in the FAA, what do you think,
15      and we had talked about it.  Had similar conversations
16      with a number of folks over the years about that.
17  Q   But of course if you were making statements to others
18      about her, that in and of itself is not part of --
19      specifically part of your mentoring to her, is that true?
20  A   Yes sir, that's true.
21  Q   Yeah.  All right.  Do you remember having a subsequent
22      conversation on or about the 18th of September of 2000
23      with Mr. O'Neal?  As is referenced in the B section of the
24      ROI.
25  A   At some point I had a conversation with Mr. O'Neal in
```

KRON ASSOCIATES
1113 W. Fireweed Lane, Suite 200
Anchorage, Alaska 99503
(907) 276-3554

1   which I in effect protested the use of the word promoted

2   in there or that statement.  I don't know whether that was

3   on the 18th or not, I don't recall.

4  Q   Well, in what fashion did you protest the term promoted,

5      did you.....

6  A   I said that's not an accurate representation, I didn't say

7      that.

8  Q   Well, I mean did you communicate that in writing?

9  A   No sir, I didn't, we had the conversation.

10  Q   And do you know when it was, was it after the report had

11     been completed?

12  A   No sir.  I don't know, I wasn't reminded of that until I

13     read this some days ago, or reread this document some days

14     ago.

15  Q   How many conversations would you say you had with Mr.

16     O'Neal?

17  A   I don't remember more than a couple.

18  Q   Yeah.

19  A   But it's been a long time.

20  Q   Right.

21     (Pause)

22  Q   Did you -- after you saw -- did you see this report in

23     writing before you made contact with Mr. O'Neal about it?

24  A   I must have seen at least a draft of it because I'd had to

25     -- would have had to have seen the language before I could

1        protest it.

2    Q   Okay.  Did you confer with the Regional Counsel's office

3        about the matter?

4    A   I don't recall.

5    Q   All right.  Okay.

6        (Pause)

7        MR. FLEISCHER:  No further questions of Mr. Duncan.

8        THE COURT:  Any redirect?

9        MS. JONES:  Just a couple of questions.

10                       **REDIRECT EXAMINATION**

11   BY MS. JONES:

12   Q   There was some talk that you'd had with Mr. Fleischer

13       about an incident occurring with Ms. Miller in the Homer

14       area while she was involved in flying an aircraft, the

15       King Air for the FAA.  Was whether she had some sort of a

16       deviation as a result of that important in your mind now,

17       you know, as to -- important to a selection of a second

18       level supervisor?

19   A   No ma'am.

20   Q   And why is that?

21   A   It has no bearing on her ability to do this supervisory

22       job.

23   Q   You indicated that you had had conversations with others

24       the same as you had with Ms. Miller about their career

25       aspirations.  Do you recall whom else you've had similar

1    conversations with?

2   A   Jerry Martelli, I've had conversations with folks in other
3        Regions, a person name Jack Giton (ph), a woman named
4        Patricia Madison at the -- out at the Memphis FSDO.  I've
5        -- I had the same conversation I think with some folks in
6        the Regional Office also.  Naomi and I have talked, Naomi
7        Christensen and I have talked about those kinds of things
8        as well.

9   Q   When you discussed the fact that you felt that Mr. O'Neal
10       mischaracterized your discussions with him did he indicate
11       that there was any sort of a process that you could use to
12       make your feelings about it part of the process?

13  A   I honestly don't recall.  I had the conversation with him,
14       you know, my feeling is that -- but it's not a direct
15       recollection, was that we had the conversation over a
16       draft and then I was frankly surprised to see that
17       characterization in this when I revisited it.  I revisited
18       my direct affidavit which had more appropriate -- you
19       know, it was the -- a better representation of what
20       actually occurred.  And I just don't remember.  I
21       didn't.....

22  Q   I don't think we have any further questions of you at this
23       time, Mr. Duncan.

24       THE COURT:  All right.  Thank you Mr. Duncan, you're
25  excused.

KRON ASSOCIATES
1113 W. Fireweed Lane, Suite 200
Anchorage, Alaska  99503
(907) 276-3554

1      MR. DUNCAN:  Thank you.

2      THE COURT:  Do we have a rebuttal witness?

3      MR. FLEISCHER:  We have a rebuttal witness, yes.

4      THE COURT:  All right.  Let's -- we'll be off the record

5   for a few minutes.

6      THE REPORTER:  Off the record.

7      (Off record)

8      (On record)

9      THE REPORTER:  On the record.

10      THE COURT:  Mr. O'Neal, I'm Judge Fall for the EEOC.  If

11   you would stand I'll swear you in.

12      MR. O'NEAL:  Yes ma'am.

13      THE COURT:  Raise your right hand.

14      (Oath administered)

15      MR. O'NEAL:  I do.

16                      **MICHAEL O'NEAL**

17   a witness, called for examination by counsel on behalf of the

18   Complainant, was duly sworn, examined and testified as follows:

19      THE COURT:  Thank you.  Please be seated.  State your full

20   name and spell your last name for the record.

21      THE WITNESS:  My name is Michael Shawn O'Neal, that's

22   spelled O apostrophe N-E-A-L.  And the.....

23      THE COURT:  Yes.  Mr. O'Neal, the attorneys will have some

24   questions for you, I may also have some questions for you.

25      THE WITNESS:  Yes ma'am.